**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GRANT ARMSTRONG and<br>ARMSTRONG RX GP, LLC<br><br>Plaintiffs,<br><br>v.<br><br>WHITE WINSTON SELECT ASSET FUNDS, LLC<br><br>Defendant/Third-Party Plaintiff,<br><br>MCCARTER & ENGLISH, LLP<br><br>Defendant,<br><br>v.<br><br>ARMSTRONG RX II, GP, LLC and<br>ARMSTRONG RX II, LP<br><br>Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:16-cv-10666-JGD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## THIRD AMENDED COMPLAINT

**Leave to File Granted March 15, 2019 [Dkt. 112].**

This action concerns the fraudulent and predatory conduct of Defendant, White Winston Select Asset Funds, LLC ("White Winston"), regarding Plaintiffs' acquisition and operation of two pharmacies in the State of Texas. White Winston induced Plaintiffs to purchase the pharmacies with the understanding that pharmacy receivables would be available for Plaintiffs to operate the pharmacies and make payments on their acquisition-related debt to White Winston. Instead, White Winston, which controlled the receivables account, wrongfully prevented Plaintiffs from accessing those funds to induce Plaintiffs' default on loan obligations. As a result, Plaintiffs struggled to operate one pharmacy,

1

could not operate the other pharmacy, and defaulted on their related loan obligations to White Winston.

<h3 style="text-align:center"><u>PARTIES</u></h3>

1.      Plaintiff Grant Armstrong ("Armstrong") is an individual who resides in Texas.

2.      Plaintiff Armstrong RX GP, LLC ("AGP") is a limited liability company duly chartered and existing under the laws of the State of Texas, with its principal place of business in Dallas County, Texas.

3.      Defendant White Winston Select Asset Funds, LLC ("White Winston"), is a limited liability corporation organized under the laws of the State of Utah, with a principal place of business at 2150 South 1300 East, Suite 500, Salt Lake City, Utah 84106.   White Winston is registered to do business in the Commonwealth of Massachusetts and, upon information and belief, White Winston has an office in Massachusetts and maintains financial accounts and lockboxes in Boston, Massachusetts. White Winston has entered its appearance herein.

4.      Defendant McCarter & English LLP ("McCarter & English") is a limited liability corporation organized under the laws of the State of New Jersey, with a principal place of business at Four Gateway Center, 100 Mulberry Street, Newark, NJ 07102. McCarter & English is registered to do business in the Commonwealth of Massachusetts and has an office in Massachusetts at 265 Franklin Street, Boston, Massachusetts, 02110.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy is greater than $75,000.

6.      The United States District Court for the Northern District of Texas transferred this matter to this Court under 28 U.S.C. § 1404(a) in an Order dated April 6, 2016 (Document No. 24) upon an unopposed motion by White Winston (Document No. 10.).  Therefore, venue is proper in this Court.

## FACTS

### *The Plano Transaction*

7.      In January 2014, Armstrong and AGP purchased from QVL Pharmacy Holdings, Inc., ("QVL") and QVL Pharmacy #145, LP ("QVL LP") (together with QVL, the "Plano Sellers") all of the Plano Sellers' then issued and outstanding limited partner interests and general partner interests of QVL LP, which owned and operated a pharmacy in Plano, Texas (the "Plano Pharmacy").  The transaction in which Armstrong and AGP purchased such ownership interests is referred to hereinafter as the "Plano Purchase Transaction."

8.      Armstrong and AGP own and continue to operate the Plano Pharmacy.

9.      Armstrong and AGP were induced to enter into the Plano Purchase Transaction by materially false representations and omissions from White Winston and the Plano Sellers.  Upon information and belief, White Winston and the Plano Sellers are affiliated entities operating under joint control and supervision.

10.	At all times relevant to the Plano Purchase Transaction, Armstrong and AGP's only contact at White Winston was Todd Enright.  Upon information and belief, Mr. Enright is a co-founder and Partner of White Winston.

11.	As part of the Plano Purchase Transaction, Armstrong and AGP were required to sign a personal guaranty, a security agreement, a pledge of the acquired interests in AGP, and an escrow agreement for those pledged security interests.

12.	White Winston was represented in the Plano Purchase Transaction and other contemporaneous litigation by McCarter & English, LLP.  As part of the Plano Purchase Transaction, Armstrong and AGP were required to deposit security interest certificates of AGP with McCarter & English under an Escrow Agreement by and between Armstrong, AGP, White Winston, and McCarter & English, dated January 23, 2014 ("Escrow Agreement").  By the terms of Escrow Agreement it negotiated, McCarter & English was designated the escrow agent responsible for holding the pledged securities interests in AGP.

13.	As part of the Plano Purchase Transaction, Armstrong and AGP were required to sign a Transition Services Agreement with the Plano Sellers (the "Plano TSA"), under which the insurance reimbursements for prescriptions filled at the Plano Pharmacy would be paid into a "lockbox account" – located at a bank in Boston, Massachusetts and controlled by White Winston – from which certain operating expenses would be deducted by QVL and the net amount remitted to the Plano Pharmacy by QVL.

14.	White Winston, which provided the funding for Armstrong and AGP to make the Plano Purchase Transaction, assured Armstrong and AGP prior to the Plano Purchase Transaction that lockbox funds would be readily available to the Plano

Pharmacy on a monthly basis such that Armstrong and AGP could purchase pharmaceutical inventory and reasonably operate the Plano Pharmacy.

15.     In truth, however, White Winston actively mismanaged the lockbox account, failing to remit net income and/or profits to the Plano Pharmacy despite numerous requests for such by Armstrong, therefore starving the Plano Pharmacy of crucial operating capital.

16.     As a result, the Plano Pharmacy had a very difficult time operating its business and an even more difficult time making required loan payments to White Winston. These difficulties forced Armstrong to pay for roughly $100,000 of inventory for the Plano Pharmacy with his personal credit card.

17.     Around this time, Armstrong reached out to a potential business partner about opening a pharmacy in Dallas, Texas. White Winston agreed to give Armstrong and AGP a six-month forbearance based on their efforts to open a Dallas location. Such forbearance was expressly conditioned on Armstrong's purchase of a QVL pharmacy in Dallas ("the Dallas Pharmacy"). When the potential business partner declined the opportunity – and then another potential business partner followed suit – White Winston issued a notice of default to Armstrong and AGP and also arranged a meeting between Armstrong and Enright to discuss the purchase by Armstrong of the Dallas Pharmacy.

18.     During the meeting, Armstrong agreed that he would move forward on the purchase of the QVL Dallas pharmacy because of the forbearance on the Plano Pharmacy and the threatened foreclosure against that pharmacy, and because White Winston agreed to cover the costs of a marketing employee for the pharmacy and Enright promised that White Winston would include and honor a "good guy" clause in any guaranty, so that

Armstrong would be relieved of any liability in case the proposed Dallas deal did not work out. Enright further represented that Armstrong would have access to a $500,000 line of credit from White Winston to use for working capital for the Dallas location. Enright also assured Armstrong that funds from the sale of the Dallas pharmacy's inventory would be readily available for the purchase of additional inventory and the operation of the pharmacy.

19. Enright failed, however, to disclose in this meeting, or subsequently, that QVL was in serious financial trouble and teetering on the edge of bankruptcy, or that QVL had defaulted on its obligations to AmerisourceBergen Drug Corporation ("ABC"). ABC was, at the time, the major supplier of inventory to the Plano Pharmacy and the Dallas Pharmacy.

