## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRANT ARMSTRONG and ARMSTRONG RX GP, LLC | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| WHITE WINSTON SELECT ASSET FUNDS, LLC | ) ) ) |
| Defendant/Third-Party Plaintiff, | ) Civil Action No. 1:16-cv-10666-JGD ) ) |
| v. | ) ) |
| ARMSTRONG RX II, GP, LLC and ARMSTRONG RX II, LP | ) ) ) |
| Third-Party Defendants. | ) ) |

## JOINT FINANCIAL ACCOUNTING DISCOVERY PLAN

In accordance with this Court's April 21, 2020 Order [Dkt. 155] directing the parties to report and "meet and confer about the scope of financial accounting discovery," below is "a joint discovery plan … identifying the areas of agreement, and the parties' positions as to the areas of disagreement, if any."[1] The Parties, Grant Armstrong and Armstrong RX GP, LLC ("*Plaintiffs*"), Armstrong RX II, GP, LLC and Armstrong RX II, LP (collectively, "*Armstrong*"), and White Winston

---

[1] The April 21, 2020 Order further stated: "Any claim of undue burden must be supported by specific facts. The court will consider proposals to phase financial accounting discovery. Absent agreement, financial accounting discovery shall be stayed pending further order of the court." Dkt. 155 at 1-2.

Select Asset Funds, LLC ("***White Winston***"), have conferred and hereby submit the following Joint Plan.

I.   **PRELIMINARY STATEMENTS**

The parties largely disagree on the scope of permissible discovery.   Areas of agreement and disagreement are set forth below.

*Armstrong:*         In its Memorandum of Decision on White Winston's Motion to Dismiss, the Court held that Armstrong's "allegations of "pervasive control" with "fraudulent or injurious consequence of the intercorporate relationship" are sufficient to state a claim that White Winston is liable for QVL's misrepresentations and omissions."  Dkt. 152 at 37.  The Court continued, "This is sufficient to state a claim for breach of fiduciary duty based on control over the Dallas Pharmacy's operations. ." *Id.* at 44. White Winston continues to argue, as it did in its motion to dismiss, that the allegation that "White Winston and QVL are one and the same and that White Winston controlled Armstrong's Dallas location and QVL improperly for its benefit" is "complete rubbish." Nevertheless, this allegation was adequately pleaded to survive the Motion to Dismiss. Now, over four years after the Complaint was first filed, it is appropriate to proceed to financial accounting discovery on this allegation and the related allegations of the Third Amended Complaint.

*White Winston:*     White Winston submits the differences among the parties regarding the permissible scope of discovery is due to the parties' "disconnect" about what happened.  For example, Armstrong contends White Winston and QVL are one and the same and that White Winston controlled Armstrong's Dallas location and

QVL improperly for its benefit.   White Winston categorically believes this is rubbish.   There simply are no documents that exist that are based on the false premise that White Winston improperly "controlled" Armstrong and QVL, or that White Winston should be conflated with QVL.   The documents that are relevant and largely already produced to Armstrong prove this negative – that White Winston was a lender and investor both to QVL and Armstrong, and unfortunately lost substantial sums as a result of its failed loans to these entities.   Armstrong's response – keep digging for more confidential information to inflict harm on White Winston – rather than accept that its premises are false and not corroborated by the relevant documents already produced to it – are what Armstrong seeks to achieve here.   This should not be sanctioned or approved by this Court.

## II.   DISCOVERY ISSUES

### 1.  Third-Party Discovery

*Armstrong:*          The most significant remaining financial accounting discovery outstanding in this case is to be directed at third parties.   Armstrong requires bank statements, balance statements, and accounts receivable statements to complete its analysis of White Winston's control over the Dallas location accounts and the commingling of those accounts with White Winston and QVL accounts. This discovery imposes no burden on White Winston. To the extent that White Winston has concerns regarding confidentiality, it need not redact, but can designate materials under the Stipulated Protective Order, Dkt. 66, as have both parties to date concerning HIPAA or other confidential materials, including those subject to third party agreements. There is no apparent basis for concerns regarding

privilege, as the bank statements, balance statements, and accounts receivables statements contain neither attorney-client communications nor attorney work product.

