UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRANT ARMSTRONG and <br> ARMSTRONG RX GP, LLC <br><br> Plaintiffs, <br> v. <br><br> WHITE WINSTON SELECT ASSET <br> FUNDS, LLC, <br><br> Defendant/Third-Party <br> Plaintiff, <br><br> v. <br><br> ARMSTRONG RX II GP, LLC and <br> ARMSTRONG RX II, LP, <br><br> Third-Party Defendants. | CIVIL ACTION <br> NO. 16-10666-JGD |

# ORDER REGARDING WHITE WINSTON
# SELECT ASSET FUNDS, LLC'S MOTION TO STRIKE

December 27, 2022

DEIN, U.S.M.J.

## I.   INTRODUCTION

This matter concerns an action brought by Grant W. Armstrong ("Mr. Armstrong") and Armstrong RX GP, LLC ("AGP"), an entity wholly owned by Mr. Armstrong, against White Winston Select Asset Funds, LLC ("White Winston" or "WW"), a financing company that provided Mr. Armstrong and AGP with loans to purchase and operate two pharmacies in Texas, one in Plano (the "Plano Pharmacy") and one in Dallas (the "Dallas Pharmacy"). WW has also asserted counterclaims against Mr. Armstrong and AGP and filed a third-party complaint

against Armstrong RX II GP, LLC and Armstrong RX II, LP (together with Mr. Armstrong and AGP, the "Armstrong Parties").  WW has moved for summary judgment in its favor on all claims asserted against it and its affirmative claims against the Armstrong Parties.  (See Docket No. 233).  The Armstrong Parties oppose WW's motion and argue that the evidence that they have submitted in response to the motion shows that genuine factual disputes exist to preclude entry of summary judgment in WW's favor.  (See Docket No. 243).  Currently before the court is "White Winston Select Asset Funds, LLC's Motion to Strike Portions of Affidavit of Grant W. Armstrong" (Docket No. 249) (the "Mot. to Strike"), which seeks to strike portions of one of the affidavits submitted by the Armstrong Parties to support their opposition to WW's motion for summary judgment.

      The "Affidavit of Grant W. Armstrong" (Docket No. 245 Ex. 51) (the "Armstrong Affidavit") was executed on June 17, 2022, after WW filed its motion for summary judgment.  WW now requests that the court strike certain paragraphs of the Armstrong Affidavit because, it argues, the information included within these paragraphs contradicts Mr. Armstrong's prior testimony at his March 7, 2022 deposition (see generally Mot. to Strike Ex. A ("Armstrong Dep. Tr.")).  Specifically, WW seeks to strike the following portions of the Armstrong Affidavit: (i) paragraph 7; (ii) the final sentence of paragraph 8; (iii) a portion of paragraph 9; (iv) all of paragraphs 15 and 16; and (v) the final sentence of paragraph 20.  (Mot. to Strike at 1).

      The court assumes the reader's familiarity with the underlying facts of this matter.  In sum, while the circumstances surrounding the timing of the Armstrong Affidavit call for a careful analysis to determine if it was proffered only to manufacture a factual dispute, the majority of the cited portions of the Armstrong Affidavit do not clearly contradict Mr.

Armstrong's deposition testimony to warrant striking the information from the record. Accordingly, for the reasons provided herein, the Motion to Strike is hereby ALLOWED in part and DENIED in part.

## II.     LEGAL STANDARD

An affidavit submitted in connection with a motion for summary judgment is subject to the "sham affidavit" rule.  "[W]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Reynolds v. Steward St. Elizabeth's Med. Ctr. of Boston, Inc., 364 F. Supp. 3d 37, 52 (D. Mass. 2019) (quoting Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)).  The First Circuit has clarified, however, "that '[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment.'" Id. (quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002)).  The "sham affidavit" rule is therefore only triggered when the affidavit clearly contradicts prior testimony.  As such, in assessing the Motion to Strike, the court must first determine whether the "post-deposition affidavit contradicts [the] deposition testimony or whether the affidavit clarifies or augments the deposition." Mahan v. Boston Water & Sewer Comm'n, 179 F.R.D. 49, 55 (D. Mass. 1998).  If there is a clear contradiction between the deposition testimony and the affidavit, "a satisfactory explanation is required." Id.  Crucially here, the issue before the court is whether there is any inconsistency between the prior testimony and the new evidence, not the credibility of the statement included in the post-deposition affidavit.  See Gattineri v. Wynn,

MA, LLC, Civil Action No. 18-11229-FDS, 2022 WL 123621, at *5 (D. Mass. Jan. 13, 2022) (declining to strike information in affidavit that was not mentioned in deposition because such "issue appears to be one of credibility, which is best left to the jury").

