UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GRANT ARMSTRONG and ) 
ARMSTRONG RX GP, LLC )
 )
       Plaintiffs, )
   v. )         CIVIL ACTION
 )         NO. 16-10666-JGD
WHITE WINSTON SELECT ASSET )
FUNDS, LLC, )
 )
       Defendant/Third-Party )
       Plaintiff, )
 )
   v. )
 )
ARMSTRONG RX II GP, LLC and )
ARMSTRONG RX II, LP, )
 )
       Third-Party Defendants. )

## MEMORANDUM OF DECISION AND ORDER ON
## WHITE WINSTON SELECT ASSET FUNDS, LLC'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

December 27, 2022

DEIN, U.S.M.J.

### I.   <u>INTRODUCTION</u>

This matter concerns an action brought by Grant W. Armstrong ("Mr. Armstrong") and

Armstrong RX GP, LLC ("AGP"), an entity wholly owned by Mr. Armstrong, against White

Winston Select Asset Funds, LLC ("WW" or "White Winston"), a financing company that

provided Mr. Armstrong and AGP with loans to purchase and operate two pharmacies in Texas,

one in Plano (the "Plano Pharmacy") and one in Dallas (the "Dallas Pharmacy").  (See Docket

No. 116 (the "Third Amended Complaint" or "TAC")).  WW has also asserted counterclaims

against Mr. Armstrong and AGP, and it has brought similar claims in a third-party complaint against two other entities owned by Mr. Armstrong, Armstrong RX II GP, LLC ("AGP II") and Armstrong RX II, LP ("ALP II") (together with Mr. Armstrong, AGP, and AGP II, the "Armstrong Parties").  (See Docket No. 12 (the "Counterclaim Complaint" or "CC"); Docket No. 17 (the "Third-Party Complaint" or "TPC")).  The parties' claims focus on the formulation, performance, and enforcement of numerous agreements executed in connection with the purchase of the Dallas Pharmacy.

Presently before the court is "White Winston Select Asset Funds, LLC's Motion for Summary Judgment" (Docket No. 233).  Through its motion for summary judgment, WW requests (i) entry of full summary judgment in its favor on all claims asserted against it by Mr. Armstrong and AGP, (ii) partial summary judgment in its favor on all counterclaims brought against Mr. Armstrong and AGP; and (iii) partial summary judgment in its favor as to all claims asserted against the third-party defendants AGP II and ALP II.  WW asks the court to determine liability on its counterclaims and claims against the third-party defendants and reserve the issue of damages for trial.

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Jenkins Starr, LLC v. Cont'l Ins. Co., Inc., 601 F. Supp. 2d 344, 346 (D. Mass. 2009) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  In sum, for many of the claims asserted in the Third Amended Complaint, the Armstrong Parties have failed to prove up their allegations and provide sufficient evidence to show that there is a genuine need for trial.  That said, there are some discrete claims for which the Armstrong Parties have proffered evidence that, when viewed in the light most favorable to

2

the Armstrong Parties as the nonmoving parties, demonstrates a genuine dispute of material

fact to preclude resolution of such claims on a motion for summary judgment.  Accordingly, for

the reasons explained herein, WW's motion for summary judgment is hereby ALLOWED in part

and DENIED in part in accordance with this memorandum of decision.

## II.   STATEMENT OF FACTS
### Scope of the Record

In connection with this motion for summary judgment, WW moved to strike certain

opposition evidence proffered by the Armstrong Parties through the "Affidavit of Grant W.

Armstrong" (Docket No. 245 Ex. 51 (the "Armstrong Affidavit")).  (See Docket No. 249).  The

court will consider the Armstrong Affidavit in accordance with its separate order allowing in

part and denying in part WW's motion to strike.  (See Docket No. 261).  The following facts are

primarily drawn from "White Winston Select Assets Funds, LLC's Response to Armstrong

Parties' Statement of Material Facts Regarding Motion for Summary Judgment by White

Winston Select Assets Funds, LLC" (Docket No. 251 ("WW Reply SMF")) and are undisputed

unless otherwise indicated.

### Acquisition of the Plano Pharmacy

Mr. Armstrong and AGP acquired the Plano Pharmacy from QVL Pharmacy Holdings, Inc.

("QVL") on or about January 23, 2014 (the "Plano Acquisition").  (WW Reply SMF ¶ 1).  Prior to

the Plano Acquisition, Mr. Armstrong worked in QVL's corporate offices as a corporate

pharmacist.  (See Docket No. 235-2 ("Armstrong Dep. Tr.") 31:13-33:23).   In November 2013,

the QVL board of directors decided to liquidate QVL and WW, as the agent for the senior

secured lender to QVL, was involved with that liquidation process.  (See WW Reply SMF ¶¶ 72,

73, 77).  Stephen Cox ("Mr. Cox"), QVL's former chief financial officer, was involved with both

the liquidation of QVL and engaged with Mr. Armstrong in connection with the acquisition and

operation of the pharmacies.  (See id. ¶¶ 73, 79).  Todd Enright ("Mr. Enright") is the manager

for WW who was involved with both the liquidation at QVL and the sale and financing of the

Plano Pharmacy and the Dallas Pharmacy to the Armstrong Parties.  (Id. ¶¶ 7, 72).

     To finance the Plano Acquisition, WW, Mr. Armstrong, and AGP executed a loan

agreement (the "Plano Loan Agreement") and related loan documents, including a promissory

note through which WW loaned Mr. Armstrong and AGP $460,000 to acquire and operate the

Plano Pharmacy.  (Id. ¶¶ 2, 3).  Under the Plano Loan Agreement, the Armstrong Parties set up

a lockbox account to hold the cash collateral for the Plano Pharmacy.  All payments and

revenues due from the operation of the business would be deposited into this account.

(Docket No. 235-1 Ex. A-2, § 3.3).  Section 3.3 of the Plano Loan Agreement allows the

Armstrong Parties to access and make disbursements from the Plano Pharmacy lockbox, so long

as no Event of Default, as defined in the agreement, has occurred.  (Id.; see WW Reply SMF

¶ 4).  As part of the Plano Acquisition, Mr. Armstrong and AGP signed a Transition Services

Agreement with QVL (the "Plano TSA"), which provided for QVL to cover certain operating

expenses for the Plano Pharmacy with funds from a lockbox account that held insurance

reimbursements for prescriptions filled at the Plano Pharmacy.  (See Docket No. 245 Ex. 47,

§ 2.02).  Under the terms of the Plano TSA, QVL would then remit the net receivables to the

Plano Pharmacy.  (See id.)

**Acquisition of the Dallas Pharmacy**

After the purchase of the Plano Pharmacy, Mr. Armstrong began exploring the acquisition of the Dallas Pharmacy.  (WW Reply SMF ¶ 7).  Mr. Armstrong asserts that Mr. Enright insisted that Mr. Armstrong go through with the purchase of the Dallas Pharmacy in order for Mr. Armstrong to seek forbearance under the Plano Loan Agreement.  (Id. ¶ 85).  WW denies this fact.  (Id.)

On May 29, 2014, Mr. Armstrong and AGP II entered into the Partnership Interest Purchase Agreement (the "PIPA") with QVL to purchase the controlling interest in the Dallas Pharmacy.  (Id. ¶ 8).  Pursuant to the PIPA, AGP II purchased 100% of the issued and outstanding general partner interests of the Dallas Pharmacy, Mr. Armstrong purchased 100% of the Class A common limited partner interests in the Dallas Pharmacy, and QVL Equity Holding Group, LLC (which is managed by WW) purchased the Class B common limited partner interests, holding a 49.5% interest in the Dallas Pharmacy.  (Id. ¶ 9).  This transaction is referred to as the Dallas Acquisition.

To finance the Dallas Acquisition, WW, AGP II, and Mr. Armstrong executed a loan agreement dated May 29, 2014 (the "Dallas Loan Agreement").  (Id. ¶ 15).  AGP II also executed a $1 million note in favor of WW to be used to acquire the ownership interest in the Dallas Pharmacy (the "$1M Note" or the "Term Note") and an additional $500,000 line of credit in favor of WW to be used for general working capital to operate the Dallas Pharmacy (the "$500K Note" or the "Revolving Line of Credit") (together with the $1M Note, the "Dallas Promissory Notes").  (Id. ¶¶ 10, 13, 14).  As further discussed below, the principal of the $500K Note was later increased to $750,000.  (Id. ¶¶ 27, 29).  Under the terms of the Dallas Loan Agreement,

the Armstrong Parties were required to establish a deposit account where receivables from the store would be held and then credited to the balance of interest on the Revolving Line of Credit or to other obligations in WW's discretion.  (See Docket No. 235-1 Ex. A-8, §§ 1.2(c)(ii), 3.3).

In connection with the Dallas Loan Agreement, AGP executed a Guaranty, dated May 29, 2014 (the "AGP Guaranty").  (WW Reply SMF ¶ 20).  Mr. Armstrong also executed a personal Limited Guaranty, dated May 29, 2014 (the "Armstrong Limited Guaranty").  (Id. ¶ 21).  The Armstrong Limited Guaranty provides that Mr. Armstrong guarantees the Dallas Promissory Notes and the Dallas Loan Agreement, subject to the limitations set forth in section 2 of the guaranty (referred to as the "Good Guy Clause").  (Id. ¶ 22).  The Good Guy Clause states that if certain terms and conditions are satisfied, as reasonably determined in good faith by WW, Mr. Armstrong will be released from the obligations of the Armstrong Limited Guaranty.  (Id.; see Docket No. 235-1 Ex. A-10, § 2).  Mr. Armstrong and AGP II also executed a Transition Services Agreement with QVL in connection with the Dallas Acquisition (the "Dallas TSA"), dated May 29, 2014.  (See Docket No. 245 Ex. 48).  Like the Plano TSA, the Dallas TSA provides that QVL will pay for the costs of certain services to the Dallas Pharmacy and deduct the costs from the cash receivables in a lockbox account.[1]  (Id. § 2.02).

Finally, Mr. Armstrong and QVL Pharmacy Subsidiaries Funding Group, LLC ("QVL Funding Group"), for which WW acts as agent, also entered into a Side Agreement on May 29, 2014, which concerns the hiring and funding of a Physicians Relationship Manager ("PRM").

---

[1]  As further discussed infra, there is some confusion in the record as to how or from where funds were to be remitted to the pharmacies under the TSAs.  It is unclear whether such funds were to be remitted from a receivables lockbox specific to each pharmacy or if such funds would come from QVL's own accounts, upon which the availability of funds depended on QVL's own line of credit with WW.

(See Docket No. 245 Ex. 49; WW Reply SMF Ex. D ("Enright July Decl.") ¶ 36; WW Reply SMF ¶ 56).  Mr. Armstrong later hired Manny Anzaldua to serve as a PRM for the Dallas Pharmacy. (WW Reply SMF ¶ 96).

### Meeting between Mr. Armstrong & Mr. Enright Prior to the Dallas Acquisition

Mr. Armstrong represents that he and Mr. Enright met in person to discuss the terms of the deal prior to the purchase of the Dallas Pharmacy.  (Id. ¶¶ 53, 87).  While the record is light on the details of this meeting, Mr. Armstrong attests that the meeting occurred at a hotel or restaurant by the Dallas-Fort Worth airport, lasted about 30 to 60 minutes, and took place prior to the purchase of the Dallas Pharmacy.  (Id. ¶¶ 51, 53, 54).  Mr. Armstrong states that at this meeting he and Mr. Enright discussed the inclusion of the Good Guy Clause in the Armstrong Limited Guaranty to protect himself from liability if the Dallas Pharmacy was not successful.  (Id. ¶¶ 87, 88).  Mr. Armstrong further attests that at this meeting Mr. Enright also promised (i) that Mr. Armstrong would have access to the $500,000 line of credit and initial $100,000 draw as working capital to fund operations at the Dallas Pharmacy, (ii) funds from the lockbox to be set up as collateral under the Dallas Loan Agreement would be available for the Dallas Pharmacy to purchase inventory, and (iii) that inventory purchases from their pharmaceutical supplier, Amerisource Bergen Drug Company ("ABDC"), would be available on commercially reasonable terms.  (See id. ¶¶ 89, 90; Armstrong Aff. ¶ 9).

Mr. Enright responds that he recalls having several discussions with Mr. Armstrong about the acquisition and the loan structure for the purchase of the Dallas Pharmacy, but he denies having a meeting with Mr. Armstrong at a restaurant or hotel near the Dallas-Fort Worth airport.  (WW Reply SMF ¶ 87).  Mr. Enright further maintains that he did not have any

discussions with Mr. Armstrong that contradicted the terms of the agreement as set forth in the Dallas Acquisition documents.  (Id. ¶ 100; Enright July Decl. ¶ 15).