20. White Winston had previously completed a vendor negotiation to amend a $2.5 million credit agreement by and between QVL and ABC, with the intent to support QVL's near-term expansion and business development. However, by October 2013, QVL had made the decision at White Winston's direction to liquidate the business. At that time, White Winston and Enright directed QVL officers to meet with counsel selected by White Winston to execute documents to effect the liquidation. QVL officers executed the documents prepared by the counsel selected by White Winston because White Winston required QVL to do so as part of its control of QVL. The two QVL bookkeepers responsible for preparing invoices under the Plano TSA were no longer QVL employees and worked for White Winston at Enright's direction. White Winston, through Enright, made all final decisions about which QVL employees were to be laid off during the liquidation, which QVL pharmacies were to be sold and on what terms, which

QVL pharmacies were to be closed, and which were to have their ABC drug orders paid and fulfilled. Once White Winston directed QVL into liquidation, White Winston and Enright controlled QVL and all its decisions. White Winston and Enright directed QVL's attorneys, issued invoices for Transition Services to Armstrong and the Plaintiffs, and controlled all receipts and disbursements of funds. Those Transition Services invoices included, at White Winston and Enright's direction, improper charges, including but not limited to amounts not paid to vendors, Todd Enright's travel, QVL accounting fees, service of QVL's debt, financing fees for the loans provided by White Winston to the Plaintiffs, McCarter & English's legal fees, the cost of preparing materials to jointly solicit with Armstrong future investment in the Dallas Pharmacy, and for indeterminate "services billed." White Winston and Enright failed to disclose this control and the QVL liquidation to Armstrong and the Plaintiffs.

21. By December 6, 2013, QVL was $256,841 in arrears to ABC under the terms of the modification, payable on an aggressive schedule with maximum allowable interest. QVL's default impaired the ability of the pharmacies to secure adequate inventory for their operation on customary and usual financing terms. Enright further failed to disclose to Armstrong that QVL's credit arrangements with ABC were based on cumulative purchases for all of QVL's pharmacy locations, not just the two locations that were sold to Armstrong. McCarter & English represented White Winston in connection with the ABC default and the negotiation of cure and repayment of the arrears.

22. On the date of the closing of the Plano Purchase Transaction and weekly thereafter, including but not limited to on February 3, 2014, February 17, 2014, February 21, 2014, February 25, 2014, March 6, 2014, March 17, 2014, March 21, 2014, April 7,

2014, April 8, 2014, April 15, 2014, April 16, 2014, April 18, 2014, April 21, 2014, April 22, 2014, April 23, 2014, April 24, 2014, April 28, 2014, May 6, 2014, May 14, 2014, May 15, 2014, May 19, 2014, May 22, 2014, May 23, 2014, May 27, 2014, May 28, 2014, June 2, 2014, ABC blocked Armstrong and AGP's drug orders due to QVL's default, and Armstrong contacted Enright. Enright variously stated that it was not possible, he had made a payment to ABC, there was a small amount of availability, there were funds available to cover the order, he was renegotiating the terms of the ABC payment, he had directed a wire payment to ABC, and he was out of town.

23.     Enright also failed to disclose to Armstrong that White Winston held an ownership interest in QVL, had liens against QVL's assets, effectively controlled QVL's operations, and was improperly directing QVL's receipt of any income (including from the Plano Pharmacy and the Dallas Pharmacy) to pay debt purportedly owed to White Winston. All funds deposited by Armstrong and the Plaintiffs into QVL Lock Box Accounts were appropriated by White Winston to pay down QVL's debt and operating expenses. All of these facts were known to Enright and QVL, but neither Enright nor any other White Winston representative disclosed such facts to Armstrong.

24.     These were materially false representations and omissions of material facts intended to induce Armstrong to agree to purchase the Dallas Pharmacy and to sign an additional promissory note with White Winston – together with a personal guaranty – to fund the acquisition of an entity then under White Winston's ownership and/or control, which White Winston would never allow to succeed under Armstrong's ownership.

25.     Upon Armstrong's agreement to proceed with the acquisition of the Dallas Pharmacy and with full knowledge of the Plano Pharmacy's dire financial straits, White

Winston agreed in March 2014 to give Armstrong and AGP a 9-month forbearance of their loans related to the Plano Purchase Transaction. To obtain that necessary forbearance, however, White Winston required Armstrong and AGP to sign an unenforceable release of all claims related to the misconduct by White Winston that precipitated the need for that forbearance and to enter into the Dallas Pharmacy purchase.

26.     White Winston's active and intentional mismanagement of the lockbox account deprived the Plano Pharmacy of approximately $300,000 worth of net income from insurance reimbursements in just over two years.

### *The Dallas Transaction*

27.     In May 2014, Armstrong and an entity in which he formerly had an interest (Armstrong RX II GP LLC, referred to hereinafter as "AGP II") purchased from QVL and QVL Pharmacy #142 GP, LLC ("QVL GP") (together with QVL, the "Dallas Sellers") all of the Dallas Sellers' then outstanding general and Class A ownership interests in QVL Pharmacy #142, LP, a Texas limited partnership now known as Armstrong RX II, LP ("the Partnership"). The Partnership was the QVL entity, which owned the Dallas Pharmacy. The transaction in which Armstrong and AGP II purchased the ownership interests in the Partnership is referred to hereinafter as the "Dallas Purchase Transaction." McCarter & English represented White Winston in the Dallas Purchase Transaction.

28.     Upon the consummation of the Dallas Purchase Transaction, Armstrong and AGP II owned a 50.5% ownership interest in the Partnership, consisting of a 49.5% Class A limited partnership interest and a 1% general partner interest. White Winston, through an affiliate (QVL Equity Holding Group, LLC) held the remaining 49.5% Class

B limited partnership interest. Armstrong and AGP II learned after the closing of the Dallas Purchase Transaction that White Winston and the Dallas Sellers are affiliated entities operating under joint control and supervision, so that White Winston has at all relevant times controlled the operations and decision-making of the Dallas Sellers, including QVL.

29. The Dallas Purchase Transaction was initially effected through the execution of a series of documents on or about May 29, 2014, including (1) a *Partnership Interests Purchase Agreement* dated as of May 29, 2014 executed by QVL and the general partner of the Partnership as the Sellers, and Armstrong and AGP II as the Buyers ("the PIPA"), (2) a *Loan Agreement* dated as of May 29, 2014 executed by AGP II, Armstrong, and White Winston ("the Loan Agreement"), (3) a *Secured Term Promissory Note* dated as of May 29, 2014 executed by AGP II and payable to White Winston in the original principal amount of $1,000,000 ("the Initial Note"), (4) a *Revolving Line of Credit Note* dated as of May 29, 2014 executed by AGP II and payable to White Winston in the original principal amount of $500,000 (said $500,000 note, as subsequently amended, is referred to hereinafter as "the LOC Note"; the Initial Note and the LOC Note are sometimes referred to hereinafter as "the Notes"), (5) a *Transition Services Agreement* dated as of May 29, 2014 executed by QVL, the Partnership, Armstrong, and AGP II ("the TSA"), (6) a *Limited Guaranty* executed by Armstrong and dated as of May 29, 2014 ("the Armstrong Guaranty"), (7) a *Limited Guaranty* executed by AGP and dated as of May 29, 2014 ("the AGP Guaranty"), and a *Side Agreement regarding Physicians Relationship Manager Position Funding* dated May 29, 2014 ("the Side

Agreement") between QVL Pharmacy Subsidiaries Funding Group, LLC ("the Funding Group") and Armstrong.