*White Winston:*     White Winston responds that it largely does not object to requested third party discovery of information regarding the amounts owed by and disbursed to Armstrong, and expenses charged and allocated to Armstrong.  What Armstrong needs to know is what amounts were disbursed or charged and for which White Winston seeks to hold it liable.  Most, if not all, of this information already has been produced to Armstrong. But Armstrong seeks much more, and White Winston objects.

### 1.   Boston Private Bank

*Armstrong:* On September 10, 2018, Armstrong served a subpoena on Boston Private Bank for statements and other records concerning the Lockbox Accounts for the Dallas and Plano locations, as well as the White Winston Operating and Investment Receipt Trust Accounts, both of which withdrew funds from the Dallas Lockbox Account. On receipt of the subpoena, Boston Private Bank agreed to produce the Dallas and Plano Lockbox accounts and did so on November 5, 2018, however, that production was incomplete and discovery was thereafter stayed for various reasons, including extended mediation and motion practice.

The requested statements and records for the White Winston Operating and Investment Receipt Trust Accounts that withdrew from the Dallas lockbox account, for the relevant months remain outstanding and are necessary. Additionally, Armstrong and its financial accounting expert have identified from the financial discovery

produced to date the following additional Boston Private Bank accounts involved in the flow

of funds to and from the Dallas location: QVL Pharmacy Subsidiaries Funding Group, LLC;

QVL Investors Business Trust; QVL Pharmacy Holdings Inc.; Dallas Operating Account;

and Plano Operating Account. Account statements for these accounts are necessary.

Armstrong's retained financial accounting expert requires these statements

and records to complete its analysis:

| Account | Dates |
|---|---|
| QVL Pharmacy Subsidiaries Funding Group, LLC | January 2013—December 2015 |
| QVL Investors Business Trust | January 2013—December 2015 |
| QVL Pharmacy Holdings Inc. Control Account | January 2013—December 2015 |
| QVL Pharmacy Holdings Inc. | January 2013—December 2015 |
| White Winston Select Asset Funds, LLC Operating Account | January 2013—December 2015 |
| White Winston Select Asset Funds, LLC Investment Receipt Trust Account | January 2013—December 2015 |
| QVL Pharmacy 142, LP c/o Texas RX Pharmacy Dallas Operating Account | January 2013—December 2015 |
| Armstrong Rx, LP Plano Operating Acct. | January 2013—December 2015 |

*White Winston*:     White Winston objects to the production of these

statements as being irrelevant, overbroad, disproportionate to the needs of the case

and the disclosure of the information in these statements will create undue burden

and harm, perhaps irreparably, to White Winston.

***White Winston Operating Account:*** This account is White Winston's general

operating account.   The sources and uses of White Winston's cash are highly

confidential.  White Winston disburses funds from its operating account to pay its

vendors, employees, investors and professional advisors.  Some of these

disbursements, particularly to White Winston's investors, are governed by confidentiality agreements.  Disclosure of the identities of White Winston's investors is particularly harmful, since these identities are highly confidential. Information regarding payments to White Winston's professional advisors in many instances may be subject to attorney-client privilege, and should not be disclosed. Redaction of the statements to eliminate this information is time-consuming and costly to White Winston.

*White Winston Investment Receipt Trust Account.*  This account was "behind" all loans White Winston made, including to Armstrong and/or QVL.  White Winston uses this account to collect receipts from its investors, and then disburse those receipts to various other accounts for further disbursements to specific loans and purposes.  Disclosure of the statements will reveal the identities of White Winston investors, the amounts of their loans, and similar highly confidential information about White Winston's relationships with these third parties and regarding loans unrelated to those at issue in this case.