### III. DISCUSSION

#### a. Paragraph 7

In paragraph 7 of the Armstrong Affidavit, Mr. Armstrong attests, "No one conveyed to me prior to the Dallas transaction that Dallas sales by that time had been 'dropping like a rock.'"  WW argues that this statement directly contradicts Mr. Armstrong's testimony that he could not recall any details about due diligence that he or any member of his team performed in connection with the purchase of the Dallas Pharmacy.  (Mot. to Strike at 7).  WW asserts that Mr. Armstrong similarly could not recall whether he had specific conversations with WW representatives concerning the profitability of the Dallas Pharmacy.  (Id.)  The court has reviewed the portions of Mr. Armstrong's deposition cited by WW as contradictory and concludes that Mr. Armstrong's statement that no one told him sales were "dropping like a rock" does not directly contradict his prior testimony.  Neither Mr. Armstrong's failure to remember any due diligence efforts that he undertook nor his testimony that he did not recall whether he affirmatively discussed profitability with WW is inconsistent with the statement that he knows that no one at any time told him that sales at the Dallas Pharmacy were "dropping like a rock."  Counsel for WW does not appear to have ever specifically asked Mr. Armstrong whether anyone conveyed to him that "sales were dropping like a rock" or asked about his knowledge with respect to sales at the Dallas Pharmacy in general.  See Gattineri, 2022 WL 123621, at *5 (declining to strike paragraph when topic was not discussed during

4

deposition and new information did not clearly contradict anything in testimony).  As such, paragraph 7 of the Armstrong Affidavit provides only additional, not contradictory, testimony. Because the statement is not clearly contradictory, the "sham affidavit" rule does not apply, and the court will not strike paragraph 7 from the summary judgment record.

    b. **Paragraph 8**

Paragraph 8 of the Armstrong Affidavit reads:

> I testified truthfully at my deposition in this case to the best of my memory at the time about my conversation with Mr. Enright before the Dallas transaction.  Since my deposition, I have recalled additionally that my meeting with Mr. Enright occurred at a restaurant (or hotel restaurant) near the Dallas-Fort Worth Airport because I recall that during our conversation Mr. Enright ordered a hamburger without a bun.  **I still do not recall how long the meeting lasted but I would estimate it was approximately 30 minutes to an hour.**

(emphasis added).  WW contends that this bolded portion of paragraph 8 directly contradicts Mr. Armstrong's deposition testimony in which he stated that he did not recall how long the meeting with WW's representative, Mr. Todd Enright, lasted. (Mot. to Strike at 8-9).

In his deposition, Mr. Armstrong was directly asked about the length of the meeting between himself and Mr. Enright.  Mr. Armstrong repeatedly responded that he did not recall how long the meeting lasted and did not recall further details about the meeting.

Q: How long did the meeting last?

A: I don't recall.

Q: Or a magnitude:  Was it a matter of minutes; was it a matter of hours; what was it?

A:  I don't recall.

Q:  Was there any other details of that meeting that you recall?

A: No.

5

(Armstrong Dep. Tr. 97:3-10).  Mr. Armstrong's post-deposition statement providing an estimate for the length of the meeting, however, does not clearly contradict the information provided in his deposition.  In his affidavit, Mr. Armstrong reasserts his previous testimony that he still does not recall how long the meeting lasted and merely provides an "estimate" of approximately 30 minutes to an hour.  Even with the additional color of this statement, the fact remains that Mr. Armstrong does not recall how long this meeting lasted.  The sentence at issue in paragraph 8 will therefore not be stricken from the record.

    c. **Paragraph 9**

In paragraph 9 of the Armstrong Affidavit, Mr. Armstrong attests:

> During my deposition, I testified to what I "believe" Mr. Enright told me.  My intent was to convey that I remember in substance what he said but could not quote him or identify specifically how he said it.  To be clear, my conversation with him during that meeting included his statements about the "Good Guy Clause," **that the $500,000 line of credit and initial $100,000 draw would be available for working capital to fund operations, that the lockbox funds would be available to purchase inventory, and that inventory purchases would be available on commercially reasonable terms.**

(emphasis added).  WW moves to strike the bolded portion of paragraph 9, arguing that Mr. Armstrong testified that he and Mr. Enright discussed the Good Guy Clause in this meeting, but Mr. Armstrong expressly testified that he did not remember anything else about that meeting.  (Mot. to Strike at 9).  WW asserts that Mr. Armstrong cannot now claim that certain topics were discussed at that meeting when he previously disclaimed any recollection about the substance of the meeting.  (See id. at 9-10).

    At his deposition, counsel for WW asked Mr. Armstrong about any discussions he had with WW prior to closing on the Dallas Pharmacy.  (Armstrong Dep. Tr. 95:17-21).  Mr. Armstrong responded that prior to purchasing the Dallas Pharmacy he and Mr. Enright met in-

6

person at a hotel or restaurant near the Dallas-Fort Worth airport. (See id. 96:5-25). Mr. Armstrong testified that at this meeting he and Mr. Enright discussed the inclusion of a "Good Guy Clause" in the loan documents to protect Mr. Armstrong if the Dallas Pharmacy were to be unsuccessful. (See id. 95:22-96:4). Counsel for WW then asked Mr. Armstrong if there were "any other details of that meeting that you recall?" (Id. 97:8-9). Mr. Armstrong replied, "No." (Id. 97:10). The additional facts in the objected-to portion of paragraph 9 do not directly contradict this testimony. Mr. Armstrong did not expressly testify that no other topics were discussed at this meeting, only that he did not recall any other details of the meeting at the time of his deposition. The fact that Mr. Armstrong only remembered these details after the deposition goes to credibility, not admissibility. See Reynolds, 364 F. Supp. 3d at 54 ("Although [deponent] did not remember much of the . . . meeting at the time of his deposition, there is no reason that he could not have remembered this meeting at a later time, i.e., when he was drafting his affidavit."); Waters v. J.C. Christensen & Assocs., Inc., Civil Action No. 08-11795-NG, 2011 WL 1344452, at *6 (D. Mass. Mar. 4, 2011) (declining to strike affidavit providing information on scope of purchases made with credit card when witness did not recall same information at prior deposition because "I don't recall" testimony is "at best, inconclusive").

      Moreover, Mr. Armstrong's other testimony on these topics– the $500,000 line of credit and initial $100,000 draw for working capital, access to the lockbox funds to purchase inventory, and that inventory purchases would be available on commercially reasonable terms – is not contradicted by the statement in his affidavit that they were discussed with Mr. Enright at this same in-person meeting. With respect to Mr. Armstrong's testimony concerning the availability of lockbox funds for inventory purchases, Mr. Armstrong stated at one point in his

7

deposition that he did not recall whether WW represented that funds from the Dallas Pharmacy sales would be readily available for inventory purchases. (Id. 218:25-219:10). However, he later stated that he was told that funds from the lockbox would be available to cover purchases for the store. (Id. 223:15-24). Mr. Armstrong also testified that Mr. Enright told him that the inventory would be taken care of for the Dallas Pharmacy. (Id. 219:20-220:21). For both topics, Mr. Armstrong either acknowledged that he did not recall when these representations were made, or it does not appear that he was specifically asked when or where these conversations took place. (See id. 220:11-12, 223:9-224:2). Further, there is no discussion in the deposition of when or where Mr. Armstrong was told about the details surrounding the $500,000 line of credit or $100,000 initial draw. Mr. Armstrong's later recollection that these issues were also discussed at the same in-person meeting near the Dallas-Fort Worth airport, therefore, does not directly contradict his prior testimony on these subjects. Accordingly, the court will not strike the bolded portion of paragraph 9 from the Armstrong Affidavit.