### Plano Pharmacy Refinancing & First Amendment to Dallas Loan Agreement

On September 2, 2014, Mr. Armstrong and AGP refinanced the debt owed to WW in connection with the Plano Acquisition (the "Plano Refinancing").  (WW Reply SMF ¶ 6).  As part of the Plano Refinancing, Mr. Armstrong, AGP, and AGP II, executed a Release of Lien and Limited Guaranties through which WW released certain liens it had against the Plano Pharmacy and released AGP from certain liabilities under the limited guaranties it executed in connection with the purchase of the pharmacies.  (Id.)  In return, the Armstrong Parties released certain claims against WW (the "Plano Release").  (Id.)  Specifically, the Plano Release provides:

> The Plano Borrowers acknowledge and agree that, as of the date hereof and in respect to this Agreement, the Plano Loan Agreement and transactions consummated thereunder: (a) neither of the Plano Borrowers has any claim or cause of action against the Lender or any of its officers, employees, attorneys or agents; (b) neither of the Plano Borrowers has offset rights, counterclaims, or defense of any kind against any of their obligations, indebtedness or liabilities to the Lender; and (c) the Lender has heretofore properly performed and satisfied in a timely manner all of its obligations to the Plano Borrowers.  The Lender desires (and the Plano Borrowers agree) to eliminate any possibility that any past conditions, acts, omissions, events, circumstances or matters in respect of the Plano Loan Agreement and transactions consummated thereunder (except as waived by this Agreement) would impair or otherwise adversely affect any of the rights, interests, contracts, collateral security or remedies of the Lender. Therefore, on their own behalf and on behalf of each of their respective successors and assigns, the Plano Borrowers hereby waive, release and discharge the Lender and all of its members, managers, directors, officers, employees, attorneys, and agents, from any and all claims, demands, actions or causes of action arising out of or is any way relating to the Plano Loan Agreement, the Guaranties, and any documents, instruments, agreements (including this Agreement), dealings or other matters connected with the Plano Loan Agreement and the Guaranties, including, without limitation, all known and unknown matters, claims, transactions or things occurring on or prior to the date

of this Agreement.  The waiver, releases, and discharges in this Section shall be effective regardless of any other event that may occur or not occur on or after the date hereof.

(Docket No. 235-1 Ex. A-4, § 4).

Shortly after, the parties also amended the original terms of the Dallas Loan Agreement. On or about October 8, 2014, WW, AGP II, ALP II, and Mr. Armstrong executed the First Amendment to the Dallas Loan Agreement and Secured Promissory Notes (the "First Amendment"), which increased the principal amount of the $500K Note by $250,000 to $750,000 and made ALP II a direct obligor under the $500K Note.[2]  (WW Reply SMF ¶¶ 27, 29). The First Amendment also contains a release (the "Dallas Release"), which states:

In consideration of the Lender's agreement to modify the Note, the Borrowers, for themselves and their subsidiaries, affiliates, employees, agents, successors and assigns (the "Releasing Parties"), do hereby remise, release and forever discharge the Lender and its agents, employees, representatives, directors, officers, members, managers, successors and assigns (the "Released Parties") of and from any and all claims, counterclaims, demands, actions and causes of action of any nature whatsoever, whether at law or in equity, including without limitation any of the foregoing arising out of or relating to this Amendment, the Notes or any of the other Loan Documents that the Releasing Parties, or any of them, have or may have against the Released Parties, whether or not known to them, from the beginning of the world to the date of this Agreement.

(Id. ¶ 30; Docket No. 235-1 Ex. A-14, § 8).

**Dallas Pharmacy Inventory Problems & Prescription Transfers**

Both the Plano Pharmacy and the Dallas Pharmacy experienced problems purchasing inventory from their supplier ABDC.  (See WW Reply SMF ¶¶ 83, 94).  The Armstrong Parties assert that the inventory problems stemmed from QVL's outstanding debt obligations to ABDC,

---

[2] The First Amendment is dated June 13, 2014, but the parties agree that WW and the Armstrong Parties actually executed this document in October of 2014.  (WW Reply SMF ¶ 28).

which complicated Mr. Armstrong's ability to get prescriptions sent to the pharmacies on credit prior receiving the customers' payment or insurance reimbursement.  (Id. ¶ 95).  WW denies this fact.  (Id.)

Mr. Armstrong also represents that the lack of inventory at the Dallas Pharmacy led to an inability to fill all prescriptions that patients originally sought to fill at the Dallas Pharmacy and admits that this caused some prescriptions to be filled instead at the Plano Pharmacy.  (Id. ¶¶ 46, 68).  The parties, however, dispute the circumstances surrounding the transfers of such prescriptions from the Dallas Pharmacy.  WW asserts that Mr. Armstrong instructed employees of the Dallas Pharmacy to transfer prescriptions from the Dallas Pharmacy to be filled at the Plano Pharmacy to increase his profits at the Plano Pharmacy.  (Id. ¶ 66).  WW argues that this conduct harmed its collateral in the Dallas Pharmacy.  Mr. Armstrong maintains that prescriptions were only ever transferred to be filled at the Plano Pharmacy rather than the Dallas Pharmacy when the Dallas Pharmacy lacked the necessary inventory and a patient agreed to have the prescription filled at the Plano Pharmacy instead.  (Id. ¶¶ 68, 71).

**Armstrong Parties' Default & Closing of Dallas Pharmacy**

In or around mid-2015, AGP II failed to make the required debt service payments pursuant to the Dallas Loan Agreement.  (Id. ¶ 35).  WW asserts that, on or about October 2, 2015, WW instructed its counsel to deliver the Armstrong Parties with a written Notice of Default.  (Id. ¶ 38).  By letter dated December 8, 2015, Mr. Armstrong and AGP II notified WW that they were transferring all rights and interests to the assets of the Dallas Pharmacy to WW as contemplated in the Good Guy Clause of the Armstrong Limited Guaranty.  (Id. ¶ 40).

Around the same time, Mr. Armstrong closed the Dallas Pharmacy.  (Id. ¶ 41).  On December 8,

2015, Mr. Armstrong and AGP initiated the instant litigation.  (Id. ¶ 43).

### III.   THE CLAIMS

Through the operative TAC, Mr. Armstrong and AGP assert the following claims against

WW: (i) request for declaratory judgment concerning the Armstrong Limited Guaranty (TAC

Count One); (ii) fraudulent inducement with respect to the Armstrong Limited Guaranty, the

Dallas Loan Agreement, the PIPA, and the Dallas TSA (TAC Counts Two, Four, Five, Six); (iii)

negligent misrepresentation (TAC Count Sixteen); (iv) fraudulent misrepresentation (TAC Count

Ten); (v) breach of the implied covenant of good faith and fair dealing with respect to the

Armstrong Limited Guaranty, the PIPA, and the Dallas Loan Agreement (TAC Counts Three,

Seven, Eight); (vi) breach of contract in connection with the Dallas Loan Agreement (TAC Count

Nine); (vii) breach of fiduciary duty with respect to the Armstrong Limited Guaranty (TAC Count

Eleven); (viii) tortious interference with a contract regarding the Dallas TSA and the Side

Agreement (TAC Counts Thirteen, Fourteen); (ix) violation of Mass. Gen. Laws ch. 93A (TAC

Count Twelve); (x) declaratory judgment concerning the Escrow Agreement (TAC Count

Seventeen); and (xi) right to accounting of the lockbox account (TAC Count Fifteen).  Pursuant

to this court's prior order allowing in part and denying in part WW's motion to dismiss the TAC

(see generally Docket No. 152 ("Motion to Dismiss Order")), Counts Twelve and Seventeen have

been dismissed.[3]

---

[3] Count Seventeen of the TAC was asserted against McCarter & English, LLP, WW's escrow agent, which was originally named as a defendant in this action but was dismissed on June 17, 2019.  (See Mot. to Dismiss Order at 2 n.2).

In the Counterclaim Complaint and Third-Party Complaint, WW brings the following claims against the various Armstrong Parties: (i) request for declaratory judgment concerning the Armstrong Limited Guaranty (CC Count Five); (ii) breach of contract concerning the Dallas Loan Agreement (CC Count One, TPC Count One); (iii) breach of contract with respect to the Armstrong Limited Guaranty (CC Count Two); (iv) breach of the implied covenant of good faith and fair dealing concerning the Dallas Loan Agreement, the Armstrong Limited Guaranty, and the Dallas Promissory Notes (CC Count Three, TPC Count Four); (v) violation of Mass. Gen. Laws ch. 93A (CC Count Four, TPC Count Five); (vi) action on the $1M Note (TPC Count Two); and (vii) action on $500K Note (TPC Count Three).

WW has now moved for full summary judgment in its favor on all claims asserted against it by Mr. Armstrong and AGP in the TAC and partial summary judgment with respect to liability on its counterclaims and the claims asserted in the TPC, reserving the issue of damages on these affirmative claims for trial.

### IV.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 also "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Popular Auto, Inc. v. Reyes-Colon (In re Reyes-Colon), 922 F.3d 13, 20 (1st Cir. 2019) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Thus, the movant may satisfy its burden "in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's

claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim." Atain Specialty Ins. Co. v. Davester LLC, 518 F. Supp. 3d 551, 555 (D. Mass. 2021). Material facts are those that have "the potential of affecting the outcome of the case," and there is a genuine factual dispute where "the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (citations omitted). The court must review the record "in a light most favorable to the non-moving party[.]" Lima v. City of E. Providence, 17 F.4th 202, 206 (1st Cir. 2021). When a motion for summary judgment is made, "the nonmoving party must . . . 'set forth specific facts showing that there is a genuine issue for trial.'" Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 56-57 (1st Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The nonmoving party can avoid summary judgment only by providing properly supported evidence. See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018); Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). The court will first apply this standard to the Armstrong Parties' claims asserted in the TAC and then consider WW's affirmative claims against the Armstrong Parties.

## V.   ANALYSIS OF ARMSTRONG PARTIES' CLAIMS IN TAC

### A.   Previously Dismissed & Moot Claims (Counts Twelve, Fifteen & Seventeen of TAC)

As an initial matter, Counts Twelve and Seventeen of the TAC were previously dismissed by this court in the Motion to Dismiss Order. (See Mot. to Dismiss Order at 2 n.2, 45-46). Thus,

the court will not address these claims again here.  Additionally, the Armstrong Parties agree that "[t]o the extent White Winston has produced all relevant and discoverable financial and account information" the demand for accounting concerning the lockbox in Count Fifteen of the TAC is moot.  (Docket No. 243 ("Opp.") at 18 n.4).  The court will therefore ALLOW WW's motion for summary judgment in its favor on Count Fifteen of the TAC as moot.

### B.  Releases Executed by Armstrong Parties

WW argues that the Armstrong Parties have released many of the claims asserted against it through the execution of the Plano Release and the Dallas Release.  The court previously determined that the issue of the releases could not be resolved at the motion to dismiss stage because the scope of the Plano Release was ambiguous and the Armstrong Parties had plausibly alleged that the Dallas Release was fraudulently induced.  Now, after further development of the record, the court will revisit the question of whether either the Plano Release or the Dallas Release bars any of the Armstrong Parties' claims against WW.

It is "well-established that a party may relinquish its right to sue by agreeing to release another party from liability."  Craft v. Regions Mortg., Inc., 769 F. Supp. 2d 7, 10 (D. Mass. 2011).  "Massachusetts law favors the enforcement of releases."  Doe v. Cultural Care, Inc., No. 10-11426-DJC, 2011 WL 1048624, at *3 (D. Mass. Mar. 17, 2011) (quoting Sharon v. City of Newton, 437 Mass. 99, 105, 769 N.E.2d 738, 744 (2002)).  Here, the releases are governed by the principles of Massachusetts contract law.  See Kimmel & Silverman, P.C. v. Porro, 53 F. Supp. 3d 325, 336 (D. Mass. 2014).  The court must first determine if the contract provisions concerning the releases are ambiguous.  If so, the meaning of the releases will become "a matter for the factfinder," in which "summary judgment is appropriate only if the extrinsic

14

evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 784 (1st Cir. 2011) (citing Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998)). If the terms of the releases are unambiguous, "[t]he guiding principle is that the plain meaning of the unambiguous terms of the release control." Gen. Hosp. Corp. v. Esoterix Genetic Laboratories, LLC, 16 F.4th 304, 310 (1st Cir. 2021). WW raised the issue of release as an affirmative defense in their answer to the Armstrong Parties' claims, asserting that the Armstrong Parties released WW from liability associated with the Dallas Acquisition documents. (See Docket No. 12 at Eighth Affirmative Defense). The undisputed facts also establish that certain of the Armstrong Parties executed the Plano Release and the Dallas Release, both of which were submitted in the record by WW. (WW Reply SMF ¶¶ 6, 28, 29; see Docket No. 235-1 Exs. A-4, A-14). Accordingly, the burden shifts to the Armstrong Parties to demonstrate that the releases do not bar their claims. Kurtz v. Kripalu Ctr. for Yoga & Health, Inc., Case No. 3:17-cv-30109-KAR, 2019 WL 454594, at *8 (D. Mass. Feb. 5, 2019) (citing Sharon, 437 Mass. 99 at 102-03, 769 N.E.2d at 742-43).