30.    Armstrong was induced to enter into the Dallas Purchase Transaction and execute all documents in connection with such transaction by materially false representations and omissions from White Winston and the Dallas Sellers.  Those  false representations included that (1) White Winston would cover the costs of a marketing employee for the pharmacy, (2) White Winston would include and honor a "good guy" clause in any guaranty which would relieve Armstrong of any liability in case the proposed Dallas deal did not work out, (3) Armstrong and AGP II would have access to a $500,000 line of credit from White Winston to use for working capital for the Dallas location, (4) an initial draw of $100,000 would be available from that line of credit, (5) funds from the sale of the Dallas pharmacy's inventory would be readily available for the purchase of additional inventory and the operation of the pharmacy, (6) ABC would continue to supply drugs on commercially reasonable terms, and (7) the Dallas location was a "very profitable store."  White Winston failed to disclose to Armstrong, among other material facts, that (1) QVL was in serious financial trouble and teetering on the edge of bankruptcy, (2) QVL had defaulted on its obligations to ABC, (3) QVL's default impaired the ability of the pharmacy to secure adequate inventory for its operation, (4) White Winston held an ownership interest in QVL and liens against QVL's assets, (5) White Winston effectively controlled QVL's operations and decision-making, (6) White Winston was improperly directing QVL's receipt of any income (including from the Plano Pharmacy and the Dallas Pharmacy) to pay debt purportedly owed to White Winston, and (7) sales at the Dallas location were "dropping like a rock" as of May 8,

2014, immediately before the May 29, 2014 closing of the Dallas Purchase Transaction. All of these facts were known to Enright and QVL, but neither Enright nor any other White Winston representative disclosed such facts to Armstrong.

31.     As part of the Dallas Purchase Transaction, AGP II executed and delivered the Initial Note to White Winston as partial payment for the purchase of the ownership interests under the PIPA, and executed and delivered the LOC Note to obtain a purported revolving line of credit in the amount of $500,000. The $500,000 line of credit supposedly available under the LOC Note was integral to Armstrong's decision to proceed with the Dallas Pharmacy transaction because the promised funds would provide necessary operating capital for the contemplated Dallas Pharmacy.

32.     Armstrong executed and delivered the Loan Agreement as part of the Dallas Purchase Transaction and in reliance on the materially false representations and omissions from White Winston and the Dallas Sellers. The Loan Agreement required AGP II to pay all revenues and payments due to the Partnership or AGP II from the operation of the Dallas Pharmacy into a "Lock Box Account," located at a bank in Boston, Massachusetts and controlled by White Winston. White Winston assured Armstrong prior to the closing of the Dallas Purchase Transaction that funds from the Lock Box Account would be readily available to the Dallas Pharmacy on a monthly basis, so that the Partnership and AGP II could purchase pharmaceutical inventory, operate the Dallas Pharmacy, and service their debt to White Winston. That representation was material to Armstrong in his decision to execute and deliver the Loan Agreement and the other documents in connection with the Dallas Purchase Transaction, given the lockbox account problems with the Plano Pharmacy.

33. Armstrong also executed and delivered the TSA as part of the Dallas Purchase Transaction and in reliance on the materially false representations and omissions from White Winston and the Dallas Sellers. Under the TSA, QVL was required to provide all of the Dallas Pharmacy's "requested drug inventory" and "back office services, including telephone, IT, billing and switching services." Such inventory and services were to be billed to the pharmacy at QVL's actual costs. Under the TSA, moreover, QVL "or its designee" was to deduct the actual costs of the drug inventory and back office services, along with any additional "Out-of-Pocket Costs" (as defined in the TSA), from the Dallas Pharmacy's cash receivables in the Lock Box Account, and then, on a monthly basis, remit the remainder of such cash receivables to the pharmacy by wire transfer or ACH transaction. The TSA was thus consistent with, and memorialized, White Winston's pre-closing representations that funds from the sale of the Dallas Pharmacy's inventory would be readily available for the purchase of additional inventory and the operation of the pharmacy. All revenues generated by sales from the Dallas Pharmacy were paid directly into the Lock Box Account, which was solely under the control of White Winston.

34. Armstrong also executed and delivered the Side Agreement as part of the Dallas Purchase Transaction and in reliance on the materially false representations and omissions from White Winston and the Dallas Sellers. Under the Side Agreement, the Funding Group, which is an LLC managed by White Winston, agreed to pay for the cost of a physicians' relationship manager who was to be responsible for increasing awareness of the Plano Pharmacy and the Dallas Pharmacy. The Side Agreement was thus consistent with, and memorialized, White Winston's pre-closing representations that it

would cover the costs of a marketing employee for the pharmacies. The Side Agreement was expressly warranted as a "material inducement" to Plaintiffs.

35. Armstrong also executed and delivered the PIPA as part of the Dallas Purchase Transaction and in reliance on the materially false representations and omissions from White Winston and the Dallas Sellers. In the PIPA, QVL expressly represented, *inter alia*, that (1) the aggregate amount of debt related to the assets and contracts of QVL was $21,475.09 (2) QVL had no material contracts other than a disclosed real estate lease, and (3) all debt of QVL and its affiliates (including the Partnership) that was secured by QVL's assets or the ownership interests transferred to Armstrong and AGP II had been released contemporaneously with the closing of the Dallas Purchase Transaction. Each such representation was false at the time it was made, and was knowingly made by QVL with the knowledge of and at the instance and direction of White Winston, to fraudulently induce Armstrong and AGP II to enter into the Dallas Purchase Transaction. Armstrong learned weeks after the closing of such transaction that (1) QVL and its affiliates were indebted to ABC for more than $2,000,000, (2) QVL and its affiliates were in default in their obligations to ABC, (3) such obligations were secured by the assets of QVL and its affiliates, and (4) such debts had not been released contemporaneously with the Dallas Purchase Transaction closing. On July 28, 2014, in fact, the Partnership was forced to sign a note to ABC for an additional $204,461.60 to prevent ABC from exercising its rights under its security documents with QVL. Armstrong would not have entered into the Dallas Purchase Transaction had he known the true facts concerning QVL's debt with ABC.

36.     At the closing of the Dallas Purchase Transaction, without adequate notice or warning to Armstrong or AGP II, the LOC Note was drawn by 93 percent ($465,582.90) due to closing costs, amounts due to White Winston in the transaction, and a difference between the Initial Note amount and the purchase price.  This decimated AGP II's presumed operating capital for the Dallas Pharmacy from the outset and prevented the $100,000 initial draw. On June 12, 2014, Armstrong wrote Enright stating that working capital was needed to pay employees, begin compounding pharmaceuticals and pay insurance. Enright responded that Armstrong could not make the initial draw of $100,000.

37.     Almost immediately, this forced AGP II to seek a $250,000 increase to the LOC Note (the "Amended LOC") for operating capital, for which White Winston – capitalizing on AGP II's, the Partnership's, and Armstrong's economic distress – demanded a full release of all claims potentially related to the Dallas Purchase Transaction, the Loan Agreement, the Initial Note, the LOC Note, and even the Amended LOC.

38.     White Winston proposed and required this unenforceable release from Armstrong, AGP II, and the Partnership with full knowledge that AGP II (1) almost certainly would default on the Loan Agreement, the Initial Note, and the LOC Note without the Amended LOC due to White Winston's treatment of the Dallas Purchase Transaction and (2) had no meaningful choice but to secure the Amended LOC due to the Loan Agreement's restrictions on the parties' ability to obtain outside financing.

39.     Armstrong, AGP II, and the Partnership believed they would be able to pay down the LOC Note and the Amended LOC with insurance reimbursements from the

high volume of prescriptions they anticipated the Dallas Pharmacy would fill, based on prior representations by White Winston concerning their access to that revenue through the Lock Box Account arrangement.