White Winston submits that discovery of the statements for these two accounts also is irrelevant, and putting White Winston to the burden of redaction of offending information in these statements is disproportionate to the needs of this case.  Armstrong contends his undisclosed expert determines he needs this information, but nowhere does Armstrong explain why this irrelevant information is needed.  The sole basis appears to be that White Winston "swept" money from the lockbox accounts into one or both of these accounts from time to time.  That's

because the cash in the lockbox account was White Winston's cash, and White Winston had every right to sweep the funds from that account and use it as it deemed appropriate.   All that Armstrong is entitled to is information to confirm what cash was received and to confirm the net cash received was applied to his loan obligations to White Winston properly.   All of that information can be developed from the lockbox accounts, which Armstrong concedes already has been produced to him.

Disclosure of this information is analogous to disclosure of Bank of America's operating and investor accounts to a disgruntled borrower litigating the validity of a Bank of America loan.   The information is irrelevant and proprietary to the lender (here, White Winston), and should not be disclosed or produced.

*Other Accounts*

Armstrong contends that it requires, although has not subpoenaed from anyone, bank statements regarding QVL Investors Business Trust, QVL Pharmacy Holdings Inc. Control Account, QVL Pharmacy Holdings, Inc. and the Dallas and Plano operating accounts.   White Winston submits the Court should make no decision regarding these matters now, and should await further subpoenas that identify these accounts (by account number and name) so that White Winston has an opportunity to respond.   The relevance of these account statements is doubtful. For example, the QVL Investors Business Trust has almost 110 members, and is involved in loans and transactions unrelated to QVL and Armstrong.   Production of the statements from this account is as objectionable and for the same reasons that

production of statements regarding QVL Pharmacy Subsidiaries Funding Group, LLC and White Winston's operating accounts are objectionable.  At a minimum, the Court should require a further subpoena so the parties can develop and, if necessary, present the issues in dispute to the Court for determination.

2.     **QVL Financial Statements: QVL and Hillcrest Capital**

*Armstrong:*            On May 25, 2018, Armstrong served subpoenas on QVL through its former Controller, Stephen Cox, who was subsequently a contractor whose contract with and payments from QVL were approved by Todd Enright, Dkt. 150+1 at ¶ 5; its former Chief Executive Officer, Chad Collins; its Restructuring Administrator, its Bankruptcy Trustee, and on June 7, 2018  through counsel of the reorganized entity, Boston Select Asset Group, seeking QVL's records concerning the Dallas location.

Armstrong received a minimal number of records from the former QVL employees; received a response from the Trustee that it held no responsive records; and received no response from Boston Select Asset Group.  To the extent that any other former QVL employees or Boston Select Asset Group retain any records or financial statements or tax returns prepared by QVL in respect of the Dallas location, Armstrong's financial accounting expert requires these statements and records to complete its analysis.

Further, Hillcrest Capital, through its principal, Robert Mahoney, was a signatory to the account control agreements for the Plano and Dallas operating accounts; reviewed and revised Transition Services Agreement invoices to the Dallas and Plano locations; prepared financial statements for the Dallas location; served as "administrative agent" for QVL

during its default negotiations with AmeriSource Bergen Drug Company; and invoiced the Dallas location for line-of-credit monitoring, accounting, and other services, which invoices were paid by advances on the Dallas line of credit. Mr. Mahoney was initially designated Chief Restructuring Officer of QVL during its bankruptcy proceedings, and QVL's former Chief Executive Officer returned QVL's electronically-stored-information to Mr. Mahoney during QVL's bankruptcy. Hillcrest Capital and/or Mr. Mahoney can therefore likely provide the needed financial statements prepared by QVL concerning the Dallas location.

Accordingly, Armstrong's financial accounting expert requires these statements and records from QVL, Hillcrest Capital, and Mr. Mahoney to complete its analysis:

## QVL

| Account | Date |
|---------|------|
| Dallas location financial statements and information used in the preparation thereof | January 2013—December 2015 |
| Dallas location tax returns and information used in the preparation thereof | January 2013—December 2015 |

## Hillcrest Capital

| Account | Date |
|---------|------|
| Dallas location financial statements and information used in the preparation thereof | January 2013—December 2015 |
| Dallas location tax returns and information used in the preparation thereof | January 2013—December 2015 |

*White Winston:*   White Winston will not speak for QVL, as QVL and White Winston are separate entities.  White Winston has no objection to production by QVL or Mr. Dinoff, as Armstrong states, "any records or financial statements or tax returns prepared by QVL in respect of the Dallas location."