### d. **Paragraphs 15 & 16**

WW next seeks to strike paragraphs 15 and 16 of the Armstrong Affidavit in their entirety. Paragraphs 15 and 16 provide:

> Because of the difficulties I encountered purchasing inventory for Dallas for reasons that included the Amerisource debt, Amerisource's restrictive credit terms, lack of available lockbox funds, and lack of payments pursuant to the Transition Services Agreement, prescriptions from Dallas were occasionally filled at Plano at the patient's direction. This was done solely to provide the customer with their medication and to prevent having to turn away the customer. The customer would be offered the choice of filling the prescription at Plano, and the prescription would only be filled at Plano if the customer made that choice. Many customers chose instead to fill their prescription at another pharmacy (CVS, Walgreens, etc.). To the extent Mr. Anzaldua was involved in the process of filling a Dallas prescription at Plano, he would not have been involved in communication with the customer about the customer's decision to fill the prescription at Plano

> and would not have been aware of the extent to which lack of inventory at Dallas motivated the effort to fill the prescription at Plano.
>
> Those circumstances, caused by the lack of the necessary inventory at Dallas, are the only circumstances under which a Dallas prescription was ever filled at Plano, and it was always done at the patient's request. I had instructed Dallas personnel to fill every prescription they could in Dallas if they had the inventory available. I never on my own transferred or directed pharmacy personnel to transfer prescriptions from Dallas to Plano.

At his deposition, Mr. Armstrong was asked whether he took any measures to cause prescriptions to be moved from the Dallas Pharmacy to the Plano Pharmacy. (Armstrong Dep. Tr. 248:20-22). He first responded, "I don't recall" and later testified, "I did not take measures to transfer prescriptions from Dallas to Plano." (Id. 248:23, 249:9-18). WW interprets paragraphs 15 and 16 of the Armstrong Affidavit to establish that Mr. Armstrong did indeed take measures to transfer prescriptions from the Dallas Pharmacy to the Plano Pharmacy, thereby contradicting his prior testimony. (Mot. to Strike at 11). WW further argues that consideration of the information provided in these paragraphs of the Armstrong Affidavit is unfair to WW because if Mr. Armstrong had made such statements during his deposition, WW would have further examined him on the issue and probed the strength of his recollections. (Id.)

First, the information in paragraphs 15 and 16 of the Armstrong Affidavit does not clearly contradict Mr. Armstrong's prior testimony, and thus, the "sham affidavit" rule does not apply. Mr. Armstrong originally stated that he did not recall whether he transferred prescriptions from the Dallas Pharmacy to the Plano Pharmacy. (Armstrong Dep. Tr. 248:20-23). Upon further questioning, however, Mr. Armstrong's testimony on this subject is essentially that he did not initiate transfers of prescriptions from one pharmacy to another and

9

that such decisions could only be made by the patients. (See id. 255:20-268:2). Mr. Armstrong repeatedly stated that it was ultimately the patient's choice where to fill their prescriptions. (See, e.g., id. 249:5-7, 251:23-252:4, 260:7-13). The additional information in the Armstrong Affidavit only elaborates on when and how prescription transfers occurred with respect to the Dallas Pharmacy and the Plano Pharmacy. Paragraphs 15 and 16 of the Armstrong Affidavit are therefore not directly contradictory of Mr. Armstrong's deposition testimony.

Second, even if these statements in the Armstrong Affidavit contradicted Mr. Armstrong's deposition testimony, the line of questioning on this topic at the deposition was not entirely clear or unambiguous. Counsel for WW jumped back and forth between the factual question of whether Mr. Armstrong caused prescriptions to be transferred from the Dallas Pharmacy to the Plano Pharmacy and hypothetical questions asking, if Mr. Armstrong did undertake such efforts to transfer prescriptions, whether such conduct would be legally consistent with his obligations under the Good Guy Clause of the guaranty signed by Mr. Armstrong as part of the acquisition of the Dallas Pharmacy. (See id. 248:20-252:9). Mr. Armstrong expressed confusion with this line of questioning at the time of the deposition. (Id. 249:24-25; 251:16-20). It was therefore not improper for the Armstrong Affidavit to include further clarification on this issue in order to address this expressed confusion. See Gattineri, 2022 WL 123621, at *1 (describing "question was phrased in a confusing manner" as sufficient explanation for conflict between information in deposition and affidavit).