## Plano Release

The Armstrong Parties assert that the Plano Release[4] applies only to claims concerning the Plano Acquisition. WW argues that the release extends to claims associated with both the

---

[4] The Plano Release provides,

> the Plano Borrowers hereby waive, release and discharge the Lender and all of its members, managers, directors, officers, employees, attorneys, and agents, from any and all claims, demands, actions or causes of action arising out of or is any way relating to the Plano Loan Agreement, the Guaranties, and any documents, instruments, agreements, (including this Agreement), dealings or other matters connected with the Plano Loan

Plano Acquisition and the Dallas Acquisition.  The court has already determined that the Plano Release, which was executed as part of the Plano Refinancing, is ambiguous as to whether it releases claims with respect to the purchase of solely the Plano Pharmacy or extends to claims related to both pharmacies.  (See Mot. to Dismiss Order at 23-24).  The court concluded that a ruling on the scope of the Plano Release could therefore not be made at the pleading stage.  (Id. at 24).  WW now argues that the Plano Release is enforceable because the Armstrong Parties, even after discovery, have not provided any evidence to suggest that the Plano Release should not be understood in the broad sense in which WW understood it (i.e., to cover all claims related to the purchase of both the Plano Pharmacy and the Dallas Pharmacy).  (Docket No. 234 ("Mem.") at 24).  Specifically, WW states that at his deposition Mr. Armstrong declined to provide any information on his understanding of the scope of the Plano Release.  (Id.)  WW therefore argues that Mr. Enright's interpretation should control, defeating all of the Armstrong Parties' claims concerning conduct that occurred prior to the execution of the Plano Release in September 2014.  (Id.)  The court, however, is still not persuaded that the summary judgment record supports WW's construction of the Plano Release as a matter of law.

"If a contract is ambiguous, the meaning of the ambiguous terms often, but not always, presents a question of fact for a jury."  Nadherny v. Roseland Prop. Co., Inc., 390 F.3d 44, 48 (1st Cir. 2004).  However, "a contract can be interpreted by the court on summary judgment if

---

Agreement and the Guaranties, including, without limitation, all known and unknown matters, claims, transactions or things occurring on or prior to the date of this Agreement. The waiver, releases, and discharges in this Section shall be effective regardless of any other event that may occur or not occur on or after the date hereof.

(Docket No. 235-1 Ex. A-4, § 4).

(a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity." Torres Vargas v. Santiago Cummings, 149 F.3d 29, 33 (1st Cir. 1998); see Nadherny, 390 F.3d at 49 ("[O]n summary judgment, a judge may determine that the extrinsic evidence which is material is uncontested, and so appropriately enter judgment.").  In ascertaining the meaning of a contract term, "the trier of fact may consult extrinsic evidence 'including the circumstances of the formation of the agreement and the intentions and objectives of the parties.'" NExTT Sols., LLC v. XOS Techs., Inc., 113 F. Supp. 3d 450, 457 (D. Mass. 2015) (quoting Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass., Inc., 79 Mass. App. Ct. 300, 307, 945 N.E.2d 964 (2011)).  Because the focus of the inquiry is on the objective intent of the parties, uncommunicated subjective expectations are insufficient to resolve a contract's ambiguity.  See Farmers Ins. Exch., 632 F.3d at 787 n.9 (rejecting testimony of defendant officer that he "assumed" a term had a certain meaning as insufficient to support defendant's suggested interpretation); RCI Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 204 (1st Cir. 1987) ("[C]ontracts depend on objective manifestations of consent and not on uncommunicated subjective expectations.").  "[T]he unexpressed intention of one party is not binding on the other party to a contract.  The intention or understanding must be mutual to have a contract." Nadherny, 390 F.3d at 51 (reversing summary judgment, in part, on finding that one party's affidavit reciting understanding of contract, even when unopposed, was insufficient to warrant summary judgment on an ambiguous contract because party did not attest that he expressed this understanding to other party during contract negotiations).

Here, the only evidence in the record concerning the parties' intended meaning of the Plano Release is Mr. Enright's uncontested statement in one of his declarations that he understood the language in the Plano Release to apply broadly to both the Plano Acquisition and the Dallas Acquisition, consistent with WW's practices with other borrowers.  (Docket No. 235-1 Ex. A ("Enright April Decl.") ¶ 9).  While the Armstrong Parties have provided no helpful evidence to the court to determine the parties' intent or understanding of the Plano Release, nowhere in the record does WW state that Mr. Enright ever expressed his broad understanding of the scope of the Plano Release to the Armstrong Parties.  Thus, Mr. Enright's testimony concerning his own, uncommunicated interpretation of the scope of the Plano Release does not resolve the ambiguity of the parties' collective intent on what the terms of the Plano Release meant when the parties executed the documents.  Accordingly, the court cannot at this time resolve the ambiguity as a matter of law through summary judgment.

### Dallas Release

The Dallas Release was executed on or about October 8, 2014 as part of the First Amendment to the Dallas Loan Agreement.  (WW Reply SMF ¶¶ 27, 28).

The Dallas Release states,

In consideration of the Lender's agreement to modify the Note, the Borrowers, for themselves and their subsidiaries, affiliates, employees, agents, successors and assigns (the "Releasing Parties"), do hereby remise, release and forever discharge the Lender and its agents, employees, representatives, directors, officers, members, managers, successors and assigns (the "Released Parties") of and from **any and all claims, counterclaims, demands, actions and causes of action of any nature whatsoever, whether at law or in equity, including without limitation any of the foregoing arising out of or relating to this Amendment, the Notes or any of the other Loan Documents that the Releasing Parties, or any of them, have or may have against the Released Parties, whether or not known to them, from the beginning of the world to the date of this Agreement.**

(Docket No. 235-1 Ex. A-14, § 8) (emphasis added).  WW argues that if the Dallas Release is

valid, it will eliminate all of the Armstrong Parties' claims premised on conduct that predates

the Dallas Release, which includes at a minimum the fraud-based claims – Counts Two, Four,

Five, Six, Ten, and Sixteen.  (See Mem. at 24).

### 1.  Validity of the First Amendment & Dallas Release

The Armstrong Parties have admitted that the First Amendment includes the release

language cited above but assert that such language is invalid because the First Amendment was

fraudulently induced.  (WW Reply SMF ¶ 30; Opp. at 18).  At the motion to dismiss stage, this

court found that, while "the question is a close one," the Armstrong Parties had plausibly

alleged fraud in the inducement with respect to the Dallas Release by "contending that White

Winston made misrepresentations about their access to funds in the Dallas Lock Box Account

on which the Plaintiffs relied."  (Mot. to Dismiss Order at 23).  The Armstrong Parties specifically

alleged that they "believed they would be able to pay down the LOC Note and the Amended

LOC with insurance reimbursements from the high volume of prescriptions they anticipated the

Dallas Pharmacy would fill, based on prior representations by White Winston concerning their

access to that revenue through the Lock Box Account arrangement."  (TAC ¶ 39).  Now, at the

summary judgment stage, the Armstrong Parties are required to provide evidence to meet their

burden of proof on these allegations.

To establish a fraudulent inducement claim, the Armstrong Parties must show "(1) that

the statement was knowingly false; (2) that [the defendants] made the false statement with the

intent to deceive; (3) that the statement was material to the plaintiffs' decision to sign the

contract; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs

were injured as a result of their reliance."  Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.,

329 F.3d 216, 225 (1st Cir. 2003).  The Armstrong Parties' fraudulent inducement claim at issue

here fails on the fourth element – reasonable reliance.  "Reliance normally is a question for a

jury."  Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59, 809 N.E.2d 1017, 1031 (2004).

However, "[a] claim for fraudulent inducement fails when the plaintiff knew that the

defendant's statement was false."  Delphi Corp. v. Litex, Inc., 394 F. Supp. 2d 331, 343 (D. Mass.

2005).  "[T]he plaintiff must prove that he did not know of the facts which made his reliance

unreasonable or could not have known."  Northeastern Univ. v. Deutsch, No. 19984927A, 2002

WL 968857, at *4 (Mass. Super. Ct. Mar. 21, 2002) (citing McEvoy Travel Bureau Inc. v. Norton

Co., 408 Mass. 704, 713 (1990)).  "The recipient of a fraudulent statement is not justified in

relying upon its truth if he knows that it is false or its falsity is obvious to him."  Stigman v.

Nickerson Enters., Inc., No. 9638, 2000 WL 1162237, at *2 (Mass. App. Div. Aug. 8, 2000)

(quoting Restatement (Second) of Torts § 541 (1976)).

  The evidence in the record establishes that, while the First Amendment is dated June

13, 2014, it was actually executed at some point in October of 2014, approximately five months

after the Dallas Acquisition at the end of May of 2014.  (WW Reply SMF ¶ 28).  The Armstrong

Parties have not proffered any evidence concerning the negotiations leading up to the First

Amendment.  Nor have they pointed to any additional specific misrepresentations or omissions

by WW concerning this document in the period between the Dallas Acquisition and the

execution of the First Amendment.  Rather, their claim for fraudulent inducement with respect

to the release relates back to an alleged meeting before the Dallas Acquisition at which, Mr.

Armstrong asserts, Mr. Enright represented that the Armstrong Parties would have access to

the lockbox account funds.  (WW Reply SMF ¶ 90).  WW denies that Mr. Enright ever promised the Armstrong Parties access to the lockbox funds.  (See id. ¶¶ 90, 100).  Further, WW has consistently maintained that it did not allow such access because it was not required to under the terms of the Dallas Loan Agreement.  (See id. ¶ 100; Enright July Decl. ¶¶ 22-24).  Regardless, there is no dispute in the record that WW never made funds available to the Armstrong Parties from the Dallas Pharmacy lockbox account.  (WW Reply SMF ¶ 100, Enright July Decl. ¶¶ 22-24).  This is the basis for many of the claims asserted by the Armstrong Parties in the TAC.  During this time, the Armstrong Parties were also in need of funds to operate the Dallas Pharmacy as it is undisputed that the Armstrong Parties repeatedly overdrew on the Revolving Line of Credit.[5]  (WW Reply SMF ¶ 23; Enright April Decl. ¶ 27).  Throughout this period, WW never made funds available to the Armstrong Parties to cover the Dallas Pharmacy's operating expenses or to reduce the balance on the line of credit.

Based on this information in the record, even assuming the representation was made, the Armstrong Parties' continued reliance on the original representation that the Dallas

---

[5] The Armstrong Parties assert that "[a]vailability on the line of credit was itself a fraud because . . . White Winston improperly loaded that line with charges unrelated to working capital and operations; the Armstrong Parties['] 'overdraws' were a consequence of that misconduct."  (Opp. at 15).  However, the Armstrong Parties' understanding of the availability on the Revolving Line of Credit and related fraud claim fail and do not alter the analysis here.  The Dallas Acquisition documents, specifically the Dallas Loan Agreement and related closing documents, contradict the Armstrong Parties' understanding that the entire $500K Note would be available for working capital, and thus, their reliance on any purported representations to the contrary are unreasonable as a matter of law.  See HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 571 (1st Cir. 2014) (rejecting fraudulent inducement claim when "contract-inducing misrepresentations . . . are irreconcilably at odds with the guaranty's express terms").  The text of the Dallas Loan Agreement provides that the $500K Note would be used both for working capital "**and** to pay the costs, fees and expenses incurred in connection with this financing." (Docket No. 235-1 Ex. A-8, § 1.2(a) (emphasis added); see also id. § 8.10 ("At the Closing, the Buyers shall pay a financing fee of $75,000 for the cost of all due diligence and other indirect expenses or fees paid or incurred by the Lender in connection with this transaction and the Closing.  All such fees shall be charged as an advance against the Revolving Loan.")).

Pharmacy would have access to the lockbox funds, when in fact, the Armstrong Parties had been operating the Dallas Pharmacy for five months prior to the execution of the First Amendment without receiving such funds, while overdrawing on their line of credit, is unreasonable as a matter of law.  The Armstrong Parties do not proffer any evidence from which the court or a reasonable factfinder could infer that there were times between the Dallas Acquisition and the execution of the First Amendment in which WW did provide such access or that the original promise was reasserted at the time of the First Amendment.  In light of the months over which WW refused to provide access to the lockbox funds, the Armstrong Parties cannot justify their continued reliance on information they knew was false.

Accordingly, the Armstrong Parties' claim that the First Amendment was fraudulently induced fails as a matter of law and the Dallas Release is valid.  The court will therefore enforce the First Amendment, including the Dallas Release, against the Armstrong Parties.

### 2.   Application of the Dallas Release

The Dallas Release states that the Armstrong Parties release WW "from any and all claims, counterclaims, demands, actions and causes of action of any nature whatsoever, whether at law or in equity . . . that the Releasing Parties, or any of them, have or may have against the Released Parties, whether or not known to them, from the beginning of the world to the date of this Agreement."  (Docket No. 235-1 Ex. A-14, § 8).  The unambiguous terms of the Dallas Release therefore establish that the Armstrong Parties have released any claims related to WW's conduct that occurred prior to the execution of the Dallas Release in October of 2014.  This is an admittedly very broad general release in favor of WW, but it does not offend Massachusetts law.