40.     The ready access to capital from the Lock Box Account that Enright promised prior to the Dallas Purchase Transaction became even more essential after the only partially remediated decimation of the LOC Note at closing.  Without regular and ready access to its net income from accounts receivable, the Dallas Pharmacy would be unable to pay its distributors and would fail.

41.     This situation was exacerbated by the Partnership's having to assume a significant portion of QVL's cumulative debt across its pharmacies to ABC, and by White Winston's conduct, misrepresentations, and omissions in connection with that debt.  When QVL, White Winston, and ABC were forcing the Partnership to sign a note for $204,461.60 to ABC, Enright assured Armstrong that the principal balance of the LOC Note would be reduced by that amount, so long as the Partnership formally assumed the ABC debt.  Contrary to Enright's assurances, White Winston never reduced the LOC Note by the ABC debt assumed by the Partnership.

42.     ABC subsequently changed the payment terms of the Partnership's note, such that payments were due bi-weekly as opposed to monthly.  Because insurance reimbursements follow at least a month after each prescription, the new terms with ABC put increased demands on the Partnership's operating capital.  Moreover, because Armstrong was a common owner of the Dallas Pharmacy and the Plano Pharmacy, ABC also changed its credit terms for the Plano Pharmacy, which, under a subsequent workout agreement, is now paying off its $300,000 debt to ABC at $15,000 per month.

43.     QVL's default on its obligations to ABC resulted in blocked orders to the Dallas Pharmacy. During the first month of operation and monthly afterwards, including, but not limited to on June 18, 2014, June 24, 2014, June 25, 2014, July 1, 2014, and August 6, 2014, September 16, 2014, September 30, 2014, October 1, 2014, October 29, 2015, January 5, 2015, January 9, 2015, January 12, 2015, Armstrong informed Enright that orders for Dallas were held or blocked. Enright variously replied that the wire had gone out, it was going out, or that it was misapplied. Meanwhile, Enright was continuously attempting to negotiate repayment of QVL's arrears to ABC, which repayment and allocation of debt he and White Winston entirely controlled. At all relevant times, White Winston acted at its sole discretion as agent for QVL in conducting these negotiations with ABC. When Enright and White Winston appropriated receivables from the Dallas Pharmacy to satisfy QVL's debt to ABC, Enright and White Winston represented that those receivables would be applied towards the Dallas Purchase Transaction obligations. These funds were never applied towards those obligations.

44.     White Winston's control of the Lock Box Account, to which the Dallas Pharmacy was required to pay all of its revenues, gave White Winston control over the Dallas Pharmacy's day-to-day operations. White Winston prevented QVL from remitting the monthly net receivables from the Lock Box Account to the Partnership as required by the TSA. White Winston caused QVL not to pay the Dallas Pharmacy's operating costs and apparently diverted funds to itself, rather than to the Partnership. By the end of 2014 alone, by White Winston's own calculation, Armstrong was due approximately $159,000 under the Plano TSA and $62,000 under the Dallas TSA. At White Winston's direction, Armstrong did not receive from QVL and has not received the amounts due him under

the TSAs. Upon information and belief, White Winston caused QVL to generate false reports to the Partnership, in which QVL billed the Partnership for services provided to the Dallas Pharmacy but then failed to pay the entities actually providing the billed services, or in which QVL billed the Partnership for services never provided to the Dallas Pharmacy. White Winston actively utilized the Lock Box Account to starve the Dallas Pharmacy of operating capital and therefore induced AGP II's default, with an eye to recovering from its guarantors and profit from any recovered collateral.

45.     The Dallas location could never satisfy its debt obligations with Enright and White Winston withholding amounts due under the Transition Services Agreement while charging multiple months of monitoring, accounting, and financing fees, even though QVL had provided no financing whatsoever in any transaction and was not a party to any of the financing agreements.

46.     Armstrong has since learned that rather than the Dallas Pharmacy's revenues going into an independent Lock Box Account, White Winston actively commingled revenues generated by all QVL pharmacies among Lock Box Accounts. White Winston had sole management of these Lock Box Accounts for all QVL pharmacies, as the only two signatories for the Lock Box Accounts were Enright and another White Winston agent. Funds were improperly drawn from these White Winston controlled accounts and transferred to other accounts in the exclusive control of White Winston, including to accounts in the name of QVL and its affiliated entities and accounts in the name of White Winston.

47.     At all relevant times, Enright and White Winston had exclusive control over those Lock Box Accounts, and no QVL employee or consultant acting at the

direction of Enright and White Winston had access to those accounts despite requests for such by certain QVL employees. Decisions regarding amounts released to vendors, customers, and insurance companies were all made by Enright and White Winston. White Winston and Enright prevented Armstrong and AGP II from receiving the services contemplated by that agreement by refusing to pay vendors, including software vendors, payroll vendors, shipping services vendors, and inventory management vendors. White Winston affirmatively misrepresented to the Plaintiffs and to Armstrong that it had paid vendors when it had not. White Winston's control was not disclosed to Armstrong.

48. White Winston's stranglehold so deprived the Dallas Pharmacy of necessary operating funds that Armstrong personally obtained a $100,000 loan from a third-party lender and invested those funds into inventory for the Dallas Pharmacy, which otherwise could not afford to stock its shelves. The Dallas Pharmacy's insurance reimbursements from that inventory, however, went with the rest of its revenue to the Lock Box Account, which White Winston would not disburse to the Dallas Pharmacy in a deliberate effort to strangle the Dallas Pharmacy of sufficient operating income.

49. Armstrong offered to Enright that $300,000 due to the Plano Pharmacy from its lockbox account could be applied to the Dallas Pharmacy, but White Winston refused to allow it, despite Armstrong's common ownership of both pharmacies.

50. Under the Deposit Account Control Agreement, Armstrong was entitled to periodic account statements from the Lock Box Account. Armstrong did not receive periodic account statements.

### *The Dallas Guaranties*

51.     As part of the Dallas Purchase Transaction and in reliance on the materially false representations and omissions from White Winston and the Dallas Sellers, Plaintiffs also executed two separate guaranties in favor of White Winston. White Winston and the Dallas Sellers induced Armstrong to execute and deliver the Armstrong Guaranty, pursuant to which Armstrong guaranteed certain of AGP II's obligations to White Winston, including those in connection with the Dallas Purchase Transaction and under the Notes.  The Armstrong Guaranty contains an express provision (the "Armstrong Release Clause"), which Enright referred to as a "good guy clause." That clause provides that Armstrong "shall be fully released and discharged from his obligations under [the Armstrong Guaranty] and the other [Purchase] Transaction Documents" if Armstrong (1) "fully cooperates with [White Winston] in turning over to [White Winston] all of [Armstrong's] right, title, and interest in the outstanding ownership interest in [AGP II] and [the Dallas Pharmacy], and in causing [AGP II] to turn over all of its assets…[to White Winston]", and (2) takes certain other actions.

52.     White Winston and the Dallas Sellers also induced AGP to execute and deliver  the AGP Guaranty, pursuant to which AGP guaranteed certain of AGP II's obligations to White Winston, including those in connection with the Dallas Purchase Transaction and under the Notes.  The AGP Guaranty contains an express provision (the "AGP Release Clause") which provides that AGP shall be released and discharged from all but the principal amount of $75,000 (plus interest and fees) under the Notes if AGP "to the extent able, fully cooperates with [White Winston] in turning over to [White Winston] all of [AGP II's] assets" and takes certain other actions.  Enright also referred

to the AGP Release Clause as a "good guy clause." White Winston released the AGP Guaranty by written agreement dated September 2, 2014, in connection with Plaintiffs' payoff of the loan agreement related to the Plano Purchase Transaction. Immediately after the Plaintiffs satisfied the loan agreement related to the Plano Purchase Transaction, White Winston and Enright directed McCarter & English not to furnish the Plano interest certificates that were held in escrow by McCarter & English as security for the Plano Purchase Transaction. Preston State Bank, which financed the payoff of the loan agreement related to the Plano Purchase Transaction, expressly negotiated with White Winston the written release agreement to release the interest in the Plano pharmacy. McCarter & English, although ostensibly a fiduciary to both Armstrong and White Winston, acted solely at White Winston's direction and did not include Armstrong in any correspondence relating to the Plano interest certificates.