White Winston submits that Armstrong concedes he has not served any subpoena at all on either Hillcrest Capital or Mr. Mahoney, and reserves its objections, if any, to any such subpoena if, as and when it is entered.   White Winston understands, however, that the premise of Armstrong's averments is mistaken – QVL never prepared any "financial statements prepared by QVL concerning the Dallas location" to Mr. Mahoney's knowledge other than those statements for the Dallas pharmacy prior to Mr. Armstrong's acquisition of it in May 2014.   Mr. Mahoney never prepared any tax returns for Armstrong or QVL (Mr. Mahoney is not a certified public accountant).   Instead, Mr. Mahoney understands Mr. Cox either prepared or last had possession of tax returns and financial statements relating to the Dallas location.   Mr. Mahoney turned over substantially all of his documents related to the Dallas location to Mr. Cox when he became engaged by Mr. Armstrong to handle its financial affairs,  or, with respect to QVL, to Mr. Dinoff (when Mr. Dinoff succeeded Mr. Mahoney as CRO of QVL).

Mr. Mahoney does not believe that he or his company Hillcrest has any remaining documents to produce.  He further believes that the few, stray documents he retains largely constitute publicly available documents relating to the QVL bankruptcy case and information supplied to the Office of the United States Trustee in the QVL bankruptcy case.   Nevertheless, generally, subject to review of and an opportunity to object to a subpoena from Armstrong, if any is served, Mr. Mahoney is prepared to produce to Armstrong financial information in its possession, custody and control directly concerning the Dallas location both before Armstrong's

acquisition of it in January, 2014 and afterwards.

### 3. Accounts Receivable: ABDC, McKesson, Harvard Drug, Insurers

*Armstrong:*          On May 25, 2018, Armstrong served a subpoena on Amerisource Bergen Drug Company seeking its records concerning the Dallas location and the QVL intercreditor arrangements. On August 23, 2018, Amerisource Bergen produced certain transaction documents related only to the intercreditor arrangements.

Armstrong's financial accounting expert requires complete accounts receivable statements to complete its analysis. These documents will show the dollar amounts that were [1] due the Dallas location, [2] controlled by White Winston and [3] commingled with White Winston funds, during the time shortly  prior to Armstrong's acquisition of the Dallas location to  the time of his  turnover of the Dallas location to White Winston.  During this time, Armstrong purchased drugs from his principal supplier, Amerisource Bergen, under the Transition Services Agreement with QVL or under an Intercreditor Agreement between White Winston,  QVL, Amerisource Bergen and Armstrong. A complete picture of accounts receivable for the Dallas location can be obtained from AmeriSource Bergen Drug Company; the Dallas location's other accounts receivables providers, including McKesson and Harvard Drug; and the insurers that reimbursed the Dallas location's customer's pharmacy claims.

Armstrong's financial accounting expert requires these accounts receivable records to complete its analysis:

| Account | Date |
|---|---|
| Dispensary level records of inventory obtained by NDC Code, with individual cost data, from any and all | January 2014—December 2015 |

| | |
|---|---|
| providers of pharmaceutical products for the period of January 2014 through December 2015 | |
| Dispensary level records of payments, refunds and allowances by month to those same providers, by payor | January 2014—December 2015 |
| Dispensary level records of payments by insurance carrier | January 2014—December 2015 |
| Any additional records related to daily sales in the possession of Mr. Armstrong | January 2014—December 2015 |

*White Winston:*     White Winston responds that it largely does not object to third-party discovery from these drug suppliers, so long as that discovery request is limited in scope and duration to relevant materials.   First, Armstrong seeks information for two years, from January 2014 – December 2015.   Armstrong nowhere explains why he needs two years of documents. Armstrong acquired the Dallas location on or about May 29, 2014, and stopped purchasing inventory under the TSA through QVL and began purchasing its own inventory directly from its major supplier (Amerisource Bergen Corporation) on or about July 28, 2014. Armstrong's discovery requests should not exceed this approximately two-month window during which claims he acquired his inventory from QVL and through the TSA, and not the two years of documents he inexplicably requests.