WW is also not prejudiced by this outcome. Counsel for WW had the opportunity to ask further questions concerning "the reasons for such prescription diversions," (Mot. to Strike at 11), when Mr. Armstrong responded that patients make such determinations regarding where

prescriptions are filled. That would have been the opportunity to ask about when, how often, and under what circumstances patients' directives to transfer prescriptions were put into practice. Counsel for WW chose not to follow up on this line of questioning, focusing instead on hypotheticals about whether such actions, if they occurred, were consistent with the Good Guy Clause. Moreover, WW's argument that including these statements in the post-deposition affidavit is unfair because it would have "probe[d] the strength of those recollections," (id.), aims to address Mr. Armstrong's credibility, a question that is not appropriate for the court to consider at this summary judgment stage. See Winfield v. Keefe, 357 F. Supp. 3d 90, 94 (D. Mass. 2019) ("The summary judgment standard bears repeating here: this Court may not act as a trier of fact, but rather must 'draw all reasonable inferences in favor of the nonmoving party, and . . . not make credibility determinations or weigh the evidence." (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000))).

    e. **Paragraph 20**

Finally, in paragraph 20 of the Armstrong Affidavit, Mr. Armstrong states:

> I understood in late 2015 that, pursuant to legal requirements, a pharmacy in Texas must be operating to maintain its license and must have a pharmacist working at the pharmacy to be operating. When there were no longer funds available to pay for a pharmacist at Dallas, the pharmacy could not continue operating and had to close. **I understood that White Winston was aware of these circumstances prior to the Dallas pharmacy closing.**

(emphasis added). WW seeks to strike the bolded portion of paragraph 20 as contradictory to Mr. Armstrong's prior testimony that he did not recall having any discussions with Mr. Enright prior to closing the Dallas Pharmacy. (Mot. to Strike at 12). Mr. Armstrong also testified, WW asserts, that he did not know to what extent Mr. Enright was aware of the circumstances surrounding the Dallas Pharmacy closure. (Id.) The Armstrong Parties respond that the final

11

sentence "simply clarifies testimony provided during [Mr.] Armstrong's deposition" and that the Armstrong Affidavit merely asserts that Mr. Armstrong "understood that Mr. Enright was aware of the circumstances (e.g., 'there were no longer funds available to pay for a pharmacist at Dallas,' Aff. ¶ 20) that necessarily required such closing." (Docket No. 259 at 8, 9).

The court finds that the Armstrong Affidavit attempts to do more than just clarify Mr. Armstrong's prior testimony. Mr. Armstrong was clear in his deposition that he did not recall any discussions with Mr. Enright prior to his decision to windup the Dallas Pharmacy. (Armstrong Dep. Tr. 246:15-247:1). Mr. Armstrong also testified, "The windup was initiated due to the fact that the Texas State board regulations being that if you're not operating, you do have to return the license and close the store. I'm not sure if Mr. Enright was aware of that or not, but I have to comply with the state laws." (Id. 253:20-25). Thus, Mr. Armstrong's deposition establishes that he did not know whether WW, through Mr. Enright, knew about the legal requirements concerning the continued employment of a pharmacist to maintain a pharmacy's license. Mr. Armstrong's affidavit contradicts this testimony because, in essence, he is now asserting that WW was aware of these legal constraints on the continued operation of the Dallas Pharmacy, although he does not explain how WW came to know this information.[1] Because the last statement in paragraph 20 of the Armstrong Affidavit contradicts Mr. Armstrong's prior testimony, Mr. Armstrong must offer a "satisfactory explanation of why the testimony is changed." Reynolds, 364 F. Supp. 3d at 52. Mr. Armstrong has provided no such

---

[1] If Mr. Armstrong is merely asserting that he has an unsubstantiated belief that WW knew of the legal constraints, the assertion adds nothing to the factual record.

12

explanation for the revised testimony.  Accordingly, the court will strike the last sentence of paragraph 20 under the "sham affidavit" rule.

## IV.    CONCLUSION

For the foregoing reasons, "White Winston Select Asset Funds, LLC's Motion to Strike Portions of Affidavit of Grant W. Armstrong" (Docket No. 249) is ALLOWED in part and DENIED in part.  The last sentence of paragraph 20 of the Armstrong Affidavit is stricken from the record and will not be considered by the court.  The remainder of the Armstrong Affidavit will be considered as part of the record in the court's assessment of WW's motion for summary judgment (Docket No. 233), giving it the weight the court deems appropriate.

          / s / Judith Gail Dein
          Judith Gail Dein
          United States Magistrate Judge