"Massachusetts law is pellucid that a broad release can encompass all matters that come within its terms." General Hosp. Corp., 16 F.4th at 309; see Eck v. Godbout, 444 Mass. 724, 725, 831 N.E.2d 296, 298 (2005) (affirming summary judgment enforcing general release as barring plaintiff's claims). Courts will enforce such general releases "even if the parties did not have in mind every existing claim at the time the release was executed." Craft, 769 F. Supp. 2d at 10; see General Hosp. Corp., 16 F.4th at 309-10 ("With respect to general releases covering 'any and all claims . . . whatsoever of every name and nature,' claims can be released even if they were not in the forefront of the parties' thinking.").[6] Further, the fact that the broad terms of the Dallas Release extend to claims asserting intentional and fraudulent conduct does not prohibit its enforcement. Massachusetts courts have cautioned that it may be against the state's public policy to allow parties to release liability for future harms caused by "gross negligence, or reckless or intentional conduct," CSX Transp., Inc. v. Mass. Bay Transp. Auth., 697 F. Supp. 2d 213, 227 (D. Mass. 2010) (quoting Sharon, 437 Mass. at 110 n.12, 769 N.E.2d 738), but the Dallas Release only protects WW from claims associated with conduct that occurred before the execution of the First Amendment. Releases prohibiting claims based on pre-release conduct, even intentional conduct, are permitted and will be enforced. See Pilalas v. Cadle Co., 695 F.3d 12, 16-17 (1st Cir. 2012) (affirming summary judgment dismissal of unlawful debt

---

[6] While the Dallas Release extends to unknown claims, there is also evidence in the record that the Armstrong Parties knew exactly what types of claims they may have against WW before they agreed to the release. Prior to executing the First Amendment, Mr. Armstrong's counsel contacted Mr. Enright and WW's counsel for information concerning actions taken to implement the Dallas Acquisition and the Dallas Loan Agreement as well as for additional information concerning the Dallas Pharmacy's obligations with respect to QVL's debt with ABDC. (See WW Reply SMF ¶ 25). Mr. Enright provided responses to the inquiries made by Mr. Armstrong's counsel before the parties executed the First Amendment. (Id. ¶ 26). These topics are now the subject of certain claims asserted by the Armstrong Parties in this action.

collection claims because plaintiff executed release that extinguished all pre-release claims against defendants); A.J. Properties, LLC v. Stanley Black & Decker, Inc., 989 F. Supp. 2d 156, 164, n.6 (D. Mass. 2013) (finding release executed in 2003 could not release defendant from liability for intentional tort that did not occur until 2010 but concluding that release still prevented suit against defendant for "claims that had accrued before it was signed"). Moreover, there is no dispute here that both parties were represented by counsel and in exchange for agreeing to the release language the Armstrong Parties received an additional $250,000 on the principal loan to operate the Dallas Pharmacy.  (See WW Reply SMF ¶¶ 28, 29).  These facts support enforcement of the Dallas Release.  See Abdella v. Seibold Plumbing & Heating, Inc., No. 11-P-1530, 2012 WL 4867375, at *1 n.4 (Mass. App. Ct. Oct. 16, 2012) (affirming dismissal of certain defendants based on general release that came about through negotiated settlement in case where plaintiffs were represented by counsel and received substantial consideration).

In applying the clear terms of the Dallas Release, the court agrees with WW that the Dallas Release undoubtably covers all of the fraud-based claims that the Armstrong Parties acknowledge are each premised on purported misrepresentations and omissions made by WW prior to the execution of the Dallas Acquisition documents on May 29, 2014.[7]  (See Opp. 13,

---

[7] The result is the same whether the court applies the "date of th[e] Agreement," which the parties agree is incorrectly stated as June 13, 2014, or the date on which the First Amendment was actually executed, October 8, 2014.  Some of the Armstrong Parties' additional claims against WW, such as the tortious interference claims (Counts Thirteen and Fourteen of TAC), breach of contract and fiduciary duty (Counts Nine and Eleven of TAC), and breach of the implied covenant of good faith and fair dealing (Counts Three, Seven, and Eight of TAC) may also have potentially been released under the Dallas Release.  However, the court cannot make that determination on this record as neither the Armstrong Parties nor WW have provided evidence detailing specific dates on which such conduct purportedly occurred.  These claims will therefore be further analyzed on their merits.

14).  As such, WW's motion for summary judgment with respect to Counts Two, Four, Five, Six,

Ten, and Sixteen of the TAC is ALLOWED as these claims were previously released pursuant to

the Dallas Release.  Because the Armstrong Parties have released their claims for fraudulent

inducement with respect to the documents underlying the Dallas Acquisition, the court will

enforce those documents – the Dallas Loan Agreement, the PIPA, the Armstrong Limited

Guaranty, and the Dallas TSA – as valid and will hold the parties to the terms of their

agreements.

      **C.**   **Declaratory Judgment – Armstrong Limited Guaranty (Count One of TAC & Count Five of CC)[8]**

Next, the parties both request declaratory judgment with respect to the Good Guy

Clause of the Armstrong Limited Guaranty.  (See Count One of TAC, Count Five of CC).  The

Armstrong Parties assert that WW refused to honor the Good Guy Clause and release Mr.

Armstrong despite the fact that he fulfilled his obligations under the clause.  (TAC ¶¶ 59-61).

WW, on the other hand, asserts that there remains a controversy concerning the nature and

extent of Mr. Armstrong's liability under the Armstrong Limited Guaranty and argues that he

has not complied with the Good Guy Clause in a manner that entitles him to the release of his

obligations.  (CC ¶ 84, Mem. at 7-8).

The Good Guy Clause is drafted as a way to protect Mr. Armstrong from attempts by

WW to enforce the personal guaranty.  Under its terms, if Mr. Armstrong cooperates with WW

to transfer his rights and interests in the Dallas Pharmacy <u>and</u> engages in or refrains from

---

[8] Because both parties request declaratory judgment with respect to Mr. Armstrong's entitlement to relief under the Good Guy Clause, the court will address the claims together in this section.

engaging in certain conduct to protect WW's collateral in the Dallas Pharmacy, Mr. Armstrong

will "be fully released and discharged from his obligations."[9]  (Docket No. 235-1 Ex. A-10, § 2).

Mr. Armstrong's entitlement to the release depends on WW's determination that Mr.

Armstrong has complied with his obligations under the clause.  (Id.)  WW's determination must

be "reasonably determined in good faith."  (Id.)  Thus, the question for the court is whether it

can decide on this summary judgment record if WW's decision to withhold the protections of

---

[9] Specifically, the Good Guy Clause provides the following "terms and conditions" with which Mr.
Armstrong must comply to be released from his obligations:

> (a) The Guarantor fully cooperates with the Lender in turning over to the Lender all of the
> Guarantor's right, title and interest in the outstanding ownership interest in the Borrower
> and the Target, and in causing the Borrower to turn over all of its assets – including all the
> Borrower's right, title and interest in the outstanding partnership interests of the Target
> – and in doing so assists the Lender, without compensation, as necessary to maximize the
> value of such assets in liquidation or sale, including, without limitation, the completion of
> any tasks necessary to complete the transition of the Borrower's business activities to any
> successor owner thereof and the formulation, development, testing, application, and
> marketing of any products under design or development by the Borrower.

> (b) The Guarantor takes no action to assert or assist any third party in asserting that he or
> any third party has ownership, license or other rights to the know-how and other property
> or products of the Borrower, except as provided by the Borrower for fair value on an arms'
> length basis under reasonable commercial terms and conditions, whether such rights are
> created before or after the date of this Agreement.

> (c) The Guarantor does not file or otherwise seek protection from creditors under federal
> or state bankruptcy or insolvency laws, and the Guarantor does not cause or permit ARXII
> or the Target to seek protection from creditors under federal or state bankruptcy or
> insolvency laws.

> (d) The Guarantor does not cause or permit ARXII or the Target to fail to pay any tax or
> municipal obligation when due; provided that the foregoing shall not prevent ARXII or the
> Target from contesting in good faith any tax or assessment so long as adequate reserves
> for payment of the same have been made and verified to the Lender.

(Docket No. 235-1 Ex. A-10, § 2).

the Good Guy Clause from Mr. Armstrong was reasonable and made in good faith as a matter of law.  As further explained below, the court finds that Mr. Armstrong has proffered sufficient evidence to create a genuine dispute as to this question and therefore it cannot now be answered on a motion for summary judgment.  See Jenkins Starr, LLC, 601 F. Supp. 2d at 346-47 (finding dispute as to whether certain costs were reasonable under the terms of contract precluded summary judgment on issue as a matter of law).

The parties' dispute over Mr. Armstrong's compliance with the Good Guy Clause appears to be focused on section (a) of the clause,[10] which requires that (i) Mr. Armstrong "fully cooperate[] with the Lender in turning over to the Lender all of the Guarantor's right, title and interest in the outstanding ownership interest in the Borrower and the Target," and, in doing so, (ii) Mr. Armstrong must "assist[] the Lender, without compensation, as necessary to maximize the value of such assets in liquidation or sale, including . . . the completion of any tasks necessary to complete the transition of the Borrower's business activities to any successor owner thereof[.]"  (Docket No. 235-1 Ex. A-10, § 2(a)).  It is undisputed that Mr. Armstrong, by letter dated December 8, 2015, notified WW that he and AGP II transferred their rights, title, and interests to all assets of the Dallas Pharmacy, including their ownership interests, to WW. (WW Reply SMF ¶ 40).[11]  However, the remaining factual disputes over the manner in which

---

[10]  Because of the way in which this dispute arose, with Mr. Armstrong initiating the transfer of the Armstrong Parties' interests in the Dallas Pharmacy to WW prior to any attempt by WW to enforce the Armstrong Limited Guaranty and collect on the Dallas Loan Agreement, neither the facts nor the parties' arguments perfectly map onto the language of the Good Guy Clause.

[11]  The Armstrong Parties "denied" this fact, but their denial relates to WW's characterization of Mr. Armstrong's actions.  There is no true dispute that Mr. Armstrong sent the letter to WW intending to transfer the Armstrong Parties' rights in the Dallas Pharmacy to WW.

Mr. Armstrong effectuated this transfer and whether he took actions to sufficiently protect WW's interest in the assets of the Dallas Pharmacy preclude the court from reaching a conclusion on Mr. Armstrong's entitlement to release under the Good Guy Clause as a matter of law.

WW argues that the Armstrong Parties had no right to unilaterally transfer their interests and the evidence shows that Mr. Armstrong did not fulfill his further obligations under the Good Guy Clause. (Id. ¶ 44; Mem. at 7-8). First, WW argues that Mr. Armstrong did not cooperate with WW with respect to his transfer of his rights and interests in the Dallas Pharmacy to WW and instead, without notice, closed the store and ceased operations. (Mem. at 8). Second, when Mr. Armstrong closed the store, he and AGP immediately filed this lawsuit seeking to invalidate WW's rights as lender, causing WW to incur litigation expenses. (Id.) Third, WW asserts that Mr. Armstrong diverted valuable business to the Plano Pharmacy by transferring prescriptions meant to be filled at the Dallas Pharmacy to the Plano Pharmacy. (Id.) WW maintains that such actions harmed the value of WW's collateral and, presumably, did not assist WW in "maximiz[ing] the value of such assets in liquidation or sale." This conduct, WW argues, does not comply with the requirements of the Good Guy Clause. (Id.)

In response, Mr. Armstrong argues that the record shows that he satisfied the requirements of the Good Guy Clause. (Opp. at 10). Mr. Armstrong asserts that he did not unilaterally shutter the Dallas Pharmacy but was forced to close because he could no longer pay for a pharmacist or maintain the license for the pharmacy. (Id.) Further, Mr. Armstrong argues that simply because he filed suit against WW does not mean that he did not satisfy the Good Guy Clause. (Id. at 10-11). Mr. Armstrong represents that he reasonably believed that he had

complied with the requirements of the clause and therefore he was justified in seeking, among other things, declaratory judgment stating that he was entitled to the release of his obligations. (Id. at 11). Finally, Mr. Armstrong rejects WW's assertion that he diverted valuable business from the Dallas Pharmacy to the Plano Pharmacy, arguing that prescriptions were only ever filled at the Plano Pharmacy at the customer's direction when the Dallas Pharmacy lacked the necessary inventory to fill those prescriptions. (Id.)

Starting first with Mr. Armstrong's initiation of this lawsuit, the court is not persuaded that such action precludes him from release under the Good Guy Clause as a matter of law. There is no dispute that the Armstrong Parties filed this lawsuit against WW on the same day that they notified WW of the purported transfer of their rights in the Dallas Pharmacy to WW, ostensibly in compliance with the terms of the Good Guy Clause. (See WW Reply SMF ¶ 43). However, the filing of the lawsuit is not expressly prohibited by the Good Guy Clause. The clause only requires that WW will "refrain from instituting legal proceedings to enforce the terms" of the loan documents if WW is satisfied that Mr. Armstrong has met the requirements of the Good Guy Clause. (Docket No. 235-1 Ex. A-10, § 2). Thus, the text of the clause does not either preclude Mr. Armstrong from filing suit, or allow this court to conclude that WW's refusal to honor the release in light of Mr. Armstrong's initiation of litigation is either reasonable or unreasonable as a matter of law.

There is also sufficient evidence in the record to create two reasonable explanations for the diversion of prescriptions from the Dallas Pharmacy to the Plano Pharmacy and for the wrap-up of the Dallas Pharmacy such that it would be inappropriate for the court to resolve this issue as a matter of law.