53.     As described above, White Winston and the Dallas Sellers induced Plaintiffs to execute and deliver the AGP Guaranty and the Armstrong Guaranty through materially false misrepresentations and omissions. Included in those misrepresentations was Enright's representation to Armstrong that the "good guy clauses" memorialized in the Armstrong Release Clause and the AGP Release Clause would operate to relieve Armstrong and AGP from liability if the Dallas Pharmacy failed. Armstrong and AGP would not have executed their respective guaranties had Enright not made such representation.

54.     On or about December 8, 2015, Armstrong and AGP II assigned their respective membership interests in AGP II and the Partnership to White Winston and otherwise fully complied with all of their obligations under the Armstrong Release

Clause and the AGP Release Clause. Prior to the assignment, Armstrong affirmatively sought out potential investors and purchasers for the Dallas pharmacy, yet White Winston obstructed these efforts by failing to prepare the necessary financial documentation required for those purchasers to timely evaluate the potential purchase. White Winston and Enright obstructed these efforts while representing to Armstrong that Armstrong and White Winston each owned half of the Dallas Pharmacy. White Winston accordingly did not intend to permit Armstrong to satisfy the release clauses. Armstrong and AGP II ultimately assigned their respective interests only after Armstrong's efforts to inject personal funds into the Dallas pharmacy were unsuccessful in reversing the effects of White Winston's conduct, and only after White Winston on multiple occasions wrongfully refused Armstrong's multiple requests to release funds from the Lock Box Account and the LOC Note. Although Armstrong has complied with and fulfilled all of his obligations under the Armstrong Release Clause, and although all conditions precedent to White Winston's performance under the Armstrong Release Clause have occurred, been fulfilled, or been waived, White Winston refuses to honor the Armstrong Release Clause and will not comply with its obligations thereunder. Instead, White Winston has engaged in aggressive litigation against Plaintiffs and the entities related to the Dallas Purchase Transaction, in an unlawful attempt to reap the financial bounty of the traps it set.

55. On April 6, 2016, McCarter & English entered an appearance in this action representing White Winston. McCarter & English did not withdraw from the action until it had moved on White Winston's behalf to dismiss the Amended Complaint and the Second Amended Complaint. Dkts. 37, 61, 74, 88.

56.     On July 9, 2018, Armstrong demanded from White Winston payments for patient prescriptions due to Armstrong from the Department of Labor Black Lung Program that White Winston had, during the pendency of the litigation, continued to collect.  White Winston has refused to furnish those payments to Armstrong.

57.     On February 15, 2019, Armstrong and White Winston both demanded the security certificates pledged in the Plano Transaction from McCarter & English.   On February 20, 2019, McCarter & English stated that it would continue to hold the certificates until it received joint instructions from the parties, or an order from a court of competent jurisdiction directing delivery of the escrowed documents.

## COUNT ONE
*(Declaratory Judgment – Armstrong Guaranty)*

58.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 57, above.

59.     An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties, and that controversy is ripe for adjudication because White Winston refuses to release Armstrong from the Armstrong Guaranty, despite Armstrong's compliance with, and fulfillment of, all of his obligations under the Armstrong Release Clause.  All conditions precedent to White Winston's performance under the Armstrong Release Clause have occurred, been fulfilled, or been waived.

60.     White Winston refuses to honor the Armstrong Release Clause and will not comply with its obligations thereto.

61.     Armstrong has complied fully with the Armstrong Release Clause and therefore requests that the Court declare him to be released in full from all liability under the Armstrong Guaranty.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT TWO
*(Fraudulent Inducement – Armstrong Guaranty)*

62.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 61, above.

63.     Prior to the closing of the Dallas Purchase Transaction, White Winston fraudulently induced Armstrong to execute the Armstrong Guaranty despite the funding difficulties experienced by the Plano Pharmacy by making false representations of material facts and failing to disclose material facts concerning the transaction.  White Winston's misrepresentations of material facts  made through Enright included that (1) White Winston would cover the costs of a marketing employee for the pharmacy, (2) White Winston would include and honor a "good guy" clause in any guaranty which would relieve Armstrong of any liability in case the proposed Dallas deal did not work out, (3) Armstrong and AGP II would have access to a $500,000 line of credit from White Winston to use for working capital for the Dallas location, (4) an initial draw of $100,000 would be available from that line of credit, (5) funds from the sale of the Dallas pharmacy's inventory would be readily available for the purchase of additional inventory and the operation of the pharmacy, (6) ABC would continue to supply drugs on commercially reasonable terms, and (7) the Dallas location was a "very profitable store." White Winston also caused QVL to make false representations of material facts to Armstrong, including that (1) the aggregate amount of debt related to the assets and contracts of QVL was $21,475.09, (2) QVL had no material contracts other than a disclosed real estate lease, and (3) all debt of QVL and its affiliates (including the

Partnership) that was secured by QVL's assets or the ownership interests transferred to Armstrong and AGP II had been released contemporaneously with the closing of the Dallas Purchase Transaction. Each such representation was false at the time it was made, and was knowingly made by QVL with the knowledge of and at the instance and direction of White Winston. White Winston and QVL knew these representations were false at the time they communicated them to Armstrong, but nevertheless intentionally made them with the intent that Armstrong would rely on them and execute the Armstrong Guaranty in connection with the Dallas Purchase Transaction.

64.     White Winston also failed to disclose material facts to Armstrong concerning the Dallas Purchase Transaction, including that (1) QVL was in serious financial trouble and teetering on the edge of bankruptcy, (2) QVL and its affiliates owed more than $2,000,000 to ABC, (3) QVL and its affiliates had defaulted on their obligations to ABC, (4) the obligations of QVL and its affiliates to ABC were secured by the assets of QVL and its affiliates, (5) that default impaired the ability of the Dallas Pharmacy to secure adequate inventory for its operation, (6) the obligations to ABC had not been released contemporaneously with the closing of the Dallas Purchase Transaction, (7) White Winston held an ownership interest in QVL and liens against QVL's assets, (8) White Winston effectively controlled QVL's operations and decision-making, (9) White Winston was improperly directing QVL's receipt of any income (including from the Plano Pharmacy and the Dallas Pharmacy) to pay debt purportedly owed to White Winston, and (10) sales at the Dallas location were "dropping like a rock" at the time of the closing of the Dallas Purchase Transaction. All of these facts were known to White Winston at the time of the Dallas Purchase Transaction, but it

intentionally failed to disclose such facts to Armstrong, to fraudulently induce Armstrong to execute the Armstrong Guaranty.

65.     As a direct and proximate result of the fraudulent inducement, Armstrong was caused to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

**<u>COUNT THREE</u>**
*(Breach of Implied Covenant of Good Faith and Fair Dealing – Armstrong Guaranty)*

66.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 65 above as if fully set forth herein.

67.     The Armstrong Guaranty includes the implied covenant of good faith and fair dealing.

68.     Pursuant to the Armstrong Guaranty, White Winston promised to carry out the purposes of the agreement in good faith and promised not to engage in any conduct that would frustrate or defeat its purposes or purposefully injure his right to obtain the benefit of the contract.