Second, so long as the accounts identified above are limited to accounts for Armstrong's purchases for his Dallas location (the only issue relevant in this litigation), then White Winston does not object.   Otherwise, Armstrong should be required to specify with more precision what accounts it believes exist, and what

documents related to such accounts it wants.   White Winston then can respond appropriately, but lacks sufficient information about these requests to respond currently.

### 4. White Winston Discovery

*Armstrong:*          In addition to the above, White Winston still possesses responsive financial accounting records that it has both not produced and segregated and withheld, which are not burdensome to produce.

*White Winston:* White Winston denies this.

### a.    QVL

*Armstrong:*          In response to Armstrong's notice of subpoenas directed to third party QVL through its former Controller, Stephen Cox; its former Chief Executive Officer, Chad Collins; its Restructuring Administrator, its Bankruptcy Trustee; and on June 7, 2018, through the reorganized entity, Boston Select Asset Group,  counsel for White Winston replied that: "My understanding is that QVL Holdings, although out of bankruptcy, has no business, no employees, no money and has destroyed its documents to comply with HIPAA." Exhibit A at 3. Counsel for White Winston continued, "QVL Holdings lacks funds to retain counsel to respond to your subpoena, and I believe my client has provided you with the relevant TSA accountings and other information it received from QVL Holdings already. Accordingly, please let me know if you will withdraw the subpoena and, if not, then I will have no alternative other than to seek to quash it." *Id.*  This communication indicates that White Winston possesses and is aware of financial accounting

information from QVL other than that which it has previously produced.[2] This

conclusion is further supported by White Winston's counsel's stated refusal to

produce known and responsive records concerning QVL, Dkt. 154-1. at 15-6, which

the Court has held Armstrong plausibly alleged was controlled by White Winston,

Doc. 152 at 35-37. To the extent that this contemporaneous, relevant information—

not summaries prepared subsequently for the purposes of litigation—is responsive

to Armstrong's requests, it should be produced.

    *White Winston:*    White Winston disputes Armstrong's characterization

that "[t]his communication indicates that White Winston possess and is aware of

financial accounting information from QVL other than that which it has previously

produced." [3]   To the contrary, White Winston believes it has produced all relevant,

non-privileged documents in its possession, custody and control that Armstrong

does not have independently regarding amounts charged to or paid on behalf of

Armstrong under the TSA from QVL.   Moreover, Armstrong's argumentative

statement that "White Winston's counsel [refuses] to produce known and responsive

records concerning QVL" is misleading at best.

    Nevertheless, as counsel for White Winston would have told counsel for

Armstrong if only he had asked, White Winston is prepared to produce additional

---

[2] Indeed, QVL was required by the terms of its Settlement Agreement in the matter of In re QVL Holdings, Inc., No. No. 15-14983, Dkt. 191-1 at 8, to preserve the QVL servers for the purposes of litigation against QVL, White Winston and Todd Enright by another purchaser of a QVL pharmacy location.

[3] White Winston is not QVL, however, and has no responsibility for QVL's compliance or lack of compliance with this settlement agreement.  Similarly, Armstrong is not a party to and is a complete stranger to the Settlement Agreement.

QVL documents now that the Court has ruled on the Motion to Dismiss.  White Winston responds that it will produce a spreadsheet to Armstrong providing a breakdown of all disbursements to and collections on account of QVL.  The spreadsheet will then contain a breakdown of three relevant elements:  (i) disbursements of principal and calculation of accrued interest owed by QVL, (ii) collections of funds into the QVL lockbox, and (iii) disbursements for expenses, under the TSA and otherwise, for which Armstrong was charged.

With respect to the first item, to the extent White Winston has them, White Winston will produce wire transfer confirmations evidencing the principal advances. With respect to the second item, White Winston will not object to production of all bank statements from the QVL lockbox account by Boston Private Bank, which should provide a full accounting to Armstrong's financial expert of the cash receipts into and disbursements out of the QVL lockbox.