With respect to the diversion of prescriptions from the Dallas Pharmacy to the Plano Pharmacy, the evidence does not establish as a matter of law that WW was reasonable or unreasonable in withholding Mr. Armstrong from the release.  The parties do not dispute that there were occasions on which prescriptions that were originally sent to the Dallas Pharmacy were transferred and ultimately filled at the Plano Pharmacy.  (See, e.g., WW Reply SMF ¶ 68). There is a genuine factual dispute, however, as to whether Mr. Armstrong prompted such actions in order to divert profits from the Dallas Pharmacy to the Plano Pharmacy or if such diversions were simply a matter of customer choice due to a lack of inventory at the Dallas Pharmacy.  (See id. ¶¶ 65-71, 99).  Mr. Armstrong has testified that the Dallas Pharmacy had difficulty securing inventory for the store.  (See, e.g., id. ¶ 94; Armstrong Dep. Tr. 206:1-4; Armstrong Aff. ¶ 13).  WW has not specifically denied this fact but disputes Mr. Armstrong's explanation of what caused the problem.  (WW Reply SMF ¶ 94).  Thus, the facts surrounding the transfer of prescriptions preclude a ruling as a matter of law as to whether Mr. Armstrong should be denied liability for failing to protect WW's collateral and maximize WW's value in the assets of the Dallas Pharmacy.[12]

WW also argues that the Armstrong Parties did not cooperate with WW in the transfer of the Armstrong Parties' interests in the store and did not protect WW's collateral, instead choosing to close the Dallas Pharmacy without warning to WW.

---

[12] While WW suggests that the reason behind the diversion of prescriptions is irrelevant, as it still harms its underlying collateral, if the real reason for the diversion was lack of inventory and customer choice, a rational factfinder could conclude that Mr. Armstrong fulfilled his obligations.

It is undisputed that Mr. Armstrong's purported transfer of his interests by letter to WW was not done with advance notice or through any engagement with WW. (Id. ¶ 40). At the same time, WW has offered no evidence that, when Mr. Armstrong informed WW of this transfer of his rights in the Dallas Pharmacy, as contemplated in the Good Guy Clause, WW requested additional documents or efforts by Mr. Armstrong to effectuate this transfer and Mr. Armstrong refused. Thus, it remains for a factfinder to determine whether Mr. Armstrong's unilateral transfer of his ownership interest, without notice, fulfilled his obligations to "fully cooperate[]" with WW in turning over his rights in the Dallas Pharmacy.

Mr. Armstrong has also provided evidence that he closed the Dallas Pharmacy based on his understanding of Texas law, which he asserts required that once the store could no longer afford to employ a pharmacist it was forced to close and forfeit its license. (Id. ¶ 117). If proven at trial, a reasonable factfinder may conclude that under the circumstances described by Mr. Armstrong it was unreasonable for WW to withhold the Good Guy Clause release from Mr. Armstrong for failing to protect or maximize WW's value in the store when he was simply attempting to comply with state law. The facts are therefore not so one-sided that rational minds could not differ on the question of the reasonableness of WW's decision to withhold the release. These remaining factual disputes preclude this court from ruling that WW is entitled to withhold the release or, conversely, that Mr. Armstrong is entitled to the release as a matter of law. This issue must be reserved for trial. WW's motion for summary judgment with respect to Count One of the TAC and Count Five of the CC is DENIED.

D. <u>**Tortious Interference (Counts Thirteen & Fourteen of TAC)**</u>

In Counts Thirteen and Fourteen of the TAC, the Armstrong Parties assert claims for tortious interference with a contract concerning the Dallas TSA and the Side Agreement. First, with respect to the Dallas TSA, the Armstrong Parties allege that "White Winston willfully and intentionally interfered with the [Dallas] TSA by preventing QVL from remitting the monthly net receivables from the Lock Box Account to the [Armstrong Parties] as required by the [Dallas] TSA." (TAC ¶ 119). The Armstrong Parties further allege that WW "caused QVL to generate false reports to the [Armstrong Parties], in which QVL billed the [Dallas Pharmacy] for services provided to the Dallas Pharmacy but then failed to pay the entities actually providing the billed services." (<u>Id.</u>) Second, the Armstrong Parties contend that WW interfered with the Side Agreement by using "improper means and methods" to prevent "the [QVL] Funding Group from paying for the cost of a physicians' relationship manager to be responsible for increasing the awareness of the Dallas Pharmacy and the Plano Pharmacy." (<u>Id.</u> ¶ 123).

"Under Massachusetts law, a plaintiff bringing a claim of tortious interference with a contractual relationship must prove that '(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract . . .; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.'" <u>Hamann v. Carpenter</u>, 937 F.3d 86, 90 (1st Cir. 2019) (quoting <u>O'Donnell v. Boggs</u>, 611 F.3d 50, 54 (1st Cir. 2010)). "[T]he standard considers the use of 'improper motive or improper means; the plaintiff need not prove both.'" <u>inVentiv Health Consulting, Inc. v. Equitas Life Scis.</u>, 289 F. Supp. 3d 272, 284 (D. Mass. 2017). The improper motive element of this claim can be satisfied with "[e]vidence of retaliation or ill will toward the

plaintiff." Hamann, 937 F.3d at 90 (quoting Cavicchi v. Koski, 67 Mass. App. Ct. 654, 658, 855 N.E.2d 1137, 1142 (2006)).  Improper means can be established by showing a "[v]iolation of 'a statute or a rule of common law' or use of threats, misrepresentations of facts or 'other improper means.'" inVentiv Health Consulting, Inc., 289 F. Supp. 3d at 283.  "Even if [the defendant] could have accomplished the same result by proper means, he may not use the improper means of misrepresentation." Draghetti v. Chmielewski, 416 Mass. 808, 817, 626 N.E.2d 862, 869 (1994) (concluding defendant's letter containing false statement that resulted in termination of employment could be considered improper means).  However, "[t]he assertion by a party of its legal rights is not 'improper means' for purposes of a tortious interference claim.'" Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 622, 19 N.E.3d 440, 449 (2014) (quoting Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App. Ct. 34, 40, 815 N.E.2d 241, 247 (2004)) (finding exercise of contractual right to stop shipments was not improper means when there was "no evidence that [defendant] used threats, misrepresented any facts, or used any other improper means").

### Dallas TSA (Count Thirteen of TAC)

The Armstrong Parties first allege that WW interfered with the Dallas TSA.  Specifically, the Armstrong Parties assert that WW (1) prevented QVL from remitting monthly net receivables from the lockbox to the Armstrong Parties and (2) caused QVL to generate false TSA reports in which QVL billed the Armstrong Parties for services but then did not actually pay the vendors who provided the billed services.  (See TAC ¶ 119).  WW asserts that it is entitled to summary judgment on this count because the Armstrong Parties have proffered no evidence of an improper motive or established that WW's purported conduct was inconsistent with its

legitimate business interests and contractual rights as a lender to QVL.  (Mem. at 19).  The

Armstrong Parties respond that they "have established a record of deceit, as well as economic

coercion," that shows that WW interfered with the TSAs by "manipulating the TSA, lying about

payment of pharmacy vendors on the TSA, and withholding funds due under the TSA."  (Opp. at

16).  The court concludes that the Armstrong Parties' claim fails under both theories.

### 1.  Preventing QVL from Remitting Funds under the TSA

The Dallas TSA is an agreement between QVL and certain of the Armstrong Parties.  (See

Docket No. 245 Ex. 48).  WW is not a party to the Dallas TSA.  (Id.)  It is undisputed that the TSAs

were established to allow QVL to continue providing services, such as ABDC inventory

purchases, IT and software systems, and security systems for the Plano Pharmacy and the

Dallas Pharmacy until the stores could operate independently.  (WW Reply SMF ¶ 106).  The

Armstrong Parties claim that WW interfered with the Dallas TSA by precluding QVL from

remitting funds owed to it under the Dallas TSA.  The Armstrong Parties have not, however,

provided any evidence from which the factfinder could infer that WW precluded QVL from

remitting such funds with an improper motive or through improper means.

There is evidence in the record that WW may have precluded QVL from fulfilling its

alleged obligations under the TSA by not providing QVL with the funds to make payments to

vendors of the Dallas Pharmacy. [13]  (See id. ¶¶ 107, 108, 110).  The Armstrong Parties have not,

---

[13] The record remains unclear as to whether this conduct amounts to interference with the terms of the
Dallas TSA because there is conflicting information in the record concerning how such payments were to
be made to the Dallas Pharmacy by QVL.  The Dallas TSA states that each month QVL would send the
Dallas Pharmacy a notice setting forth the services paid for by QVL under the TSA and deduct the costs
of such services from the cash receivables in a lockbox account of the Dallas Pharmacy (defined in the
Dallas TSA as the "Controlled Account").  (Docket No. 245 Ex. 48, § 2.02(b)(i)).  The Dallas TSA then
provides that, assuming there is no dispute as to the costs noticed by QVL, "[t]he remainder of the cash

however, provided any evidence concerning WW's intent with respect to its purported

direction to QVL to withhold funds from the Dallas Pharmacy to establish an improper motive.

WW also asserts that any interference it may have had with QVL's ability to pay the Armstrong

Parties under the Dallas TSA was based on its legal rights as QVL's lender under the line of

credit agreement between QVL and WW.  (WW Reply SMF ¶ 112).  As such, WW maintains that

its conduct was not improper and cannot sustain a claim for tortious interference.  The

Armstrong Parties have provided no real argument or evidence to counter this assertion or

support its argument that WW intentionally interfered with the Dallas TSA using any improper

means.  The court is therefore not persuaded that this theory presents a triable claim for

tortious interference with the Dallas TSA.

---

receivables of the [Dallas Pharmacy] deposited in the Controlled Account for the prior month shall be remitted by [QVL] to the [Dallas Pharmacy] within five (5) Business Days by wire transfer or ACH transaction following such month's respective Notices Date."  (Id. § 2.02(b)(iv)).  Thus, the terms of the Dallas TSA itself suggest that the funds to be remitted to the Dallas Pharmacy were expected to come directly from the balance of cash receivables in the Dallas TSA Controlled Account, which involved the Dallas Pharmacy's own funds and not those of QVL.  On the other hand, there is also evidence in the record that suggests that the money to be remitted to the Plano Pharmacy and the Dallas Pharmacy would come directly from a QVL account.  (See, e.g., Docket No. 245 Ex. 20 ("Cox Dep. Tr.") 144:5-8 (describing the TSAs as intended "to benefit the pharmacies that were just sold and to get money back into QVL for bills they had to pay on behalf of those pharmacies")).  This appears to be WW's understanding of how the transactions were to take place, because it has made representations in the record that the ability of QVL to remit funds to the Plano Pharmacy and the Dallas Pharmacy under the TSAs was dependent on the funds available in QVL's coffers, which were in turn dependent on the line of credit between WW and QVL.  (See Docket No. 250 ("Reply") at 9-10, n.9).  Regardless, because the Armstrong Parties have failed to establish that WW's purported interference was done with the requisite improper motive or means, this confusion does not preclude summary judgment on this claim.

2.   QVL's Failure to Pay Vendors & False Charges on TSA Invoices

The Armstrong Parties' second argument for tortious interference with the Dallas TSA similarly fails.

In his deposition, Mr. Cox, QVL's former chief financial officer, testified that at some time after QVL voted to liquidate, Mr. Enright directed QVL to not make certain payments to vendors.  (See Cox Dep. Tr. 107:10-108:01; 108:4-11 ("[W]e had a secure servers data center in Dallas and those were directed not to pay.  A phone system was all lumped together and eventually that was not to pay, at least slow down.  Certain suppliers of office supplies, things like that.  I'm not sure exactly each one, I can't tell you that.")).  Mr. Cox further testified that Mr. Enright's direction to him to not pay these vendors came after the 2013 board meeting when QVL decided to liquidate, but he could not provide the exact time frame for these discussions, and thus, there is no concrete evidence in the record that establishes that these directives were made during the time in which the Armstrong Parties were operating the Dallas Pharmacy.  (See id. 108:12-14; 109:19-110:13).  Additionally, as discussed above, there is evidence in the record with respect to QVL's failure to pay these vendors that suggests the issue was the availability of QVL funds to pay these debts and whether it could request additional credit under its loan agreement with WW to cover such expenses.  (See WW Reply SMF ¶ 110).  The Armstrong Parties do not rebut this fact with additional evidence.  Thus, it would appear that WW was acting consistently with its contractual rights in denying QVL further advances on its line of credit, which does not support a claim for tortious interference.

Even if WW was acting consistently with its legal rights in denying QVL additional advances on the line of credit, it is not entitled to use improper means to achieve the same

goal.  The improper means element could be established if WW "used threats, misrepresented

any facts, or used any other improper means" with respect to its interference with the Dallas

TSA.  See Skyhook Wireless, Inc., 86 Mass. App. Ct. at 622, 19 N.E.3d 449.  The assertion that

WW then went on to direct QVL to include payments that were not actually made to the

vendors as false charges on the TSA could give rise to an inference that WW tortiously

interfered with the TSA through improper means.  Unfortunately for the Armstrong Parties,

they have not proffered any evidence that Mr. Enright or anyone at WW directed QVL to

include false charges for services that were not paid on the TSA invoices, nor have they

proffered any TSA invoices as evidence to establish specific charges for which the Armstrong

Parties were charged but the vendors were not paid.