69.     By reason of the conduct complained of, White Winston has breached the implied covenant of good faith and fair dealing in the Armstrong Guaranty.

70.     White Winston's breach of the implied covenant of good faith and fair dealing has denied Armstrong the benefits of the Armstrong Guaranty and has otherwise damaged Armstrong in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT FOUR
*(Fraudulent Inducement – Loan Agreement)*

71.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 70 above as if fully set forth herein.

72.     Prior to the closing of the Dallas Purchase Transaction, White Winston fraudulently induced Armstrong to execute the Loan Agreement by making false representations of material facts and failing to disclose material facts concerning the transaction.  White Winston's misrepresentations of material facts  made through Enright included that that (1) White Winston would cover the costs of a marketing employee for the pharmacy, (2) White Winston would include and honor a "good guy" clause in any guaranty which would relieve Armstrong of any liability in case the proposed Dallas deal did not work out, (3) Armstrong and AGP II would have access to a $500,000 line of credit from White Winston to use for working capital for the Dallas location, (4) an initial draw of $100,000 would be available from that line of credit, (5) funds from the sale of the Dallas pharmacy's inventory would be readily available for the purchase of additional inventory and the operation of the pharmacy, (6) ABC would continue to supply drugs on commercially reasonable terms, (7) the Dallas location was a "very profitable store," and (8) funds appropriated from the Dallas Pharmacy by QVL to cure its default on ABC obligations would be applied towards the Dallas Purchase Transaction obligations. White Winston also caused QVL to make false representations of material facts to Armstrong including that (1) the aggregate amount of debt related to the assets and contracts of QVL was $21,475.09, (2) QVL had no material contracts other than a disclosed real estate lease, and (3) all debt of QVL and its affiliates (including the Partnership) that was secured by QVL's assets or the ownership interests transferred to

Armstrong and AGP II had been released contemporaneously with the closing of the Dallas Purchase Transaction. Each such representation was false at the time it was made, and was knowingly made by QVL with the knowledge of and at the instance and direction of White Winston. White Winston and QVL knew these representations were false at the time they communicated them to Armstrong, but nevertheless intentionally made them with the intent that Armstrong would rely on them and execute the Loan Agreement in connection with the Dallas Purchase Transaction.

73. White Winston also failed to disclose material facts to Armstrong concerning the Dallas Purchase Transaction, including that (1) QVL was in serious financial trouble and teetering on the edge of bankruptcy, (2) QVL and its affiliates owed more than $2,000,000 to ABC, (3) QVL and its affiliates had defaulted on their obligations to ABC, (4) the obligations of QVL and its affiliates to ABC were secured by the assets of QVL and its affiliates, (5) that default impaired the ability of the Dallas Pharmacy to secure adequate inventory for its operation, (6) the obligations to ABC had not been released contemporaneously with the closing of the Dallas Purchase Transaction, (7) White Winston held an ownership interest in QVL and liens against QVL's assets, (8) White Winston effectively controlled QVL's operations and decision-making, (9) White Winston was improperly directing QVL's receipt of any income (including from the Plano Pharmacy and the Dallas Pharmacy) to pay debt purportedly owed to White Winston, and (10) sales at the Dallas location were "dropping like a rock" at the time of the closing of the Dallas Purchase Transaction. All of these facts were known to White Winston at the time of the Dallas Purchase Transaction, but it

intentionally failed to disclose such facts to Armstrong to fraudulently induce him to execute the Loan Agreement.

74.     Armstrong would not have entered into the Loan Agreement had White Winston not made the described misrepresentations and omissions.

75.     As a direct and proximate result of the fraudulent inducement, Armstrong was caused to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT FIVE

*(Fraudulent Inducement – PIPA)*

76.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 75 above as if fully set forth herein.

77.     Prior to the closing of the Dallas Purchase Transaction, White Winston fraudulently induced Armstrong to execute the PIPA by making false representations of material facts and failing to disclose material facts concerning the transaction.  White Winston's misrepresentations of material facts made through Enright included that that (1) White Winston would cover the costs of a marketing employee for the pharmacy, (2) White Winston would include and honor a "good guy" clause in any guaranty which would relieve Armstrong of any liability in case the proposed Dallas deal did not work out, (3) Armstrong and AGP II would have access to a $500,000 line of credit from White Winston to use for working capital for the Dallas location, (4) an initial draw of $100,000 would be available from that line of credit, (5) funds from the sale of the Dallas pharmacy's inventory would be readily available for the purchase of additional inventory and the operation of the pharmacy, (6) ABC would continue to supply drugs on

commercially reasonable terms, (7) the Dallas location was a "very profitable store," and (8) funds appropriated from the Dallas Pharmacy by QVL to cure its default on ABC obligations would be applied towards the Dallas Purchase Transaction obligations. White Winston also caused QVL to make false representations of material facts to Armstrong including that (1) the aggregate amount of debt related to the assets and contracts of QVL was $21,475.09, (2) QVL had no material contracts other than a disclosed real estate lease, and (3) all debt of QVL and its affiliates (including the Partnership) that was secured by QVL's assets or the ownership interests transferred to Armstrong and AGP II had been released contemporaneously with the closing of the Dallas Purchase Transaction. Each such representation was false at the time it was made, and was knowingly made by QVL with the knowledge of and at the instance and direction of White Winston. White Winston and QVL knew these representations were false at the time they communicated them to Armstrong, but nevertheless intentionally made them with the intent that Armstrong would rely on them and execute the PIPA in connection with the Dallas Purchase Transaction.

78.     White Winston also failed to disclose material facts to Armstrong concerning the Dallas Purchase Transaction, including that (1) QVL was in serious financial trouble and teetering on the edge of bankruptcy, (2) QVL and its affiliates owed more than $2,000,000 to ABC, (3) QVL and its affiliates had defaulted on their obligations to ABC, (4) the obligations of QVL and its affiliates to ABC were secured by the assets of QVL and its affiliates, (5) that default impaired the ability of the Dallas Pharmacy to secure adequate inventory for its operation, (6) the obligations to ABC had not been released contemporaneously with the closing of the Dallas Purchase

Transaction, (7) White Winston held an ownership interest in QVL and liens against QVL's assets, (8) White Winston effectively controlled QVL's operations and decision-making, (9) White Winston was improperly directing QVL's receipt of any income (including from the Plano Pharmacy and the Dallas Pharmacy) to pay debt purportedly owed to White Winston, and (10) sales at the Dallas location were "dropping like a rock" at the time of the closing of the Dallas Purchase Transaction. All of these facts were known to White Winston at the time of the Dallas Purchase Transaction, but it intentionally failed to disclose such facts to Armstrong to fraudulently induce him to execute the PIPA.

79.     Armstrong would not have entered into the PIPA had White Winston not made the described misrepresentations and omissions.

80.     As a direct and proximate result of the fraudulent inducement, Armstrong was caused to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT SIX
*(Fraudulent Inducement – TSA)*

81.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 80 above as if fully set forth herein.