With respect to the third item, the only evidence of what disbursements were made appear on bank account statements of QVL Pharmacy Subsidiaries Funding Group, LLC.  As noted above, those statements may contain substantial additional, confidential, proprietary, and irrelevant information.  The spreadsheet White Winston provided shows the disbursements that represent principal advances to QVL.  To the extent Armstrong demonstrates a need to review backup confirming those disbursements in fact were made as represented, then once Armstrong identifies the disbursement line items it challenges, with respect to those line items, White Winston is prepared (i) to request the relevant bank statements from Boston

Private Bank, (ii) redact the objectionable information from those statements, and (iii) produce the redacted statements to Armstrong.

Otherwise, White Winston is unclear what documents it has that are responsive to Armstrong's request that have not been produced already to Armstrong. Mr. Cox (on behalf of QVL) prepared the charges and provided both to Armstrong and to White Winston spreadsheets showing which QVL charges were allocable to Armstrong in the brief, two-month period during which QVL and Armstrong performed under the TSA. White Winston either has produced or is prepared to produce to Armstrong all such spreadsheets it received from Mr. Cox. White Winston has no independent knowledge generally of Mr. Cox's allocations. Mr. Cox, and not White Winston, knows which disbursements White Winston made to QVL were used for Dallas and allocated as charges to the Dallas location. White Winston has no basis to know what wire transfers to QVL were used by Mr. Cox, in whole or in part, for Mr. Armstrong's benefit under the TSA, and has no basis to tie any particular wire transfer to QVL to Armstrong. In short, White Winston has no other information (except for information prepared by Mr. Cox at QVL and provided already to Mr. Armstrong) about whether and how much was disbursed to QVL that has any relevance whatsoever to the Dallas location.

Thus, Armstrong should be required to identify, and justify, all disbursements made for which he claims he was charged. White Winston then can identify any disbursements it made to QVL for which Armstrong was charged, and then provide remittance confirmations (through redacted bank statements) showing

16

that those disbursements were made.

### b. Documents Withheld

*Armstrong:*        White Winston's counsel represented on March 15, 2018 that documents and metadata previously "withheld entirely or redacted" from production on the basis of the pending motion to dismiss would be produced. Doc. 154-2. The motion to dismiss was resolved on March 23, 2020, and White Winston has still not produced the information withheld or redacted, much less identified these documents with particularity.[4] The documents can and should be produced with minimal burden, in their native format as ordered by the Court, Dkt. 155, particularly insofar as they include financial accounting records.

*White Winston:*        Armstrong asserts that White Winston has also failed to produce Todd Enright's text messages, which have been produced by Armstrong under the Court's ESI Order, Dkt. 85 at 3, but not White Winston, Tr. at 14; a privilege log, as required by F.R.C.P. 26(b)(5); and documents concerning its counterclaims, its litigation records, and additional correspondence. Dkt. 154 n. 3. White Winston responds that of course, since discovery was stayed, White Winston believed its obligation to produce these items also was stayed. White Winston intends to produce these items forthwith once financial discovery is not stayed. White Winston also will produce .pdf copies of the text messages by June 19, 2020. White Winston is in consultations with its ESI vendor to determine when and how

---

[4] White Winston has also failed to produce Todd Enright's text messages, which have been produced by Armstrong under the Court's ESI Order, Dkt. 85 at 3, but not White Winston, Tr. at 14; a privilege log, as required by F.R.C.P. 26(b)(5); and documents concerning its counterclaims, its litigation records, and additional correspondence. Dkt. 154 n. 3

best to prepare and produce a privilege log.

5. *Discovery from Armstrong and related Third Party Discovery*

*White Winston:*    White Winston requires third party discovery from prescribers at the Dallas and Plano locations that are relevant to its claim that Armstrong fraudulently transferred the business of Dallas to Plano and then abruptly caused Dallas to shut down.  First, White Winston requires disclosure by Armstrong of (i) the identities and contact information for the top 10 prescribers (by volume and if different, separately by dollar amount) in Dallas in the 12 months immediately preceding Mr. Armstrong's shutdown of Dallas, (ii) identities and contact info for the top 10 prescribers (by volume and if different, separately by dollar amount) in Plano for the 12 month period immediately preceding the shutdown of Dallas, and thereafter for each 12 month period after the shutdown, (iii) disclosure of Plano sales to former Dallas prescribers in each calendar year after the Dallas shutdown, and (iv) tax returns for Plano for each calendar year from and after Mr. Armstrong's acquisition of Dallas.  This information is or should be easily available to Armstrong and capable of being produced without undue burden.