The Armstrong Parties attempt to connect Mr. Enright to the allegedly false charges on

the TSA invoices by pointing to a declaration Mr. Cox executed on July 12, 2019, which was

submitted to this court in connection with the briefing on WW's motion to dismiss the TAC.[14]

(See WW Reply SMF ¶ 110; Docket No. 245 Ex. 21 (the "Cox 2019 Decl."); Mot. to Dismiss Order

at 4).  WW challenges the court's consideration of Mr. Cox's 2019 declaration as hearsay.  (See

WW Reply SMF ¶ 110).  However, the court need not decide whether the statement is

admissible because, even if the court were to consider Mr. Cox's 2019 declaration, the cited

---

[14]  The Armstrong Parties also point to testimony from Mr. Cox in which he states that Mr. Enright
reviewed the TSA invoices before they were sent out and Mr. Enright would make changes and add
extra charges to the TSA invoices, such as charges for interest, administration, and overhead.  (WW
Reply SMF ¶ 109).  WW admits that it reviewed TSA invoices before they were sent out as a lender to
QVL but states that Mr. Cox's testimony only establishes that the TSA invoices properly reflected agreed-
upon charges.  (Id.)  This fact, disputed or otherwise, does not establish that Mr. Enright directed QVL to
add any false charges to the TSA, which is key to the Armstrong Parties' claims that WW interfered with
the TSAs through improper means, such as misrepresentation.

portion of the declaration does not establish that Mr. Enright directed QVL to create false

charges on the TSA invoices.  In the 2019 declaration, Mr. Cox stated that he

> personally prepared the monthly invoices that were to be delivered to Mr.
> Armstrong pursuant to the Transition Services Agreement concerning the Dallas
> pharmacy executed on May 29, 2014 that purported to show which of the Dallas
> pharmacy debts had been paid out of, and deducted from, the Lockbox Account.
> On multiple occasions, however, Enright directed that certain of the pharmacy's
> debts not be paid, even though the invoices to Mr. Armstrong showed that those
> debts had been paid.

(Cox 2019 Decl. ¶ 6).  This testimony is conclusory and ambiguous, and does not establish the

facts as alleged.  Moreover, even under the most liberal reading, this testimony establishes only

that Mr. Enright directed that certain debts not be paid, not that he directed Mr. Cox to then

send false TSA invoices to Mr. Armstrong and the Dallas Pharmacy stating that they had in fact

been paid.  Without such evidence from which a factfinder could infer that WW intentionally

engaged in improper conduct, the Armstrong Parties cannot survive summary judgment on

their claim for tortious interference with the Dallas TSA.  The motion for summary judgment is

therefore ALLOWED in favor of WW with respect to Count Thirteen.

### Side Agreement (Count Fourteen of TAC)

The Armstrong Parties' additional tortious interference claim, Count Fourteen of the

TAC, is also insufficiently supported by evidence in the record.  Specifically, the Armstrong

Parties have again not proffered any evidence to raise a genuine dispute as to whether WW

intentionally interfered with the Side Agreement with an improper motive of through improper

means.

The Armstrong Parties argue that their claim for tortious interference with the Side Agreement survives summary judgment because Mr. Armstrong attests that he recalls that WW did not pay for the services provided by the PRM he hired, Mr. Anzaldua. (See WW Reply SMF ¶¶ 56, 96; Armstrong Aff. ¶ 14). The Armstrong Parties contend that this fact demonstrates that WW interfered with the Side Agreement by requiring Mr. Armstrong to pay for the PRM without "reimbursing him or adjusting the line of credit accordingly." (Opp. at 16). However, Mr. Armstrong's interpretation of the Side Agreement is not supported by the terms of the document or any other evidence in the record.

The Side Agreement is an agreement between Mr. Armstrong and the QVL Funding Group, for which WW is manager. (See Docket No. 245 Ex. 49). The Side Agreement provides that the QVL Funding Group will make $85,000 available to QVL or its affiliates through a line of credit established between the QVL Funding Group and QVL pursuant to a December 23, 2013 loan agreement. (Id.) The Side Agreement further provides that "the PRM will be engaged by QVL or one of its affiliates and the PRM's services will be provided to the Armstrong Entities under those certain Transition Services Agreements by and between QVL and the Armstrong Entities." (Id.) The Side Agreement is not ambiguous about how this transaction was supposed to be implemented – the QVL Funding Group would make funds available to QVL to hire a PRM, and the PRM's services would be provided to the Dallas Pharmacy through the TSAs.[15] The

---

[15] Strangely, QVL did not sign the Side Agreement, and this raises questions as to how QVL or its affiliates could have the obligation to hire and provide the services of the PRM to the Dallas Pharmacy. Mr. Armstrong himself, however, submitted the Side Agreement as evidence in opposition to WW's motion for summary judgment and has provided no other evidence or explanation to support why the Side Agreement should not be understood pursuant to its clear terms, which do not provide Mr. Armstrong with the right to unilaterally hire a PRM and expect reimbursement directly from WW.

Armstrong Parties have not provided any additional evidence to support their contrary interpretation of the Side Agreement, i.e., that Mr. Armstrong was empowered to hire a PRM himself and expect reimbursement directly from WW.  Thus, even if it was undisputed that WW did not reimburse Mr. Armstrong for Mr. Anzaldua's salary, the Armstrong Parties have not established that this conduct amounts to an intentional interference with the terms of the Side Agreement.  This claim therefore fails as a matter of law.

Further, the record evidence does not support the conclusion that WW did in fact prevent the QVL Funding Group from making funds available to QVL in order for QVL to hire the PRM.  Mr. Enright attests that he recalls that "White Winston, as agent for the [QVL] Funding Group made the funds available to QVL."  (Enright July Decl. ¶ 38).  Mr. Armstrong has provided testimony that he paid for the PRM's services and never received any reimbursement from QVL or WW but does not provide any evidence to rebut WW's assertion that it made such funds available to QVL.  (See Armstrong Dep. Tr. 216:25-217:15; Armstrong Aff. ¶ 14).  Accordingly, WW is entitled to judgment in its favor as a matter of law and its motion for summary judgment is ALLOWED as to Count Fourteen of the TAC.

### E.  Armstrong Parties' Claims for Breach of Good Faith and Fair Dealing (Counts Three, Seven & Eight of TAC)

The Armstrong Parties next assert that WW's conduct breached the implied covenant of good faith and fair dealing in the Armstrong Limited Guaranty (Count Three of TAC), the PIPA (Count Seven of TAC), and the Dallas Loan Agreement (Count Eight of TAC).  As explained above, the Armstrong Parties' claims for fraudulent inducement with respect to the Dallas

Acquisition documents that form the basis of these claims fail because such claims are barred by the Dallas Release.  These agreements are therefore valid and enforceable.

"Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract."  Hopkinton Friendly Serv., Inc. v. Global Cos. LLC, 384 F. Supp. 3d 179, 188 (D. Mass. 2019).  The covenant requires parties to "deal honestly and in good faith both in the performance and enforcement of the terms of their contract."  Id. (quoting Shaulis v. Nordstrom, Inc., 120 F. Supp. 3d 40, 54 (D. Mass. 2015)).  "[N]either party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."  Clinical Tech., Inc. v. Covidien Sales, LLC, 192 F. Supp. 3d 223, 237 (D. Mass. 2016) (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237-38 (1st Cir. 2013)).  "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."  Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

Further, "[t]he scope of the covenant is only as broad as the contract that governs the particular relationship."  Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 189, 48 N.E.3d 442, 450 (2016) (quoting Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, 822 N.E.2d 667, 684 (2005)).  To establish this claim, the plaintiff must present "evidence to demonstrate a lack of good faith, such as 'a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.'"  Clinical Tech., Inc., 192 F. Supp. 3d at 237; see Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 541 (1st Cir. 2009) ("Establishing a violation of the covenant of good faith and fair dealing requires at least bad faith conduct.");

T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 574-75, 924 N.E.2d 696, 706-07 (2010)

(concluding plaintiff failed to prove a lack of good faith when it did not present evidence that

defendant acted with motive of harming the plaintiff's rights, had any other improper motive,

or acted in order to gain an advantage for itself).

For the foregoing reasons, the court concludes that a dispute remains with respect to

Count Three of the TAC that precludes summary judgment, but the Armstrong Parties have

failed to provide sufficient evidence to create a triable issue with respect to Counts Seven and

Eight of the TAC.

### Armstrong Limited Guaranty (Count Three of TAC)

The Armstrong Parties' claim for breach of the implied covenant of good faith and fair

dealing with respect to the Armstrong Limited Guaranty cannot be determined as a matter of

law at this time. While not entirely clear from the Armstrong Parties' pleadings and arguments,

the court construes the claim with respect to the Armstrong Limited Guaranty to be that WW

frustrated the purpose of the agreement by failing to honor the Good Guy Clause and release

Mr. Armstrong from his obligations. As discussed supra, there remains a genuine dispute as to

whether WW's refusal to release Mr. Armstrong under the Good Guy Clause was unreasonable

and demonstrated a lack of good faith. Therefore, whether WW has breached the implied

covenant of good faith and fair dealing in the Armstrong Limited Guaranty by refusing to honor

the Good Guy Clause remains a matter of dispute and WW's motion for summary judgment on

Count Three is DENIED.

### Dallas Loan Agreement & PIPA (Counts Seven & Eight of TAC)

The TAC is vague as to which of WW's alleged conduct violated the implied covenants of good faith and fair dealing in the Dallas Loan Agreement and the PIPA.  The Armstrong Parties now assert that the implied covenant of good faith and fair dealing for each of these agreements was breached by WW's

> continuous course of deceptive and manipulative conduct throughout the Parties' dealings, including in relation to the pharmacy operations.  From freely adding charges to the TSA invoices sent to Mr. Armstrong, to directing Mr. Cox to send Mr. Armstrong TSA invoices that showed that the pharmacy vendors had been paid when they had not, to withholding pharmacy revenues due to the pharmacies under the TSAs, to continuing to deny the complete control that White Winston had over all relevant aspects of QVL[.]

(Opp. at 17).

The Armstrong Parties have not explained, however, how this purported conduct, which is largely related to the TSAs, even if proven, violates the parties' reasonable expectations with respect to the PIPA[16] or the Dallas Loan Agreement. "The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives."  Ayash, 443 Mass. at 385, 822 N.E.2d at 684; see AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001) ("[T]he requirement of good-faith performance ultimately is circumscribed by the obligations – the contractual 'fruits' – actually contained in the

---

[16] WW originally argued in its motion to dismiss that it was not a party to the PIPA and therefore could not be liable for breaching the implied covenant of good faith and fair dealing.  In the Motion to Dismiss Order, the court held that the Armstrong Parties had made specific allegations with respect to WW's control over QVL such that WW could be liable for QVL's alleged failure to honor the PIPA.  (Mot. to Dismiss Order at 39).  The issue of WW's control over QVL is still a matter of factual dispute, but the court does not need to answer this question in order to dispose of the claim.  As explained above, even if WW controlled QVL to be liable for QVL's actions regarding the PIPA, the Armstrong Parties have failed to proffer sufficient evidence to preclude summary judgment on Count Seven.

agreement."); Vil v. Wells Fargo Home Mortg., Civil Action No. 17-cv-12121-ADB, 2019 WL

569846, at *9 (D. Mass. Feb. 12, 2019) ("[T]he implied covenant of good faith cannot create

rights and duties not otherwise provided for in the existing contractual relationship." (quoting

MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 493 (1st Cir. 2013))).  With respect to the PIPA,

the Armstrong Parties have not explained how WW's conduct interfered with the Armstrong

Parties' ability to receive the fruits of that contract.  It is undisputed that the PIPA was entered

into by the Armstrong Parties "for the purposes of purchasing the controlling interest" in the

Dallas Pharmacy.  (WW Reply SMF ¶¶ 8, 9).  The Armstrong Parties did purchase the controlling

stake in the Dallas Pharmacy.  While the Transition Services Agreement is referenced in the

PIPA as a closing document to be executed at the time of the Dallas Acquisition (see Docket No.

251 Ex. A-22, § 5.2(iii)), the Armstrong Parties do not suggest that such reference gives rise to a

performance obligation under the PIPA that was circumscribed by WW's conduct.

       The same is true with respect to the Dallas Loan Agreement.  The Armstrong Parties

have not articulated how WW's conduct contradicted the performance obligations under that

contract.  The purpose of the Dallas Loan Agreement was to provide the Armstrong Parties with

the funds to purchase and operate the Dallas Pharmacy.  WW asserts that it disbursed all of the

funds due under the Dallas Loan Agreement.  (WW Reply SMF ¶ 17).  The Armstrong Parties

deny this fact, but Mr. Armstrong's denial of paragraph 17 of the WW Reply SMF is insufficient

to create a genuine dispute of material fact as to this issue.  (Id.)  The Armstrong Parties only

support this denial with evidence concerning the Plano Pharmacy, which is not at issue, and

with complaints that the Dallas Pharmacy did not receive access to the Dallas lockbox funds,

which, as explained below, is not required under the Dallas Loan Agreement.