82.     Prior to the closing of the Dallas Purchase Transaction, White Winston fraudulently induced Armstrong to execute the TSA by making false representations of material facts and failing to disclose material facts concerning the transaction. White Winston's misrepresentations of material facts made through Enright included that (1) White Winston would cover the costs of a marketing employee for the pharmacy, (2)

White Winston would include and honor a "good guy" clause in any guaranty which would relieve Armstrong of any liability in case the proposed Dallas deal did not work out, (3) Armstrong and AGP II would have access to a $500,000 line of credit from White Winston to use for working capital for the Dallas location, (4) an initial draw of $100,000 would be available from that line of credit, (5) funds from the sale of the Dallas pharmacy's inventory would be readily available for the purchase of additional inventory and the operation of the pharmacy, (6) ABC would continue to supply drugs on commercially reasonable terms, (7) the Dallas location was a "very profitable store," and (8) funds appropriated from the Dallas Pharmacy by QVL to cure its default on ABC obligations would be applied towards the Dallas Purchase Transaction obligations    White Winston also caused QVL to make false representations of material facts to Armstrong including that (1) the aggregate amount of debt related to the assets and contracts of QVL was $21,475.09, (2) QVL had no material contracts other than a disclosed real estate lease, and (3) all debt of QVL and its affiliates (including the Partnership) that was secured by QVL's assets or the ownership interests transferred to Armstrong and AGP II had been released contemporaneously with the closing of the Dallas Purchase Transaction.   Each such representation was false at the time it was made, and was knowingly made by QVL with the knowledge of and at the instance and direction of White Winston.   White Winston and QVL knew these representations were false at the time they communicated them to Armstrong, but nevertheless intentionally made them with the intent that Armstrong would rely on them and execute the TSA in connection with the Dallas Purchase Transaction.

83. White Winston also failed to disclose material facts to Armstrong concerning the Dallas Purchase Transaction, including that (1) QVL was in serious financial trouble and teetering on the edge of bankruptcy, (2) QVL and its affiliates owed more than $2,000,000 to ABC, (3) QVL and its affiliates had defaulted on their obligations to ABC, (4) the obligations of QVL and its affiliates to ABC were secured by the assets of QVL and its affiliates, (5) that default impaired the ability of the Dallas Pharmacy to secure adequate inventory for its operation, (6) the obligations to ABC had not been released contemporaneously with the closing of the Dallas Purchase Transaction, (7) White Winston held an ownership interest in QVL and liens against QVL's assets, (8) White Winston effectively controlled QVL's operations and decision-making, (9) White Winston was improperly directing QVL's receipt of any income (including from the Plano Pharmacy and the Dallas Pharmacy) to pay debt purportedly owed to White Winston, and (10) sales at the Dallas location were "dropping like a rock" at the time of the closing of the Dallas Purchase Transaction. All of these facts were known to White Winston at the time of the Dallas Purchase Transaction, but it intentionally failed to disclose such facts to Armstrong to fraudulently induce him to execute the TSA.

84. Armstrong would not have entered into the TSA had White Winston not made the described misrepresentations and omissions.

85. As a direct and proximate result of the fraudulent inducement, Armstrong was caused to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT SEVEN
*(Breach of Implied Covenant of Good Faith and Fair Dealing – PIPA)*

86.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 85 above as if fully set forth herein.

87.     The PIPA includes the implied covenant of good faith and fair dealing.

88.     Pursuant to the PIPA, White Winston promised to carry out the purposes of the agreement in good faith and promised not to engage in any conduct that would frustrate or defeat its purposes or purposefully injure Armstrong's right to obtain the benefit of the contract.

89.     By reason of the conduct complained of, White Winston has breached the implied covenant of good faith and fair dealing in the PIPA.

90.     White Winston's breach of the implied covenant of good faith and fair dealing has denied Armstrong the benefits of the PIPA and has otherwise damaged Armstrong in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT EIGHT
*(Breach of Implied Covenant of Good Faith and Fair Dealing – Loan Agreement)*

91.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 90 above as if fully set forth herein.

92.     The Loan Agreement includes the implied covenant of good faith and fair dealing.

93.     Pursuant to the Loan Agreement, White Winston promised to carry out the purposes of the agreement in good faith and promised not to engage in any conduct that

would frustrate or defeat its purposes or purposefully injure Armstrong's right to obtain the benefit of the contract.

94. By reason of the conduct complained of, White Winston has breached the implied covenant of good faith and fair dealing in the Loan Agreement.

95. White Winston's breach of the implied covenant of good faith and fair dealing has denied Armstrong the benefits of the Loan Agreement and has otherwise damaged Armstrong in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT NINE
### *(Breach of Contract – Loan Agreement)*

96. Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 95 above as if fully set forth herein.

97. White Winston, by and through the conduct complained above, breached the Loan Agreement by starving the Dallas Pharmacy of the funds required for it to operate and instead keeping the funds in the Lock Box Account and/or improperly diverting such funds to its own use.

98. Armstrong performed his obligations under the Loan Agreement and caused related payments to be made to White Winston to the extent possible given White Winston's breach.

99. As a direct and proximate result of White Winston's breach, Armstrong was caused to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT TEN
### *(Fraudulent Misrepresentation)*

100.    Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 99 above.

101.    White Winston convinced Plaintiffs to undertake the Dallas Purchase Transaction, despite the funding difficulties experienced by the Plano Pharmacy, through the false representations and failure to disclose material facts described above.  White Winston knew such representations were false when they were made, but nevertheless communicated them to Armstrong and AGP with the intention of causing Plaintiffs to rely on them and enter into the Dallas Purchase Transaction.

102.    Enright intended for Plaintiffs to rely on these misrepresentations and omissions and undertake the Dallas Purchase Transaction with White Winston and the Dallas Sellers.

103.    Contrary to Enright's misrepresentations, the Dallas Pharmacy did not receive ready access to reimbursements from the Lock Box Account, and White Winston has pursued the Plaintiffs' related guaranties aggressively despite Plaintiffs' compliance with all obligations required for their release therefrom.

104.    As a direct and proximate result of White Winston's misrepresentations, Plaintiffs were caused to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT ELEVEN
### *(Breach of Fiduciary Duty – Armstrong Guaranty)*

105.    Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 104 above as if fully set forth herein.

106.    The Loan Agreement, through the required Lock Box Account held in White Winston's name for the benefit of AGP II, provided White Winston with control over the Dallas Pharmacy's revenue and therefore control over the Dallas Pharmacy's day-to-day management and operations. Under the Loan Agreement and by the acts and conduct described herein, White Winston exercised such control.

107.    By virtue of this control, White Winston owed a duty of care to Armstrong as guarantor of AGP II's obligations to White Winston under the Loan Agreement, the Initial Note, the Amended Note, and the LOC Note.

108.    Further, White Winston knew that Armstrong reposed his trust, confidence and reliance with White Winston concerning the Lock Box Account because Enright assured Armstrong that funds would be readily available to the Dallas Pharmacy on a monthly basis from the Lock Box Account such that AGP II and the Partnership could purchase pharmaceutical inventory, operate the Dallas Pharmacy, and could service their debt to White Winston.

109.    Through the conduct described above, White Winston breached its duties of care and loyalty to Armstrong.

110.    As a direct and proximate result of White Winston's breach, Armstrong was caused to suffer damages, in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT TWELVE
*(Violation of G.L. c. 93A)*

111.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 110 above as if fully set forth herein.

112.     White Winston is engaged in commerce within the meaning of G.L. c. 93A.

113.     Through its conduct complained above, White Winston has engaged in unfair and deceptive conduct in violation of G.L. c. 93A, §§ 2 and 11.

114.     White Winston's conduct was willful and knowing.

115.     The unfair and deceptive conduct and acts described herein occurred primarily and substantially in the Commonwealth of Massachusetts.

116.     As a direct and proximate result of White Winston's unfair and deceptive conduct, Plaintiffs have suffered and will continue to suffer harm in an amount to be determined at the trial of this action.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT THIRTEEN
*(Tortious Interference with Contract – TSA)*

117.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 116 above as if fully set forth herein.

118.     At all times relevant hereto, the TSA constituted a valid and existing contract between QVL and Armstrong.  At all times relevant hereto, White Winston effectively controlled QVL's operations and decision-making.