Second, White Winston anticipates thereafter it will require third party discovery from some of the prescribers identified by Mr. Armstrong to corroborate that Armstrong unilaterally and fraudulently moved Dallas prescriptions to Plano after shutting down Dallas.

White Winston also anticipates it will require third party discovery from

Stephen Cox.  Mr. Cox, a QVL employee and professional person retained by Mr. Armstrong and close confidant of Mr. Armstrong, prepared the financial analyses for the funds collected in the Dallas lockbox and allocated under the TSA about which Armstrong complains, so discovery from him is required regarding these matters.  Mr. Cox also stole funds from QVL, and White Winston expects it will make inquiry into these matters.  Whether Mr. Cox intends to invoke his Fifth Amendment privilege against testifying, and if so then whether he has waived his Fifth Amendment privilege by supplying an affidavit that Armstrong already filed in this case, are matters that remain to be determined.

White Winston continues to evaluate its discovery needs, and reserves the right to seek additional or different financial discovery.

*Armstrong:*        The disclosures sought by White Winston from Armstrong concerning the identities and contact information of prescribers to the Dallas location are not related to financial or accounting discovery. The third party inventory and accounts receivable sought by Armstrong, however, will supply the relevant information to White Winston's inquiry—demonstrating that any reduction in the Dallas location sales was directly proportionate to its lack of inventory.

The tax records for the Plano location are not only irrelevant to White Winston's claims, the production of those records would be burdensome, as they comprise a schedule of Mr. Armstrong's personal tax returns.

6.    ***Armstrong's Withheld Documents***

*White Winston:*        Although counsel for Armstrong previously agreed to

provide copies of all third-party discovery he received years ago to counsel for White Winston, to date, he has refused to do so and has refused to identify them with particularity.  These documents should be produced forthwith.

*Armstrong:*         Armstrong will produce all outstanding third-party discovery by June 19, 2020.

III.   <u>**Conclusion and Requested Relief**</u>

*Armstrong:*         For all of the forgoing reasons, Armstrong prays that this Court allow, and order as entered, this joint financial accounting discovery plan, which includes approval for Armstrong to issue or reissue subpoenas, as necessary, for the documents and information described herein.

*White Winston:*    This is a report, not a motion, so White Winston submits that a request by any litigant in this case for entry of an order is inappropriate. White Winston objects to Armstrong's request for an order, and instead requests that any orders that are entered are entered only upon the filing of an appropriate motion and an opportunity to respond.[6]

---

[6] Armstrong only provided a draft of this "report" to counsel for White Winston for the first time by e-mail dated June 8, 2020 at 12:48 p.m.  White Winston requests more than one business day to respond to Armstrong's invective and allegations before the Court enters any orders against it.

Dated:     <u>June 9, 2020</u>

<u>s/s Patrick T. Clendenen</u>          <u>s/s Jeffrey D. Sternklar</u>
Patrick T. Clendenen (BBO          Jeffrey D. Sternklar (BBO #549561)
#564165)                       Jeffrey D. Sternklar, LLC
Clendenen & Shea, LLC          26th Floor, 225 Franklin Street
400 Orange Street               Boston, MA 02110
New Haven, CT 06511           Telephone: 617-396-4515
Telephone: 203-787-1183        Email: jeffrey@sternklarlaw.com
Fax: 203-787-2847
Email: ptc@clenlaw.com

**For Grant Armstrong; Armstrong**    **For White Winston Select Asset Funds,**
**RX GP, LLC; Armstrong RX II GP,**    **LLC.**
**LLC; and Armstrong RX II, LP.**

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document filed through the Court's CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 9, 2020.

                    <u>s/s Patrick T. Clendenen</u>
                    Clendenen & Shea, LLC