The Armstrong Parties have similarly failed to proffer any evidence from which a reasonable juror could infer that WW's conduct was lacking in good faith.  The Armstrong Parties have submitted no evidence that WW's refusal to provide access to the lockbox funds or to increase the line of credit for QVL to remit funds to the Dallas Pharmacy was done with a lack of good faith and not as a genuine dispute over the terms of the agreements.  Moreover, the Armstrong Parties have pointed to no evidence, circumstantial or otherwise, concerning WW's intent or Mr. Enright's state of mind with respect to this alleged conduct.  Accordingly, WW's motion for summary judgment on Counts Seven and Eight of the TAC is ALLOWED.

### F.  Armstrong Parties' Claim for Breach of Contract (Count Nine of TAC)

The Armstrong Parties assert two theories in the TAC for breach of contract.  First, the Armstrong Parties allege that WW breached the Dallas Loan Agreement by "starving the Dallas Pharmacy of the funds required for it to operate and instead keeping the funds in the Lock Box Account."  (TAC ¶ 97).  Second, the Armstrong Parties allege that WW was improperly diverting funds from the lockbox for its own use.  (Id.)  This second theory is not supported by any admissible evidence in the record.  (See WW Reply SMF ¶ 31).  Therefore, the breach of contract claim turns on the Armstrong Parties' first assertion that WW was required to provide the Armstrong Parties with access to the Dallas Pharmacy lockbox funds under the terms of the Dallas Loan Agreement.

"To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result."  Bulwer v.

45

Mount Auburn Hosp., 473 Mass. 672, 690, 46 N.E.3d 24, 39 (2016).  "Evidence of prior or contemporaneous oral agreements cannot be admitted to vary or modify the terms of an unambiguous written contract.'"  Sax v. DiPrete, 639 F. Supp. 2d 165, 170 (D. Mass. 2009) (quoting Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992)). "[P]arties are bound by the plain terms of their contract."  Id. at 170, 171 (quoting Hiller v. Submarine Signal Co., 325 Mass. 546, 550, 91 N.E.2d 667, 679 (1950)) (finding explicit term of contract was "undisputedly fulfilled" and party did not "identify any term of the employment contract that was in fact breached" but only focused on terms "that had been discussed in the pre-contractual negotiations").

The Dallas Loan Agreement does not include an express term requiring WW to provide the Armstrong Parties with access to the lockbox funds.  The parties admit that such language is provided in the Plano Loan Agreement but was not similarly included in the Dallas Loan Agreement.  (WW Reply SMF ¶ 16).  Rather, the Dallas Loan Agreement states that WW is only required to remit receivables from the lockbox to the Armstrong Parties once all of the Armstrong Parties' obligations have been satisfied in full.  (See Docket No. 235-1 Ex. A-8, § 1.2(c)(ii)).  The Armstrong Parties have therefore not pointed to an express term in the Dallas Loan Agreement that WW has breached by failing to grant the Armstrong Parties access to the funds in the lockbox.  Instead, the Armstrong Parties' claim relies solely on the oral representation purportedly made by Mr. Enright to Mr. Armstrong prior to the Dallas Acquisition.  (See WW Reply SMF ¶ 100).  This oral representation, however, cannot sustain the Armstrong Parties' claim for breach of contract because the Dallas Loan Agreement is a fully integrated contract.

The Dallas Loan Agreement's integration clause states, "[t]his Agreement embodies the entire agreement and understanding between the parties relating to the subject matter hereof and there are no covenants, promises, agreements, conditions or understandings, oral or written, except as herein set forth."  (Docket No. 235-1 Ex. A-8, § 8.18; see WW Reply SMF ¶ 100).  In Massachusetts,

> "[w]here the writing shows on its face that it is the entire agreement of the parties and 'comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.'"

Agri-Mark, Inc. v. Niro, Inc., 233 F. Supp. 2d 200, 208 (D. Mass. 2002) (quoting Elias Bros. Rests., Inc. v. Acorn Enters., Inc., 831 F. Supp. 920, 927 (D. Mass. 1993)).  Further, because the Armstrong Parties' fraud-based claims were previously released by the Dallas Release, there is no active claim that the Dallas Loan Agreement was fraudulently induced to prevent the enforcement of the Dallas Loan Agreement by its terms.  The Dallas Loan Agreement's integration clause is therefore "a complete bar to the use of parole evidence to insert a term into a contract that the parties neither bargained for nor agreed to include."  Sax, 639 F. Supp. 2d at 171 (finding integration clause precluded claim for breach of contract as a matter of law).  WW's motion for summary judgment in its favor on Count Nine of the TAC is therefore ALLOWED.

### G.  Armstrong Parties' Claim for Breach of Fiduciary Duty (Count Eleven of TAC)

The Armstrong Parties next allege that WW owed a duty of care to Mr. Armstrong through the Armstrong Limited Guaranty, which it breached by not making funds from the Dallas Pharmacy lockbox available to the Armstrong Parties to purchase inventory for the store.

(See TAC ¶ 108).  The Armstrong Parties contend that the fiduciary duty to Mr. Armstrong

stems from (i) WW's "control over the Dallas Pharmacy's revenue and therefore control over

the Dallas Pharmacy's day-to-day management and operations" and (ii) WW's knowledge that

Mr. Armstrong "reposed his trust, confidence and reliance with White Winston concerning the

Lock Box Account because Enright assured Armstrong that funds would be readily available to

the Dallas Pharmacy on a monthly basis from the Lock Box Account" to "purchase

pharmaceutical inventory, operate the Dallas Pharmacy, and could service their debt to White

Winston."  (Id. ¶¶ 106, 108).  In the Motion to Dismiss Order, the court found that the

Armstrong Parties had included sufficient allegations to plausibly assert that WW owed a

fiduciary duty to Mr. Armstrong by virtue of its alleged control over the Dallas Pharmacy's day-

to-day operations.  (Mot. to Dismiss Order at 41).  However, the Armstrong Parties have now

failed to support those allegations with any evidence in the record and summary judgment for

WW is therefore appropriate on Count Eleven.

"A claim for breach of fiduciary duty has four elements: 1) existence of a fiduciary duty

arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a

causal relationship between the breach and the damages."  Qestec, Inc. v. Krummenacker, 367

F. Supp. 2d 89, 97 (D. Mass. 2005) (citing Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 705

N.E.2d 279, 288-89 (1999)).  In general, the relationship between the Armstrong Parties and

WW is that of a borrower and a lender.  A fiduciary duty between a lender and a borrower may

arise if the lender knows that the borrower "reposes its trust and confidence in the lender and

the lender knows of and accepts the borrower's trust."  FAMM Steel, Inc. v. Sovereign Bank,

571 F.3d 93, 102 (1st Cir. 2009).  Additionally, "under certain circumstances, a lender may

actively participate in or exercise control over the business of a borrower to such an extent that a fiduciary relationship arises."  Id. at 103.

Here, the Armstrong Parties have proffered no evidence that WW knew that Mr. Armstrong reposed any trust, confidence, or reliance on WW concerning the lockbox account to survive summary judgment for WW.  "[T]he plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.  The catalyst in such a change is the defendant's knowledge of the plaintiff's reliance upon him."  See id. at 102 (quoting Broomfield v. Kosow, 349 Mass. 749, 212 N.E.2d 556, 560 (1965).  Beyond the allegations in the TAC, the Armstrong Parties have not proffered evidence that they reposed trust and confidence in WW with respect to the Dallas Pharmacy lockbox, let alone that WW was aware of or accepted that trust.

The Armstrong Parties have also failed to proffer evidence that WW exercised day-to-day control over the Dallas Pharmacy such that a fiduciary relationship existed between Mr. Armstrong and WW.  (See TAC ¶¶ 44, 106).  If a lender "exercises unqualified control over a borrower" a fiduciary duty may arise.  Blixseth v. Byrne, 214 F. Supp. 3d 97, 104 (D. Mass. 2016) (citing FAMM Steel, Inc., 571 F.3d at 103).  To satisfy this standard, the party asserting such a duty must establish that the lender's control extended to the day-to-day operations of the borrower.  Id.  This is a demanding standard as "even a very high level of involvement in a [borrower's] enterprise does not create a fiduciary duty."  Id. (citing FDIC v. Fordham (In re Fordham), 130 B.R. 632, 649 (Bankr. D. Mass. 1991)).  The level of involvement in the borrower's affairs must be "unusual in the context of a commercial loan."  See FAMM Steel, Inc., 571 F.3d at 103.

It is undisputed that WW exercised complete control over the lockbox accounts for the Dallas Pharmacy and could apply the funds received in the lockbox to the obligations under the Dallas Loan Agreement in its discretion.  (WW Reply SMF ¶ 103; Docket No. 235-1 Ex. A-8, § 1.2(c)(ii)).  This level of control is not enough to create a fiduciary duty.  "Courts have consistently held that a lender does not assume the requisite degree of control over its borrower simply by making advances and reducing funding in accordance with the terms of a loan agreement – even when the loan administration is 'admittedly powerful and ultimately severe.'"  See Schwan's Sale Enters., Inc. v. Commerce Bank & Trust Co., 397 F. Supp. 2d 189, 196 (D. Mass. 2005).  WW's control over the lockbox account is consistent with the terms of the Dallas Loan Agreement and, while such terms undoubtably lend WW a level of control over the Dallas Pharmacy's finances, this is insufficient to create a fiduciary relationship between WW and Mr. Armstrong.  Further, a lender's control over its collateral is not so unusual in a commercial context as to create a fiduciary duty to the borrower.  See, e.g., id. at 195-97 (finding lender's control over borrower's finances though lockbox arrangement did not establish sufficient control over borrower's operations to give rise to fiduciary duty).

The only other evidence in the record concerning WW's involvement with operations at the Dallas Pharmacy is Mr. Enright's participation in negotiations with the Dallas Pharmacy's pharmaceutical supplier, ABDC, to help the Dallas Pharmacy get better terms for inventory purchases.  (See WW Reply SMF ¶¶ 115, 116).  This evidence, however, merely shows that WW, at times, helped the Dallas Pharmacy negotiate with another creditor and does not give rise to an inference that WW was engaged in day-to-day operations.  Accordingly, the Armstrong Parties have not provided sufficient evidence to establish that a fiduciary relationship existed

between WW and Mr. Armstrong.[17]  WW's motion for summary judgment with respect to

Count Eleven is therefore ALLOWED.

## V.  ANALYSIS OF WW'S COUNTERCLAIMS & THIRD-PARTY COMPLAINT

### A.  WW's Breach of Contract Claims (Counts One and Two of CC & Count One of TPC)

WW brings its own claims for breach of contract, asserting that the Armstrong Parties

have breached both the Dallas Loan Agreement and the Armstrong Limited Guaranty.

---

[17] The Armstrong Parties have also argued, in connection with the fraud-based claims, that WW owed Mr. Armstrong a fiduciary duty because WW and the Armstrong Parties were joint venturers in the Dallas Pharmacy.  (Opp. at 13).  This theory similarly fails.  It is well-settled that partners and joint venturers owe each other fiduciary duties.  See Karter v. Pleasant View Gardens, Inc., 248 F. Supp. 3d 299, 309 (D. Mass. 2017).  To determine whether a joint venture exists, Massachusetts courts consider several factors, including:

> (1) an agreement by the parties manifesting their intention to associate for joint profit not amounting to a partnership or a corporation; (2) a contribution of money, property, effort, knowledge, skill, or other assets to a common undertaking; (3) a joint property interest in all or parts of the subject matter of the venture; (4) a right to participate in the control or management of the enterprise; (5) an expectation of profit; (6) a right to share in profits; (7) an express or implied duty to share in losses; and (8) a limitation to a single undertaking (or possibly a small number of enterprises).

Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co., 40 F. Supp. 2d 49, 53 (D. Mass. 1999) (quoting Shain Inv. Co., Inc. v. Cohen, 15 Mass. App. Ct. 4, 443 N.E.2d 126, 130 (1982)).  The record evidence here is insufficient to create a triable issue as to whether WW and the Armstrong Parties were joint venturers.

In the Dallas Loan Agreement, WW and the Armstrong Parties "expressly disclaim any intention to create a partnership or joint venture pertaining to the subject matter of this Agreement.  The parties intend that their relationship shall be solely that of borrower and lender, whether that relationship is relevant for purposes of the parties' dealings between themselves or with third persons."  (Docket No. 235-1 Ex. A-8, § 8.8).  Such evidence does not suggest an agreement or intent by the Armstrong Parties and WW to participate in the Dallas Pharmacy for joint profit and weighs against a finding that the parties entered into a joint venture.  Further, it is undisputed that QVL Equity Holding Group, LLC ("QVL Equity"), not WW, purchased the Class B common limited partner interest in the Dallas Pharmacy under the terms of the PIPA, thereby holding a 49.5% interest in the Dallas Pharmacy.  (WW Reply SMF ¶ 9).  WW is the manager for QVL Equity, but the Armstrong Parties have provided no argument or evidence to raise a genuine dispute over the question of why WW's association with QVL Equity should be treated as creating a joint venture between the Armstrong Parties and WW itself.  The evidence concerning QVL Equity's stake in the Dallas Pharmacy may weigh in favor of finding that QVL Equity was engaged in a joint venture with the Armstrong Parties, but it does not establish such a relationship with respect to WW.