119.    White Winston willfully and intentionally interfered with the TSA by preventing QVL from remitting the monthly net receivables from the Lock Box Account to the Partnership as required by the TSA.  White Winston used improper means and methods in causing QVL to not pay the Dallas Pharmacy's operating costs and apparently diverted funds to itself, rather than to the Partnership.  Upon information and belief, White Winston caused QVL to generate false reports to the Partnership, in which QVL billed the Partnership for services provided to the Dallas Pharmacy but then failed to pay the entities actually providing the billed services.

120.    Such interference proximately caused injury to Armstrong.  Armstrong has incurred actual damage or loss as a result of White Winston's conduct.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT FOURTEEN
*(Tortious Interference with Contract – Side Agreement)*

121.    Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 120 above as if fully set forth herein.

122.    At all times relevant hereto, the Side Agreement constituted a valid and existing contract between the Funding Group and Armstrong.  At all times relevant hereto, although a separate entity, White Winston was, upon information and belief, effectively controlling its operations and decision-making.

123.    White Winston willfully and intentionally interfered with the Side Agreement by preventing the Funding Group from paying for the cost of a physicians' relationship manager to be responsible for increasing the awareness of the Dallas Pharmacy and the Plano Pharmacy.  White Winston employed improper means and

methods to ensure that the Funding Group would not pay for a physicians' relationship manager to induce Armstrong's default on the Dallas Pharmacy loans.

124.    Such interference proximately caused injury to Armstrong.  Armstrong has incurred actual damage or loss as a result of White Winston's conduct.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT FIFTEEN
*(Right to Accounting of Lock Box Account – Deposit Account Control Agreement and under the Court's Equitable Powers)*

125.    Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 124 above as if fully set forth herein.

126.    The Deposit Account Control Agreement granted the Plaintiffs a right to periodic account statements relating to the Lock Box Accounts.

127.    Contrary to White Winston's representations, it commingled revenues from all QVL pharmacies in Lock Box Accounts.

128.    Plaintiffs require an accounting of the Lock Box Accounts because of White Winston's wrongful commingling of all QVL pharmacies revenue and its operation of the Lock Box Accounts in a manner that starved Plaintiffs of operating income for the Dallas Pharmacy.

129.    The complexity of the commercial transactions further warrants an accounting under the Court's equitable powers.

## COUNT SIXTEEN
*(Negligent Misrepresentation)*

130.    Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 129 above.

131.    White Winston, in the course of its business, supplied false information and material omissions for the guidance of the Plaintiffs in their business transactions with White Winston.  Specifically, White Winston convinced Plaintiffs to undertake the Dallas Purchase Transaction, despite the funding difficulties experienced by the Plano Pharmacy, through the false representations and failure to disclose material facts described above.

132.    White Winston convinced Plaintiffs to enter into the Dallas Purchase Transaction with White Winston as lender, through false representations and material omissions described above. White Winston  knew or should have known that the Dallas Pharmacy would encounter the same funding issues as the Plano Pharmacy, but nevertheless communicated the opposite to Armstrong with the intention of causing Plaintiffs to rely on it  and enter into the Dallas Purchase Agreement.

133.    Such false information and material omissions by White Winston caused and resulted in pecuniary loss to the Plaintiffs by their justifiable reliance on such information and omissions, and with White Winston's failure to exercise reasonable care or competence in both obtaining and communicating the information to the Plaintiffs.

134.    As a direct and proximate result of White Winston's misrepresentations, Plaintiffs were caused to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## COUNT SEVENTEEN
*(Declaratory Judgment – Escrow Agreement)*

135.    Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 – 134 above.

136.     An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties, and that controversy is ripe for adjudication because McCarter & English has been serving as Escrow Agent under the Escrow Agreement by and among the Plaintiffs, Armstrong and AGP, as Pledgors, and the defendant, White Winston, as Lender, while also representing White Winston in the instant litigation, creating a conflict of interest.  McCarter & English represented White Winston during the Plano Purchase Transaction, the Dallas Purchase Transaction, during the ABC renegotiations, and in other contemporaneous litigation.  McCarter & English entered an appearance for White Winston and brought affirmative claims in this matter on April 6, 2016.  McCarter & English cannot act in a fiduciary capacity for both parties as Escrow Agent to the Escrow Agreement between the plaintiffs and defendant.

137.     Moreover, McCarter & English as Escrow Agent should have released and delivered the Escrowed Documents to the Pledgors in September 2014 when the Pledgors refinanced their loan with Preston State Bank, thus fulfilling all obligations to the Lenders under the Escrow Agreement.

138.     On February 15, 2019, White Winston, as Lender to the Escrow Agreement, sent Notice to McCarter & English demanding release and delivery of the Escrowed Documents, as that term is used in the Escrow Agreement, to the Lender. White Winston incorrectly claimed that the Escrowed Documents, which were pledged in the January 23, 2014 Plano Purchase Transaction, were also pledged against the subsequent and previously uncontemplated May 29, 2014 Dallas Purchase Transaction.

139.     On February 15, 2019, the plaintiffs, as Pledgors to the Escrow Agreement, sent Notice to McCarter & English demanding release and delivery of the

Escrowed Documents to the Pledgors. The Plaintiffs correctly stated that the Escrowed Documents pledged in the Plano Purchase Transaction were not pledged against the subsequent, previously uncontemplated Dallas Purchase Transaction. Moreover, Mr. Armstrong had expressly been released from all claims arising out of or in any way relating to any other documents evidencing or securing the Plano Purchase Transaction.

140. On February 20, 2019, White Winston, as Lender to the Escrow Agreement, sent Notice to McCarter & English objecting to the release and delivery of the Escrowed Documents to the Pledgors.

141. McCarter & English refuses to honor the Escrow Agreement and will not comply with its obligations thereto. Specifically, McCarter & English refuses to release and deliver the Escrowed Documents to the Pledgors.

142. Thus, due to the non-waivable conflict of interest, Armstrong requests that the Court declare that McCarter & English cannot serve independently as Escrow Agent and order that McCarter & English take no further actions other than to release and deliver the Escrowed Documents to the Plaintiffs, and also to withdraw as Escrow Agent.

WHEREFORE, Plaintiffs respectfully request that the Court enter the relief requested below.

## RELIEF REQUESTED

Plaintiffs, Grant Armstrong and Armstrong RX GP, LLC, respectfully request that the Court enter a Final Judgment:

    (1)    Awarding Plaintiffs judgment on each and every Count of this Third Amended Complaint;

    (2)    Awarding Plaintiffs their actual damages, trebled;

(3)    Declaring that Armstrong is released from the Armstrong Guaranty and that McCarter & English cannot serve independently as Escrow Agent;

(4)    Ordering McCarter & English to deliver the Escrowed Documents to the Plaintiffs, and to withdraw as Escrow Agent;

(5)    Permitting Plaintiffs to the right of accounting from the Lock Box Account under the Deposit Account Control Agreement and under the Court's Equitable Powers;

(6)    Awarding Plaintiffs their reasonable attorney's fees and costs; and

(7)    Awarding Plaintiffs such other and further relief as the Court deems just and proper or as Plaintiffs may be able to demonstrate they are entitled.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully Submitted,

GRANT ARMSTRONG,
ARMSTRONG RX GP, LLC,
ARMSTRONG RX II, GP, LLC
ARMSTRONG RX II, LP

By Their Attorneys,

Patrick T. Clendenen (BBO #564165)
Clendenen & Shea, LLC
400 Orange Street
New Haven, CT 06511
203-787-1183 (telephone)
203-787-2847 (facsimile)
ptc@clenlaw.com

Date:  April 5, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the Court's CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by U.S. mail to those indicated as non-registered participants on April 5, 2019.

CLENDENEN & SHEA, LLC