**Dallas Loan Agreement (Count One of CC & Count One of TPC)**

In Count One of the CC and Count One of the TPC, WW alleges that the Armstrong

Parties breached the Dallas Loan Agreement by defaulting on the loans and failing to make the

required payments in accordance with the terms of the agreement and the related Dallas

Promissory Notes.  (CC ¶ 61; TPC ¶ 63).  As explained supra, under Massachusetts law, "[t]he

elements of a breach of contract claim are 'that there was an agreement between the parties;

the agreement was supported by consideration; the plaintiff was ready, willing, and able to

perform his or her part of the contract; the defendant committed a breach of the contract; and

the plaintiff suffered harm as a result.'"  Huang v. RE/MAX Leading Edge, 101 Mass. App. Ct.

150, 153-54, 190 N.E.3d 518, 523 (2022) (quoting Bulwer, 473 Mass. at 690, 46 N.E.3d at 39).  In

sum, the Armstrong Parties concede that they "executed the various agreements in connection

with the Plano and Dallas transactions" and "that non-payment on a loan constituted a 'default'

under the loan."  (Opp. at 18-19).  The Armstrong Parties' only defense to the enforcement of

the Dallas Loan Agreement is that it was fraudulently induced.  (Id. at 19).  However, as

previously explained, the Armstrong Parties' fraud-based claims, including the claim that the

Dallas Loan Agreement was fraudulently induced and therefore invalid, was released pursuant

to the Dallas Release.  As such, there is no longer a viable claim that the Dallas Loan Agreement

should not be enforced against the Armstrong Parties.  Without this defense, the undisputed

facts show that WW is entitled to summary judgment on its breach of contract claim.  It is

undisputed that the Dallas Loan Agreement was executed by AGP II and Mr. Armstrong, and

that ALP II became a signatory to the Dallas Loan Agreement and the Dallas Promissory Notes

by the execution of the First Amendment.  (WW Reply SMF ¶¶ 15, 27, 29).  The Armstrong

Parties also admit that they failed to make the required debt service payments under the loans, which constitutes an "Event of Default" under the Dallas Loan Agreement. (Id. ¶¶ 35-36).[18]

In light of these undisputed facts in the record and the Armstrong Parties' release of their fraudulent inducement defense, summary judgment for WW on Count One of the CC and Count One of the TPC is ALLOWED.

### Armstrong Limited Guaranty (Count Two of CC)

WW also asserts that Mr. Armstrong breached the Armstrong Limited Guaranty because under the guaranty, Mr. Armstrong is liable to WW for the full amounts due under the Dallas Pharmacy loan documents. (CC ¶ 68). Because Mr. Armstrong is not entitled to the Good Guy Clause, WW argues, his failure to pay the amounts due to WW is a breach of the Armstrong Limited Guaranty. (CC ¶¶ 68-71). There is still a genuine dispute as to whether WW acted reasonably and in good faith in denying Mr. Armstrong the release under the Good Guy Clause of the Armstrong Limited Guaranty. Accordingly, the court cannot now determine as a matter of law that Mr. Armstrong breached his duties under the Armstrong Limited Guaranty by

---

[18] The Armstrong Parties do not expressly admit WW's statement of fact that AGP II and ALP II have defaulted under the Dallas Loan Agreements, responding instead that they admit that "non-payment constitutes a default as defined in the documents cited," but then they reassert their legal arguments, now rejected by this court, that the documents are not valid because they were fraudulently induced. The Armstrong Parties' failure to deny this fact and proffer contrary factual evidence does not create a genuine factual dispute as to whether the Armstrong Parties defaulted on the Dallas Loan Agreement.

refusing to pay WW the amounts owed under the Dallas Loan Agreement and related documents.  WW's motion for summary judgment on Count Two of the CC is therefore DENIED.

### B.   Actions on Dallas Promissory Notes (Counts Two & Three of TPC)

In Counts Two and Three of the TPC, WW asserts that AGP II and ALP II are liable on the $1M Note and the $500M Note.  "The Massachusetts Uniform Commercial Code, G.L. c. 106 . . . is the controlling authority for promissory notes."  Guenin v. Benson, 1999 WL 788624, at *2 (Mass. App. Div. Mar. 29, 1999).  "Once the signature is admitted and the promissory note is produced, the holder is entitled to recover on the promissory note unless the defendant establishes a valid defense."  Id.  WW has now produced the Dallas Promissory Notes.  (See Docket No. 235-1 Exs. A-6, A-7, A-14).  It is undisputed that AGP II executed the Dallas Promissory Notes.  (WW Reply SMF ¶¶ 13, 14).  ALP II likewise admits that it was a signatory to the First Amendment to the Dallas Loan Agreement and the Dallas Promissory Notes.  (Id. ¶ 29).  The Armstrong Parties have further admitted that they have defaulted on the Dallas Promissory Notes.  (Id. ¶ 35).  The Armstrong Parties have provided no real argument or defense to the enforcement of the Dallas Promissory Notes.[19]  Accordingly, summary judgment in favor of WW on Counts Two and Three of the TPC is ALLOWED.

---

[19] The Armstrong Parties never directly articulated a specific claim or affirmative defense that the Dallas Promissory Notes themselves are the product of fraudulent inducement.  The Dallas Promissory Notes are, however, integrally tied to the Dallas Loan Agreement, for which the Armstrong Parties have consistently asserted that they were fraudulently induced into executing.  However, as detailed above, the Armstrong Parties' claims for fraudulent inducement were released by the Dallas Release and therefore such claims do not preclude the enforcement of the Dallas Promissory Notes against the Armstrong Parties.

**C.  WW's Claims for Breach of Implied Covenant of Good Faith and Fair Dealing (Count Three of CC & Count Four of TPC)**

WW also claims that the Armstrong Parties breached the implied covenant of good faith and fair dealing in the Dallas Loan Agreement, the Dallas Promissory Notes, and the Armstrong Limited Guaranty.  (CC ¶ 75; TPC ¶ 91).  Again, the Armstrong Parties' only defense against these claims is that the underlying documents were fraudulently induced, but the court has concluded supra that the Armstrong Parties have released their claims for fraudulent inducement with respect to the documents underlying the Dallas Acquisition.

As previously explained, under Massachusetts law, every contract contains an implied covenant of good faith and fair dealing.  See Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D. Mass. 2005).  "In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of (the plaintiff) to receive the fruits of the contract."  Blake v. Prof'l Coin Grading Serv., 898 F. Supp. 2d 365, 388 (D. Mass. 2012) (quoting Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198, 209-10 (D. Mass. 2003)).  However, "while every breach of contract has the 'effect of destroying or injuring the rights of the other party to receive [its] fruits,' not every breach of contract is a breach of the implied covenant of good faith and fair dealing."  Christensen, 360 F. Supp. 2d at 226.  In order to establish a violation of the implied covenant of good faith and fair dealing, the plaintiff must show a lack of good faith in the manner of performance, which "can be inferred from the totality of the circumstances."  Robert & Ardis James Found., 474 Mass. at 189, 48 N.E.3d at 450.

To demonstrate that the Armstrong Parties have engaged in the requisite conduct to establish a breach of the implied covenant of good faith and fair dealing, WW points to Mr. Armstrong's diversion of business from the Dallas Pharmacy to the Plano Pharmacy, his decision to unilaterally close the Dallas Pharmacy, and the Armstrong Parties' failure to make the payments owed to WW on the Dallas loans.  (Mem. at 31).  The court's discussion concerning the request for declaratory judgment on the Good Guy Clause explains that there remains a factual dispute as to whether Mr. Armstrong diverted business from the Dallas Pharmacy to the Plano Pharmacy to increase profits at the Plano Pharmacy or if this conduct was based merely on the Dallas Pharmacy's lack of inventory and patient choice.  (See, e.g., WW Reply SMF ¶ 65). This dispute therefore precludes the court from finding that Mr. Armstrong's conduct was done with a lack of good faith or to gain some unfair economic advantage as a matter of law. Similarly, there remains a dispute as to Mr. Armstrong's decision to unilaterally close the Dallas Pharmacy, with the Armstrong Parties asserting that Mr. Armstrong was forced to close based on the economic situation at the Dallas Pharmacy and his related interpretation of Texas pharmacy regulations, not out of any desire to harm WW's collateral or gain an economic advantage.  (Id. ¶ 41).  Finally, WW has not provided evidence establishing that the Armstrong Parties' failure to make the payments due under the Dallas Loan Agreement was driven by any bad faith rather than simply the result of insufficient funds.  The evidence in the record therefore does not demonstrate that the Armstrong Parties prevented WW from receiving the fruits of these contracts with the requisite lack of good faith.  Accordingly, WW's motion for summary judgment on Count Three of the CC and Count Four of the TPC is DENIED.

### D.  Violation of Mass. Gen. Laws ch. 93A (Count Four of CC & Count Five of TPC)

WW also asserts claims against the Armstrong Parties under Mass. Gen. Laws ch. 93A, §§ 2, 11, arguing that the Armstrong Parties engaged in unfair and deceptive practices.  (See CC ¶ 79; TPC ¶ 95).  For the following reasons, the court concludes that WW is not entitled to summary judgment in its favor on these claims.

Chapter 93A precludes unfair or deceptive acts or practices in the conduct of trade or commerce.  Mass. Gen. Laws ch. 93A, § 2.  As this court previously explained in the Motion to Dismiss Order, the statute provides, in relevant part, "[n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition, or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."  Id. § 11.  Thus, courts must "determine whether the center of gravity of the circumstances that give rise to the [93A, § 11] claim is primarily and substantially within the Commonwealth."  Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp., 438 Mass. 459, 473, 781 N.E.2d 787, 799 (2003).  "The determination cannot be 'reduced to any precise formula' but rather requires a 'fact intensive and unique' inquiry for each case." AECOM Tech. Servs. Inc. v. Mallinckrodt LLC, 117 F. Supp. 3d 98, 106 (D. Mass. 2015) (quoting Kuwaiti, 438 Mass. at 472-73, 781 N.E.2d at 798).  "While relevant, the location of the recipient of the alleged unfair or deceptive conduct is not necessarily determinative of whether the conduct occurred primarily and substantially within Massachusetts."  Renwood Winery, Inc. v. Landmark Label, Inc., 64 Mass. App. Ct. 1113, 835 N.E.2d 1178 (2005).  Moreover, only the allegedly unfair and deceptive conduct may be considered: "[c]ontacts with Massachusetts that were neither unfair nor deceptive do not play a part in this assessment."  AECOM Tech. Servs.

Inc., 117 F. Supp. 3d at 106 (internal quotations omitted) (and cases cited).  Thus, the alleged

wrongdoer's conduct becomes the focus of the inquiry.  See Spring Inv'r Servs., Inc. v.

Carrington Capital Mgmt., LLC, No. 10-10166-FDS, 2013 WL 1703890, at *12 (D. Mass. Apr. 18,

2013) (finding ch. 93A inapplicable despite harm to Massachusetts company where "[v]irtually

all of the allegedly unfair conduct . . . took place in Connecticut").

WW argues that the Armstrong Parties' allegedly deceptive conduct occurred in

Massachusetts because the Dallas Pharmacy loan documents are governed by Massachusetts

law and Mr. Enright executed the documents, on behalf of WW, in Massachusetts.  (See WW

Reply SMF ¶ 15).  These facts, however, do not relate to the allegedly unfair or deceptive

conduct, which must have occurred primarily and substantially in Massachusetts.  There is no

allegation or evidence in the record that suggests that the Armstrong Parties' execution of the

Dallas Acquisition loan documents was unfair or deceptive.  Rather, WW's own arguments

betray that the deceptive conduct at issue is actually Mr. Armstrong's purported diversion of

business from the Dallas Pharmacy to the Plano Pharmacy and the Armstrong Parties' failure to

continue operating the Dallas Pharmacy and protect WW's collateral.  (Mem. at 32).  This

conduct all occurred in Texas, not Massachusetts.  There is therefore no evidence in the record

from which the court could determine that the unfair and deceptive conduct occurred primarily

in Massachusetts to conclude that WW is entitled to judgment in its favor on these claims as a

matter of law.  As such, WW's motion for summary judgment with respect to Count Four of the

CC and Count Five of the TPC is DENIED.

**VI.    CONCLUSION**

For all the reasons detailed above, "White Winston Select Asset Funds, LLC's Motion for Summary Judgment" (Docket No. 233) is ALLOWED in part and DENIED in part.  Specifically, WW's motion for summary judgment is ALLOWED with respect to Counts Two, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, Thirteen, Fourteen, Fifteen, and Sixteen of the TAC; Count One of the CC; and Counts One, Two, and Three of the TPC and DENIED with respect to Counts One and Three of the TAC; Counts Two, Three, Four, and Five of the CC; and Counts Four and Five of the TPC.  Counts Twelve and Seventeen of the TAC are not addressed in this opinion because they were previously dismissed by the court.  (See Mot. to Dismiss Order at 2 n.2, 45-46).

    / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge