UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GRANT ARMSTRONG and | ) | |
| ARMSTRONG RX GP, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| WHITE WINSTON SELECT ASSET FUNDS, LLC, | ) | NO. 16-10666-JGD |
| | ) | |
| Defendant/Third Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ARMSTRONG RX II GP, LLC and | ) | |
| ARMSTRONG RX II, LP, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## FINDINGS OF FACT AND RULINGS OF LAW

September 20, 2023

DEIN, U.S.M.J.

### I. BACKGROUND

The plaintiffs, Grant W. Armstrong ("Mr. Armstrong") and Armstrong RX GP, LLC

("AGP"), an entity wholly owned by Mr. Armstrong, brought this action against White Winston

Select Asset Funds, LLC ("WW" or "White Winston"), a financing company that provided Mr.

Armstrong, AGP and other entities owned by Mr. Armstrong, with loans to purchase and

operate two pharmacies in Texas, one in Plano (the "Plano Pharmacy") and one in Dallas (the

"Dallas Pharmacy"). (See Docket No. 116 (the "Third Amended Complaint" or "TAC")). White

Winston asserted counterclaims against Mr. Armstrong and AGP. (See Docket No. 12 (the

"Counterclaim Complaint" or "CC")). It also brought similar claims in a third-party complaint

against two other entities owned by Mr. Armstrong, *i.e.*, Armstrong RX II GP, LLC and Armstrong RX II, LP.  (See Docket No. 17 (the "Third-Party Complaint" or "TPC")).[1]  The Dallas Pharmacy failed, and the parties' claims focused on the formulation, performance, and enforcement of numerous agreements executed in connection with the purchase and operation of the Dallas Pharmacy.

After extensive discovery, White Winston moved for summary judgment as to liability only on all claims asserted against it in the TAC, and partial summary judgment on the claims it had asserted in its Counterclaim Complaint and Third-Party Complaint.  (See Docket No. 233). On December 27, 2022, the court issued its "Memorandum of Decision and Order on White Winston Select Asset Funds, LLC's Motion for Summary Judgment" (Docket No. 262) ("SJ Dec.") finding in favor of White Winston as to liability only on most, but not all, of the claims that were at issue.[2]  Among the issues remaining open, was Mr. Armstrong's liability under a personal guaranty he had executed in connection with the Dallas loans (the "Armstrong Guaranty").

Thereafter, the parties reached an agreement as to the amount of damages owed to White Winston, as a result of which White Winston agreed to withdraw its still-pending claims for breach of the implied covenant of good faith and fair dealing (Count Three of the Counterclaim Complaint and Count Four of the Third-Party Complaint) and its claims under

---

[1] Mr. Armstrong and the entities he owns are collectively referred to as the "Armstrong Parties."

[2] Specifically, WW's motion for summary judgment was allowed with respect to liability only on Counts Two, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, Thirteen, Fourteen, Fifteen, and Sixteen of the TAC; Count One of the CC; and Counts One, Two and Three of the TPC.  It was denied with respect to Counts One and Three of the TAC; Counts Two, Three, Four, and Five of the CC; and Counts Four and Five of the TPC. (SJ Dec. at 59).  Counts Twelve and Seventeen of the TAC had been previously dismissed by the court.  (Id.).

Mass. Gen. Laws ch. 93A, §§ 2, 11 (Count Four of the Counterclaim Complaint and Count Five of the Third-Party Complaint).  (See "Joint Pretrial Memorandum" (Docket No. 270) at 2). Specifically, the parties stipulated that the "amount of damages due to White Winston relative to White Winston's claims against the Armstrong Parties for its claims on the promissory notes and breach of contract, as well as the damages recoverable if Mr. Armstrong is found liable under the Armstrong Guaranty" is $5,046,874.51 plus legal fees and costs.  (Id.).  The issues remaining for trial were the plaintiffs' claims for declaratory judgment relative to Mr. Armstrong's liability under the Armstrong Guaranty (TAC Count One) and their claim for breach of the implied covenant of good faith and fair dealing with respect to the Armstrong Guaranty (TAC Count Three), along with White Winston's claims against Mr. Armstrong for declaratory judgment relative to his liability under the Armstrong Guaranty and its claim for breach of the Armstrong Guaranty (Counterclaim Complaint Counts Five and Two, respectively).  (Id. at 2-4).

A jury waived trial was held before this court on May 15 and 16, 2023.  Mr. Armstrong testified on behalf of the Armstrong Parties, and Todd M. Enright ("Mr. Enright") testified on behalf of White Winston.  Fifty-six (56) exhibits were entered into evidence.  Thereafter, White Winston submitted portions of the deposition testimony of Manual Anzaldua (Docket No. 279) ("Anzaldua Test.") and the court ruled on objections thereto.  (Docket No. 281).  The parties submitted post-trial briefs on July 6, 2023 (Docket Nos. 289, 290) and the court heard closing arguments on July 7, 2023.

After consideration of all the evidence and arguments of the parties, the court makes the following findings of fact and rulings of law.  As detailed herein, judgment shall enter in favor of Mr. Armstrong on all claims relating to the Armstrong Guaranty.

## II. <u>FINDINGS OF FACT</u>[3]

### <u>General Chronology</u>

Mr. Armstrong and AGP acquired the Plano Pharmacy from QVL Pharmacy Holdings, Inc. ("QVL") on or about January 23, 2014.  Prior to this acquisition, Mr. Armstrong worked in QVL's corporate offices as a corporate pharmacist.  White Winston loaned Mr. Armstrong and AGP $460,000 to acquire and operate the Plano Pharmacy.  The transaction is reflected in a loan agreement and related loan documents.  (<u>See</u> SJ Dec. at 3-4; SF ¶¶ 1-2; I:24-25).

On or about May 29, 2014, Mr. Armstrong and AGP II entered into a series of agreements with QVL to purchase the Dallas Pharmacy.  White Winston loaned AGP II $1 million to acquire the Pharmacy and provided an additional $500,000 line of credit to be used for general working capital to operate the Dallas Pharmacy.  This line of credit was increased to $750,000 in October 2014.  (SJ Dec. at 5; SF ¶¶ 15-17).  The amount owed on the line of credit was close to $1,000,000 when the Pharmacy closed in December 2015.  (IIA:15-16).

In connection with the acquisition of the Dallas Pharmacy, Mr. Armstrong executed a personal "Limited Guaranty," dated May 29, 2014 (the "Armstrong Guaranty") guarantying payment of all amounts due to White Winston from the Armstrong Entities.  (SJ Dec. at 6; Ex. 7). The instant dispute centers on Section 2 of the Armstrong Guaranty, which the parties have

---

[3] Some of the background facts were established in connection with White Winston's motion for summary judgment and are not in dispute.  They are included here for context, and citations will be to the SJ Dec.  Since the details of the complicated financial transactions are not relevant to the instant dispute, they will only be discussed generally.  The transcript for Day 1 of the trial is found at Docket No. 284 ("I:___"), for the morning of Day 2 it is found at Docket No. 287 ("IIA:___"), and for the afternoon of Day 2 it is found at Docket No. 282 ("IIP: ___").  Trial exhibits are cited as ("Ex. ___").  The parties submitted Stipulated Facts ("SF") as part of their Joint Pre-Trial Memorandum (Docket No. 270).

been referring to as the "Good Guy Clause."  Section 2 relieves Mr. Armstrong of his Guaranty

obligations if certain conditions are met.

Under the Armstrong Guaranty, White Winston is the Lender, Armstrong RX II GP LLC

("ARXII") is the Borrower, Grant Armstrong is the Guarantor, and QVL's ownership of the Dallas

Pharmacy is the Target.  Section 2 provides as follows:

> **Section 2.   Limitation.**  Provided that the terms and conditions set forth below in this Section 2 are satisfied, as reasonably determined in good faith by the Lender, the Lender agrees to fully release Guarantor from the Notes, the Loan Agreement, the other Loan Documents and each other document, agreement or instrument delivered pursuant to any of them under which they arise (the "***Transaction Documents***"), and refrain from instituting legal proceedings to enforce the terms and conditions thereof:
>
> (a)   The Guarantor fully cooperates with the Lender in turning over to the Lender all of the Guarantor's right, title and interest in the outstanding ownership interest in the Borrower and the Target, and in causing the Borrower to turn over all of its assets – including all the Borrower's right, title and interest in the outstanding partnership interests of the Target – and in so doing assists the Lender, without compensation, as necessary to maximize the value of such assets in liquidation or sale, including, without limitation, the completion of any tasks necessary to complete the transition of the Borrower's business activities to any successor owner thereof and the formulation, development, testing, application, and marketing of any products under design or development by the Borrower.
>
> (b)   The Guarantor takes no action to assert or assist any third party in asserting that he or any third party has ownership, license or other rights to the know-how and other property or products of the Borrower, except as provided by the Borrower for fair value on an arms' length basis under reasonable commercial terms and conditions, whether such rights are created before or after the date of this Agreement.
>
> (c)   The Guarantor does not file or otherwise seek protection from creditors under federal or state bankruptcy or insolvency laws, and the Guarantor does not cause or permit ARXII or the Target to seek protection from creditors under federal or state bankruptcy or insolvency laws.
>
> (d)   The Guarantor does not cause or permit ARXII or the Target to fail to pay any tax or municipal obligation when due; provided that the foregoing shall

[5]

> not prevent ARXII or the Target from contesting in good faith any tax or
> assessment so long as adequate reserves for payment of the same have
> been made and verified to the Lender.
>
> The Guarantor shall be fully released and discharged from his obligations under
> this Guaranty and the other Transaction Documents upon his satisfaction of his
> obligations under this Section 2.

(Ex. 7).[4]

Mr. Enright represented White Winston in connection with the acquisitions of the Plano

and Dallas Pharmacies.  (I:27-28).

On September 2, 2014, Mr. Armstrong and AGP refinanced the debt owed to White

Winston in connection with the Plano Acquisition.  (SF ¶ 3).  Thus, while Mr. Armstrong

continued to own and operate the Plano Pharmacy, White Winston no longer had any interest

in the operation or assets of the Plano Pharmacy.  (SJ Dec. at 8).  Mr. Armstrong worked as the

pharmacist-in-charge ("PIC") of the Plano Pharmacy.  (I:26).  Shortly after this buyout of WW,

White Winston increased the revolving line of credit from $500,000 to $750,000 for the Dallas

Pharmacy.  (SJ Dec. at 9; SF ¶¶ 15-17).

The Plano Pharmacy was a successful enterprise.  The Dallas Pharmacy, however, was

struggling from the outset.  (I:39).  The principal causes of the Dallas Pharmacy's financial

difficulties were the heavy debt burden it owed White Winston and the problems it had

purchasing inventory from its supplier, AmerisourceBergen ("Amerisource" or "ABC").  (I:39,

47).  The Armstrong Parties assert that the inventory problems stemmed from QVL's

outstanding debt obligations to Amerisource, as a result of which Amerisource put the Dallas

---

[4] There is no contention that Mr. Armstrong breached any obligation other than the cooperation clause
found in § 2(a), so the other potential grounds for default will not be discussed herein.

Pharmacy on very strict credit terms.  This complicated Mr. Armstrong's ability to get prescription inventory to fill on credit and resulted in inventory shortages.  Thus, the Dallas Pharmacy needed to wait to receive the customers' payment or insurance reimbursement before being able to order the drugs needed.  (See SJ Dec. at 9-10; I:39-41).  While the cause of the problems with Amerisource is in some dispute, the fact that the credit limits imposed by Amerisource interfered with the Dallas Pharmacy's ability to do business is undisputed.

In or around mid-2015, AGP II failed to make the required debt service payments pursuant to the Dallas Loan Agreement.  (SJ Dec. at 10).  As detailed more fully below, on October 2, 2015, White Winston's counsel sent a written Notice of Default to the borrower, Armstrong RX II GP LLC, referencing the Dallas Loan Agreement among the borrower, Mr. Armstrong, and WW as the lender.  (Ex. 21).

By letter dated December 8, 2015, Mr. Armstrong notified WW that he was transferring all rights and interests to the assets of the Dallas Pharmacy to White Winston, as contemplated by the Good Guy Clause of the Armstrong Guaranty.  (SJ Dec. at 10; Ex. 37).  On the same date the Armstrong Parties commenced litigation in Texas State Court seeking, in a one-count complaint, a declaratory judgment as to whether Mr. Armstrong was released under the Armstrong Guaranty.  (SF ¶ 23; Ex. 26).  Shortly thereafter Mr. Armstrong closed the Dallas Pharmacy.  (SJ Dec. at 11).

By letter dated December 11, 2015, WW asserted that the Armstrong Parties did not have the right to turn over ownership of the Dallas Pharmacy to White Winston, and rejected the idea that White Winston was in any way responsible for the Armstrong Parties' liabilities. (SF ¶ 24; Ex. 24).

[7]

It is White Winston's contention that Mr. Armstrong just "threw the keys" at WW and did not assist in the orderly closure or transition of the Dallas Pharmacy. According to WW, the Armstrong parties were not authorized to turn over the Pharmacy until WW had "sought to foreclose on the loan and sought satisfaction of the Borrower's obligations from the Guarantors." (Ex. 24). Thus, White Winston contends that it reasonably concluded in good faith that Mr. Armstrong was not entitled to the benefit of the "Good Guy" clause and that he remains liable for the full amount of the debt, which is now above $5 million.

It is the Armstrong Parties' contention that they pleaded for assistance for many, many months before closing the Pharmacy. On a number of occasions, Mr. Armstrong informed WW that the Pharmacy was failing, and that without structural changes in the debt owed to WW and its ability to get inventory, it could not continue. He also repeatedly asked for advice as to how to save the Dallas Pharmacy, and offered to participate in an orderly transition. However, White Winston refused to take any productive steps. Instead, it just continued to require Mr. Armstrong to keep running the Dallas Pharmacy while running up more debt, and then complaining about the amount of debt. Moreover, WW never requested that the Armstrong Parties assist in closing or transitioning the Pharmacy or provided any constructive advice.

The evidence supports the Armstrong Parties' version of events. White Winston was faced with a bad financial investment. It was apparent through the testimony of Mr. Enright, that WW wanted Mr. Armstrong to invest substantial amounts of his own money into the Pharmacy if he could not attract other investors. Despite Mr. Armstrong's best efforts, attempts to attract other investors were unsuccessful, and Mr. Armstrong was not obligated to invest his own funds into the Dallas Pharmacy. The evidence before the court leads to the

conclusion that White Winston believed that it could hold Mr. Armstrong personally liable on the debt and assumed that this would force him to invest his own funds.  (See IIP:19 "There was nothing that would have precluded Grant Armstrong from writing a check to put money into this business.").

By refusing to participate in or propose any actions which could salvage the Dallas Pharmacy, and refusing to even consider accepting the Armstrong Parties' offer to transfer the ownership of the Pharmacy or assist in closing the Pharmacy, or addressing the financial crisis in any constructive manner, White Winston completely vitiated the Good Guy Clause of the Armstrong Guaranty.

Assuming, without deciding, that WW needed to take steps before the Good Guy Clause became operative, such as foreclosing on the loan, White Winston failed to do so.  Instead, it left the Armstrong Parties in limbo, and destroyed the value of the Good Guy Clause.  The Armstrong Parties were, and remained, willing to assist WW in any way as required by the Armstrong Guaranty.  By its conduct, WW breached the implied covenant of good faith and fair dealing as found in the Limited Guaranty.

## The Evidence

Mr. Armstrong is a pharmacist by training.  He had worked as a pharmacy manager for QVL, a mall pharmacy chain, and then worked in QVL corporate as a corporate pharmacist. (I:23-25).  In January 2014, QVL was selling its pharmacies, including Plano where Mr. Armstrong was working as a manager.  (I:25-26).  Mr. Armstrong decided to purchase Plano. This was his first business acquisition.  He worked at Plano as the pharmacist-in-charge and the

owner after the acquisition.  (I:25-27).  Plano was a retail pharmacy that specializes in pain

management.  White Winston financed the Plano purchase.  (Id.).

In May 2014, the opportunity arose for Mr. Armstrong to purchase the Dallas location.

(I:27-28).  He thought it made sense to expand.  Originally, Mr. Armstrong believed that he

would have a partner in the acquisition, but that arrangement never materialized.

Nevertheless, he decided to go forward with the transaction because of the limitation of

liability found in the Good Guy Clause, which reduced his risk.  (Id.).

White Winston financed the purchase of the Dallas Pharmacy.  WW loaned the

Armstrong entities $1,000,000 to purchase the pharmacy, and provided a $500,000 line of

credit.  The line of credit was drawn on almost immediately due to acquisition costs.  (I:28; see

Ex. 8, 9).

The Dallas Pharmacy was also a retail pharmacy that specialized in pain management.

(I:36-37).  It was located in an urban area in a small shopping center.  (I:36).  The Plano and

Dallas pharmacies are approximately 30 minutes driving distance apart.  (I:39, 164).  I do not

find credible White Winston's argument that the two pharmacies were head-to-head

competitors in the same market, or that Mr. Armstrong wanted Dallas to fail to increase the

profitability of Plano.  (See IIP:15-16).  Rather, I find that all parties believed that there was

more than enough room in the market for both pharmacies to operate profitably.

Charmaine Gibson was hired as the pharmacist-in-charge of the Dallas Pharmacy.  (I:37).

Manny Anzaldua was hired as a pharmacy relationship manager to visit doctors to try and

promote Dallas as a pain management pharmacy.  (I:41-42).  Mr. Anzaldua had worked with Mr.

Armstrong at QVL.  (I:42).  Stephen Cox was also hired as an accountant for the Pharmacy.
(I:46)  He was previously the CFO of QVL.  (Id.).

The Dallas Pharmacy began having financial difficulties almost immediately after the
acquisition.  (I:39)  The primary stressors were problems with Amerisource and the substantial
debt to White Winston.

With respect to the debt to White Winston, it became necessary to increase the line of
credit to $750,000, and White Winston advanced Dallas even more than that.  However, WW
never forgave any of the debt.  While it deferred payments on occasion, it included the interest,
and, later on, attorneys' fees, in the debt.  (Ex. 28; IIA:82-83; IIP:23-24).

With respect to Amerisource, it is undisputed that Amerisource required payment for
inventory much sooner than industry standard, as a result of which Dallas was supposed to pay
for inventory before it received insurance payments.  Since Dallas often did not have the cash
for inventory, it could not make sales.  The short payment terms were originally due to QVL's
debt to Amerisource, which the Armstrong Parties assumed.  (I:39-41).  There is a disagreement
between the parties as to whether Mr. Armstrong knew about this obligation before purchasing
Dallas, and whether Mr. Armstrong paid off $200,000 of the debt with his personal funds.  (See
I:39-41, 86, 136-38; IIP:29-30).  Those issues do not need to be resolved.  It is undisputed that
Amerisource's payment terms were a substantial financial stress on the Dallas Pharmacy, and
that this was known to White Winston.

Not long after the acquisition of the Dallas Pharmacy, Mr. Armstrong began looking for
physician investors.  The original plan was to seek investors for both Plano and Dallas, but Plano
was taken off the table after Mr. Armstrong was able to refinance the White Winston loan.

(I:43-44, 153).  Mr. Armstrong worked with Mr. Enright to put together an investment plan for

the physicians.  Mr. Armstrong introduced Mr. Enright to various physicians, but Mr. Enright

was the one with the financial background, and he was supposed to meet with the physicians to

sell the proposal.  (I:44).

As described below, Mr. Enright consistently urged Mr. Armstrong to find physician

investors to solve the Dallas Pharmacy's financial crisis.  Physician investors and Mr.

Armstrong's investment of his own funds were the only suggestions White Winston made to

address the Dallas Pharmacy's ever worsening financial condition.  The evidence before this

court is that Mr. Armstrong did everything he could to get physician investors, but his efforts

did not come to fruition.  There is no evidence before this court that Mr. Armstrong failed to

cooperate with White Winston, or in any way obstructed the efforts to obtain physician

investors.

Messrs, Armstrong and Enright were in frequent communication, sometimes more than

once a week.  (I:44).  Mr. Enright was kept fully apprised of the Dallas Pharmacy's financial

condition.

Dallas' financial condition was serious by January 2015.  Credit holds ordered by

Amerisource were starving the store of inventory, and without inventory Dallas could not fill

prescriptions.  (I:46).  The debt burden to WW was also unsustainable.  While WW was willing

to accrue debt, it was not willing to "wipe it out."  (Ex. 50 at 4741).[5]  Mr. Armstrong however

pleaded during January, "[m]aybe we can reduce the interest rate or something.  I am afraid

---

[5] Unless otherwise indicated, exhibit page numbers are to the Bates stamp numbers found on Exhibits at the bottom of the page.

that even accruing the debt, it will be soo (sic) much that it won't be able to get out from under it."  (Id.).  Stephen Cox, the accountant, was also advising WW about the need to restructure the debt at this time as well.  (Ex. 51 at 1121-22).  Nevertheless, as detailed herein, no structural changes to the debt were ever considered by WW.

On February 2, 2015, Mr. Armstrong sent Mr. Enright an email asking if he needed to get his lawyer involved since he had not received a response about his request that WW make a payment that was due.  (Ex. 56 at 13808).  Mr. Enright responded "Grant[,] I am going to tell you once, and only once, don't threaten me.  I am busy in the midst of another matter and Neither I nor white Winston are QVL."  (Ex. 56 at 13807).  The communication exemplifies White Winston's response to numerous requests for assistance from Mr. Armstrong.  Any attempt to formally address the Pharmacy's financial crisis was rebuffed.

The issue whether White Winston was obligated to make accommodations on the loans is not before the court and nothing herein should be construed as requiring WW to increase its investment in the Dallas Pharmacy.  However, White Winston could not destroy the benefit to Mr. Armstrong of the Limited Guaranty it had agreed to accept by stringing the Armstrong Parties along.

On occasions when the Dallas Pharmacy did not have inventory, Ms. Gibson contacted customers to see if they wanted their prescriptions filled at Plano.  This court rejects White Winston's contention that sales were "diverted" to Plano.  I find that Dallas prescriptions were only filled at Plano if Dallas did not have inventory and could not make the sale, and if the customer approved.  If Plano had not filled the prescriptions, they would have had to have been

filled at another pharmacy.  They would not and could not have been filled at Dallas.  (See Anzaldua Test. at 45, 80-81; IIA:52-54).

By March 2015, the situation at the Dallas Pharmacy was critical.  Email exchanges between Mr. Armstrong and Mr. Enright during the period of March 25-26, 2015, exemplify the tone and substance of the communications.  (See Ex. 29).  Mr. Armstrong made it clear that the situation could not wait for any physician investors, even if they were to come on board in the next few months.  He further made it clear that WW's intervention with Amerisource was critical.  (Ex. 29 at 4344-45). Mr. Armstrong proposed ways to reduce the debt to WW.  (Ex. 29 at 4343).  Mr. Armstrong asked Mr. Enright, "I really want to know what your plan is" and said "I know you are busy, but we have to figure this out."  (Ex. 29 at 4344).  Mr. Armstrong asked for advice, and cautioned that "the longer we drag it out, the worse it will get."  (Id.).  Mr. Enright's response was to caution Mr. Armstrong that he was "already well over the LOC" (line of credit) and that he would get back to him "ASAP."  (Ex. 29 at 4343).

These types of communications continued.  For example, in an email exchange from May 20-26, 2015 between Mr. Armstrong and Mr. Enright, Mr. Armstrong emphasized the financial crisis caused by the debt burden and problems with Amerisource, and stated that "[w]e need to figure out the long term plan."  (Ex. 30 at 2161).  Mr. Enright's response was that "[t]he Long term plan is getting these MD's in" and that he would be willing to "discuss a restructure of everything when we get the MD[s] in."  (Ex. 30 at 2159-60).  Mr. Enright further cautioned that "[i]f we don't start getting [the physicians] on-board you are going to have a real issue."  (Ex. 30 at 2158-59).  Mr. Armstrong continued to work on getting physician investors, (see, e.g., id. at 2158), but they never materialized.  He further continued to express his concern

[14]

that even after physician investments, the interest charges were too much for the store to handle.  (Ex. 30 at 2160).

The financial difficulties of Dallas, the problems with Amerisource and the attempts at getting physician investors continued to be a topic of discussion for months without break.  In June, 2015, Mr. Enright acknowledged that a "solution" was needed "pretty quickly" and urged Mr. Armstrong to "really follow-up on these MD[s]."  (Ex. 31 at 3845).

White Winston was party to an inter-creditor agreement with Amerisource, in which WW was the senior creditor and Amerisource the junior creditor with respect to amounts owed by the Armstrong entities.  (IIP:33-34; see Ex. 52).  The Plano Pharmacy was not in default to Amerisource, but the Dallas Pharmacy was.  (See Ex. 52 at 2816-17).  As a result of its arrangement with Amerisource, Mr. Enright felt that he could put some pressure on Amerisource.  (IIP:34).  Unfortunately, however, White Winston did not reach a resolution with Amerisource.

On July 7, 2015, Amerisource sent a demand for payment to Mr. Enright.  (Ex. 52 at 2822).  In response, Mr. Enright asserted that WW had no obligation to fund the debt but cautioned Amerisource that WW could go forward with its right as senior creditor to liquidate.  (Ex. 52 at 2821).  He also suggested that they "try to work cooperatively."  (Id.).  It was White Winston's position that "a global longer term agreement" was needed with Amerisource before WW would "agree to fund any additional amounts."  (Ex. 52 at 2820).  Amerisource proposed a solution, but it was rejected by White Winston on July 10, 2015.  (Ex. 52 at 2815).  In an email on that date from Mr. Enright to Amerisource, Mr. Enright equated the situation to "a game of chicken between the two creditors" with there being "little [Armstrong] can do."  (Id.).  Thus,

Mr. Enright cautioned, it "[s]mells like a recipe for a chapter 11 filing." (Id.).  Some

conversations continued, and Amerisource proposed another deal in July 2015.  While it was

being considered, on July 23, 2015, Mr. Enright urged Amerisource to allow Mr. Armstrong to

purchase inventory COD, cautioning "I fear the patient may be dead by the time we get it the

blood transfusion." (Ex. 32 at 15034).  Amerisource then submitted a formal written proposal

on August 12, 2015, but WW never responded, and no deal with Amerisource was ever

implemented.  (I:61-63; see Ex. 36 at 3125).  When Amerisource subsequently threatened to

put the Plano Pharmacy on a payment plan as well, Mr. Armstrong paid the Dallas Pharmacy's

$200,000 debt to Amerisource.  (I:86).

By August 2015, the situation in Dallas had reached crisis proportions.  As Mr.

Armstrong wrote to Mr. Enright:

> I think it is time to have a discussion about the state of Dallas.  It has not received
> inventory for over a month.  The funds in the bank accounts are at zero.  It is not
> going to make payroll next week, let alone pay the other necessary bills.  I don't
> know how to keep it open until an investor writes a check.  Even then, with the
> current deal in place, it won't make a difference.  The store can't support the
> interest and fees that are imposed against it.  We need to go to the drawing board
> and come up with a game plan.  I don't know if that is going to involve the good
> guy clause and selling out, or a restructure to allow the store to come back.  Maybe
> we will have to think outside the box and consider other options.  Please think
> about things and let's discuss soon.

(Ex. 33 at 3591).  Instead of addressing the critical issues, and proposing any constructive

solutions, or even instructing Mr. Armstrong on how to go forward with an orderly sale or

liquidation of the Pharmacy, Mr. Enright wrote back on August 13, 2015:

> Well, I will be back in a week but I am not sure this is a situation where you simply
> abandon ship.  I expect you to deliver the docs and other and make this work.
> Right now we are the only ones out [o]f pocket and, as I see it, Plano is a current
> beneficiary.

[16]

Let's plants (sic) meet when we get back and I expect that you will have heather [a potential investor] done and I will meet with the MDs.

We will talk next week.

(Id.).  This response epitomizes White Winston's conscious decision to deprive Mr. Armstrong of the benefits of the Good Guy Clause in the Limited Guaranty, and to seek to impose obligations on Mr. Armstrong to salvage a bad financial investment beyond those Mr. Armstrong had agreed to undertake.

The conversations continued.  In September 2015, there was discussion about payroll not being met.  (See Ex. 41).  On September 15, 2015, Mr. Armstrong indicated that he had been paying some expenses out of pocket and proposed splitting payroll and other inventory expenses otherwise "our conversation moves from investment to sell out."  (Ex. 41 at 3370).  This was rejected out of hand by Mr. Enright ("Thanks but not interested") who accused Mr. Armstrong of racking up more payroll without any intention of paying.  (Ex. 41 at 3369).  Mr. Enright wrote, "[w]e expect that you will fund 100% of the payroll liability as the sole officer and director.  After you do that we can have a conversation of what we are willing or not willing to do vis a vis the debt." (Id.).  Mr. Enright threatened further:

If you do not cover your liabilities we will be forced to seek all rights and remedies under law with respect to the debt and your guaranty.

As I said, you are at the point where this can move forward, it seems foolish that you plan to walk away for $9,000 that you are liable for by Texas statute in any event.

(Id.).  This is additional evidence that White Winston was aware of, but nevertheless refused to entertain, alternatives that would allow Mr. Armstrong to have the benefit of the Good Guy Clause.  Instead, White Winston insisted that Mr. Armstrong contribute funds to the business

[17]

that he was not otherwise obligated to invest or risk incurring personal liability for payroll under state law.

Mr. Armstrong did, in fact, make the payroll payment and paid for some of the outstanding inventory. (Ex. 34). Nevertheless, Mr. Armstrong wrote to Mr. Enright on September 16, 2015, "I can not (sic) cover the next payroll (or half of it) so we will have to discuss next steps." (Ex. 34 at 3357). He further urged Mr. Enright to put information together for potential investors. (Id.). The two men continued to work on proposals for physician investments, with Mr. Enright being responsible for finalizing the proposals. (See Ex. 35 at 3246). By October 1, 2015, Mr. Armstrong was saying that the proposals needed to get out quickly because bills were piling up at Dallas, including rent that was 3 months overdue, and he did not have the funds to pay them. (Ex. 35 at 3246). He further emphasized that the debt structure needed to be modified. (Id. ("Without settlement of the TSA [which governed the purchase of inventory], I can't put more funds into Dallas.")). Mr. Armstrong again ended with "[p]lease advise me on how you wish to proceed" but no substantive suggestions were forthcoming. (Id.).

Instead, on October 2, 2015, White Winston's counsel, Benjamin Hron, sent Armstrong RX II, L.P. a notice of default and demand for payment. (Ex. 21). Therein, WW advised that default under the Loan Agreements had occurred due to the Borrower's failure to make payments when due and "[t]he occurrence of a material adverse change in the business, operations and condition of the Borrower that impairs the Borrower's ability to meet its payment obligations under the Loan Documents." (Ex. 21 at 9566).

[18]

At trial, WW made much of the fact that the notice of default did not accelerate the loan and that it did not otherwise take steps to collect on the loan.  (See I:148-49).   Apparently, WW believes that Mr. Armstrong should have understood that this was just some sort of technical notice and was of no consequence.  (Id.).  However, the notice of default expressly states the "[t]he Lender hereby reserves its right to pursue all remedies provided for under the Loan Documents or at law or in equity *without further notice to the Borrower*, except where such notice is specifically required."  (Ex. 21 at 9566, emphasis added).  Moreover, White Winston's refusal to take steps in furtherance of the Borrower's default is conduct which contributed to the evisceration of the Good Guy clause – White Winston gave the Armstrong Entities nothing to cooperate with, and then sought to hold Mr. Armstrong liable due to a lack of cooperation.  It was around this time that Mr. Armstrong sought legal advice on how best to proceed.  (I:149).

Meanwhile, the situation with Amerisource continued to deteriorate, with White Winston refusing to consider any payment on the debt unless there was an investor in the Pharmacy.  (See, e.g., Ex. 36 at 3123-3137).  On October 5, 2015, Amerisource wrote to Mr. Armstrong:

> Grant – with ABC [Amerisource] not receiving a response for the workouts to show progress which was sent on 08/12 nor any payments on the Texas RX Phcy II account since 07/24 we have no choice but to lower our exposure with your accounts. Please note we will be putting your Plano account on prepay x2 effective immediately.  Your terms will be prepay so if you'd like to order product please send a down stroke of $X amount of which you will be entitled to ½ of the amount of the payment towards purchases . . . i.e. today's payment of $40K submitted, $20K will go towards available purchases and $20K will go towards your outstanding balance.

(Ex. 36 at 3122).  When Mr. Armstrong sent this letter to Mr. Enright, his response was "Boy, he really is sticking his neck out on that one.  I don't know what you have signed with them but

you need to have a very stern legal letter sent to them." (Ex. 36 at 3121). Obviously, this response did not help resolve the credit problem with Amerisource that had been an issue since the Armstrong Entities had acquired Dallas. Mr. Armstrong eventually brought the Amerisource account current by paying $200,000 so that Plano could continue to purchase inventory. (I:86).

Problems continued to mount. On October 15, 2015, the landlord of the Dallas Pharmacy sent, by certified mail, a "Notice of Default, Demand for Payment and Notice of Intent to Exercise Remedies Under Lease." (Ex. 42 at 3026). Mr. Armstrong promptly sent it to Mr. Enright. (Ex. 42 at 3025). The record does not reflect his response.

The situation continued to deteriorate at the Dallas Pharmacy. There were a number of overdrafts which were sent to White Winston from the bank for payment and White Winston was apparently kept fully aware of the problems. (See, e.g., Ex. 43 & 44). Similarly, Mr. Armstrong continued to work to identify potential investors in the Pharmacy but, as Mr. Enright knew, those efforts were not successful. While White Winston complains that the Armstrong Parties continued to incur debts, it took no steps to work with Mr. Armstrong to come up with a plan to sell or close the Pharmacy, electing instead to continue to keep Mr. Armstrong in limbo.

On December 8, 2015, Mr. Armstrong's counsel sent a letter by overnight mail to WW (Mr. Enright) on behalf of Mr. Armstrong pursuant to Section 2 of the Armstrong Guaranty. (Ex. 37). That letter states in relevant part:

> Pursuant to Section 2 of the Limited Guaranty, Armstrong agrees to fully cooperate with the Lender in turning over to the Lender all of Armstrong's right, title and interest in the outstanding ownership interest in the Borrower and the Limited Partnership, and in causing the Borrower to turn over all of its assets, including all the Borrower's right, title and interest in the outstanding partnership interests of the Limited Partnership – and in so doing assist the Lender, without compensation, as necessary to maximize the value of such assets in liquidation or sale, including, without limitation, the completion of any tasks necessary to

complete the transition of the Borrower's business activities to any successor owner thereof and the formulation, development, testing, application, and marketing of any products under design or development by the Borrower.
    . . . .

Please be advised that Armstrong is willing to take such additional actions and execute such additional documents as Lender may reasonably request to effect the transactions contemplated by Section 2 of the Limited Guaranty. If there are any other such actions that Lender reasonably believes should be taken, or other documents that Lender reasonably believes should be executed, please advise us[.] Armstrong stands ready and willing to take such additional steps as may be reasonably necessary under Section 2.

In furtherance of Section 2 of the Limited Guaranty, Armstrong and Borrower have executed and are delivering to you for execution by Lender the enclosed Assignment of Membership Interest in Armstrong RX II GP LLC, Assignment of Class A Common Limited Partnership Interest in Armstrong RX II, LP, Bill of Sale, and Release (collectively "the Closing Documents").

Armstrong demands that Lender immediately execute and deliver to the undersigned each of the Closing Documents to effect the transactions contemplated under Section 2 of the Limited Guaranty.

This letter does not purport to set forth an exhaustive statement of all facts relevant to the issues discussed therein, not shall any statement made in this letter to be construed as a waiver of any right or remedy presently available to my client, all such rights, remedies, and claims being hereby expressly reserved.

(Ex. 37 at 12534-35).

On December 8, 2015, Armstrong RX GP LLC and Mr. Armstrong commenced an action in Texas state court against White Winston. (Ex. 26 at CMECF page 8 of 17). In a one count complaint, the plaintiffs sought a declaratory judgment that Mr. Armstrong "has complied with and fulfilled all of his obligations under the Armstrong Release clause, so that Armstrong is fully released and discharged from his obligations under the Armstrong Guaranty[.]" (Ex. 26 at CMECF page 13 of 17).[6]

---

[6] The complaint also sought a declaration that AGP had complied with its obligations under a Guaranty. That is no longer at issue and will not be addressed herein.

White Winston eventually removed the case to federal court in Texas and then the matter was transferred to this court.  As detailed in the SJ Decision, matters escalated dramatically and numerous other claims, cross-claims and third party claims were asserted.

It is White Winston's contention that the letter of December 8, 2015, coupled with the initiation of the lawsuit, constituted the Armstrong Parties just "throwing the keys" at White Winston.  (See, e.g, IIP:13, 14, 16, 39, 49, 62, 67).

On December 10, 2015, the Armstrong Parties' counsel emailed a letter to White Winston's counsel requesting that White Winston release funds from the Dallas Pharmacy's account to pay $9,615.38 due for payroll, and reiterating that:

> The Armstrong Parties desire to fully cooperate with [WW] in order to maximize the value of the assets, and failure to remit the required payroll may result in the PIC terminating her employment with the Limited Partnership.  Pursuant to applicable law, the failure of a pharmacy to maintain a full time PIC will require the pharmacy to cease dispensing any further prescription drugs.

> The Armstrong Parties reiterate that they are willing to take all such necessary actions as reasonably necessary to maximize the value of the assets and stand ready to act as reasonably directed by [WW].  Due to the time sensitivity of this matter, we will follow-up with this correspondence with a telephone call shortly.

(Ex. 53 at 12862).

The Armstrong Parties' counsel emailed a copy of the complaint, along with a letter to White Winston's counsel, on December 11, 2015.  (Ex. 45).  Therein counsel referred to a telephone conversation in which WW's counsel had indicated that there were not enough funds to pay the physician-in-charge and that White Winston did not intend to pay the wages. As the Armstrong Parties' counsel wrote:

> My clients desire to continue to fully cooperate with [WW] in order to maximize the value of the assets.  However, please be advised that as a result of your clients' failure to remit the necessary wages to the PIC, we anticipate that the PIC will

[22]

> voluntarily cease employment with the Limited Partnership today or shortly
> thereafter. Our clients inform us that, pursuant to applicable law, the departure
> of the PIC will require the immediate closure of the pharmacy. Please provide us
> with the desired instructions to handle employee communications concerning
> that potential closure and any other matters concerning the Limited Partnership.
> In addition, provided that funds continue to be unavailable through [WW] and the
> closure of the pharmacy appears imminent, please provide us with instructions on
> how you desire us to handle further operations of the pharmacy as well as the
> continued bills and expenses being incurred by AGRP and the Limited Partnership.
> My clients reiterate that they are willing to take all such necessary actions as
> reasonably necessary to maximize the value of the assets and stand ready to act
> as reasonably directed by [WW].

(Ex. 45 at 12621).

It is undisputed that WW never requested anything of Mr. Armstrong or any of the

Armstrong Entities. (IIA:56-59). I find that Mr. Armstrong and the Armstrong Entities would

have cooperated with White Winston. However, White Winston never proposed any plan or

even requested that Mr. Armstrong defer closing the Pharmacy with a promise to try and work

out a financial arrangement or orderly closure of the Pharmacy.

On December 11, 2015, the Armstrong Parties sent another letter to WW's counsel

stating in part as follows:

> Despite filing the petition, please be aware that the petition does not include any
> causes of actions for damages and merely asks the court for a declaratory
> judgment regarding the interpretation of the Limited Guaranties. Furthermore,
> as discussed, pursuant to the applicable documentation between our clients and
> pursuant to your interpretation of the mechanics of the Limited Guaranty, my
> clients are prepared to follow your proposed procedures and are amen[]able to
> closing the pharmacy while continuing to take all necessary actions to turn over
> the assets to maximize their value including assisting with any potential sale to a
> third party. Upon execution of the full release from the Limited Guaranties, Notes,
> Loan Agreement and other applicable transaction documents, my clients would
> promptly dismiss the lawsuit. Please contact me if this warrants further
> discussion.

(Ex. 54 at 12860).

[23]

While the plaintiffs requested a release before they would dismiss the lawsuit, the court

find that the Armstrong Parties were willing to participate in any plan moving forward without

preconditions.

On December 11, 2015, White Winston's counsel emailed a letter to the Armstrong

Parties' counsel.  Therein he wrote:

> White Winston rejects your assertion that the Guarantors have the right to turn over ownership of the Borrower in satisfaction of their obligations under the documents evidencing the credit facility (the "Loan Documents") before White Winston has sought to foreclose on the loan and sought satisfaction of the Borrower's obligations from the Guarantors;
>
> White Winston rejects your assertion that White Winston is responsible in any way for any liabilities of the Lender, including, without limitation, any wages owing to the PIC;
>
> Your clients' attempts to assign to White Winston responsibility for the obligations of the Lender, and the filing of a motion for declaratory judgment in connection therewith, constitute a violation of the Guarantor's obligations under Section 2 of the guaranties, and therefore vitiate the limitations on the Guarantor's obligations thereunder.
>
> Filing for declaratory judgment in Dallas County, Texas, is in direct contravention to the choice of venue provisions in the Loan Documents.
>
> You are hereby notified that White Winston deems the Guarantors to be in breach of their obligations under their respective guaranties and reserves the right to pursue all remedies available to it, including seeking full satisfaction of the Borrower's obligations under the Loan Documents.

(Ex. 24).

Around this time, Mr. Armstrong had located a pharmacist, Aemad, who might be

interested in purchasing the Pharmacy and so informed Mr. Enright.  (Ex. 38).  On December 11,

2015, Mr. Enright wrote to Mr. Armstrong that he would need to address any sale, since Mr.

Armstrong was the owner and operator of the Pharmacy, but stated that he would be happy

"to speak to Aemad regarding the assumption of the existing debt due and payable to White Winston regarding the location."  (Id.)

Although the details are not clear, it seems that Aemad did purchase some fixtures for $20,000.  (IIP:45-46).  The record is unclear as to what happened to the pharmaceuticals. (IIA:41-42).

White Winston emphasizes how complicated it is to actually transfer the business of a Pharmacy to a new owner, and points to the complexity of transactions in a highly regulated industry dealing with pharmaceuticals as evidence that the plaintiffs could not simply "turn over" the Pharmacy.  The Armstrong Parties do not disagree.  However, they were unable to get White Winston to the table to discuss any possible course of action.

Ms. Gibson left the Dallas pharmacy on December 14, 2015.  (IIA:30-31).

On December 16, 2015, Mr. Armstrong canceled the insurance on the Dallas Pharmacy "due to the location closing."  (Ex. 49).

According to Mr. Enright, the problem was that Mr. Armstrong had not given him advance notice of the intention to send the letter of December 8, 2015.  As Mr. Enright testified,

> [T]o the extent that Grant had come to us and said, I can no longer do this, I can no longer operate this business under the way we've been attempting to operate it, I need to turn over the assets and help you any way I can in order to maximize your recovery on this asset, he could have come to us.

(IIP:52).

This court finds that Mr. Armstrong did go to Mr. Enright on numerous occasions saying he could "no longer operate this business" and asking for help, but that Mr. Enright disregarded

these pleas.  This court further finds that it would have been futile for Mr. Armstrong to repeat

the plea again in December 2015, and that he was forced to take more drastic action.

### III.  RULINGS OF LAW

"Under Massachusetts law, a covenant of good faith and fair dealing is implied in every

contract."  Hopkinton Friendly Serv., Inc. v. Global Cos. LLC, 384 F. Supp. 3d 179, 188 (D. Mass.

2019) (quoting Shaulis v. Nordstrom Inc., 120 F. Supp. 3d 40, 54 (D. Mass. 2015) (additional

citation omitted)).  "The covenant provides that the parties will deal honestly and in good faith

in both the performance and enforcement of the terms of their contract."  Id. (additional

citation omitted).

"The covenant of good faith and fair dealing . . . provides 'that neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract.'"  A.L. Prime Energy Consultant, Inc. v. MBTA, 479 Mass. 419,

434, 95 N.E.3d 547, 560 (2018) (quoting Weiler v. PorfolioScope, Inc., 469 Mass. 75, 82, 12

N.E.3d 354, 361-62 (2014) (citation omitted)); Druker v. Roland Wm. Jutras Assocs., 370 Mass.

383, 385, 348 N.E.2d 763, 765 (1976) (and cases cited).  See also Clinical Tech., Inc. v. Covidien

Sales, LLC, 192 F. Supp. 3d 223, 237 (D. Mass. 2016) (quoting Young v. Wells Fargo Bank, N.A.,

717 F.3d 224, 237-38 (1st Cir. 2013) (additional citation omitted)).  The purpose of the implied

covenant of good faith and fair dealing is to ensure "that the objectives of the contract may be

realized."  Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, 822 N.E.2d 667, 684 (2005).

"A party may breach the covenant of good faith and fair dealing implicit in every

contract without breaching any express term of that contract."  Massachusetts v. Schering-

Plough Corp., 779 F. Supp. 2d 224, 240 (D. Mass. 2011) (quoting Speakman v. Allmerica Fin. Life

Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005)).  "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."  Speakman, 367 F. Supp. 2d at 132.

"'[T]he requirement of good-faith performance ultimately is circumscribed by the obligations – the contractual 'fruits' – actually contained in the agreement.'"  Covidien Sales, 192 F. Supp. 3d at 237 (quoting AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001)).  "'As a consequence, the implied covenant cannot create rights and duties not otherwise provided for in the existing contractual relationship, and instead focuses on the manner of performance.'"  Id. (quoting Young, 717 F.3d at 238 (internal quotation marks and citations omitted)).

"The plaintiff bears the burden of presenting evidence to demonstrate a lack of good faith, such as 'a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.'"  Covidien Sales, 192 F. Supp. 3d at 237 (quoting Young, 717 F.3d at 238).  "'Evidence that a party behaved in a manner unreasonable under all the circumstances may indicate a lack of good faith, but the core question remains whether the alleged conduct was motivated by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract.'"  Id. (quoting Young, 717 F.3d at 238 (internal citation omitted)).

As an initial matter, this court rules that the Armstrong Parties did not breach the terms of the Limited Guaranty.  It is undisputed that there was no breach of any obligations found in sections 2(b) and 2(d) of the Armstrong Guaranty.

To the extent that the Good Guy Clause required the Armstrong Parties to cooperate with White Winston, this court finds that the Armstrong Parties did so.  The Armstrong Parties kept WW fully apprised of the situation in the Dallas Pharmacy.  Armstrong actively sought additional physician investors.  Armstrong further worked hard to keep the Dallas Pharmacy open.  The Armstrong Parties agreed to undertake any actions White Winston would have directed to close the Pharmacy or to transfer ownership.  Thus, there was no breach on the part of the Armstrong Parties.

The court finds further that the plaintiff's filing of the declaratory judgment action did not constitute a breach of the Armstrong Guaranty.

White Winston, however, breached the implied covenant of good faith and fair dealing found in the Armstrong Guaranty.  White Winston did not have an unlimited personal guaranty from Mr. Armstrong, although it acted as if it did.

By its actions, White Winston totally destroyed the value of the Limited Guaranty to Mr. Armstrong.  By ignoring his repeated requests for direction and/or assistance, White Winston prevented Mr. Armstrong and the Armstrong Parties from providing any cooperation, as called for by the Good Guy Clause.  The Armstrong Parties stood ready and willing to provide any assistance WW required, but White Winston refused to identify any such assistance.

White Winston contends that it needed to declare the loan in default, and to make a demand on Mr. Armstrong, before he was entitled to attempt to comply with the Good Guy Clause.  No such requirements are apparent in the terms of the Limited Guaranty.  Assuming such requirements existed, however, White Winston's failure to exercise its rights in the Loan Documents destroyed the benefit of the Limited Guaranty to the Armstrong Parties.

[28]

White Winston acted in bad faith.  It acted in its own interest, and with the hope that it could pressure Mr. Armstrong to make a financial investment in the Dallas Pharmacy that he was not obligated to make.

White Winston contends that Mr. Armstrong is liable for the full amount of the debt. White Winston created this liability by eliminating the benefits Mr. Armstrong had contracted to receive under the Armstrong Guaranty.

This court concludes that Mr. Armstrong has no liability to White Winston under the Armstrong Guaranty.

### IV.  <u>ORDER</u>

A declaratory judgment shall enter on Count One of the Third Amended Complaint and Count Five of the Counterclaim Complaint that the Armstrong Parties fully complied with their obligations under the Limited Guaranty.  Mr. Armstrong has no personal liability on the loans from White Winston relating to the Dallas Pharmacy.

Judgment shall enter in favor of the Armstrong Parties on the claims for breach of the implied covenant of good faith and fair dealing found in Count Three of the TAC and Count Two of the Counterclaim Complaint.

By agreement, the amount of damages due White Winston pursuant to the Dallas Pharmacy loan documents is $5,046,874.51 plus legal fees and costs.

By agreement, White Winston has withdrawn its claims for breach of the implied covenant of good faith and fair dealing found in Count Three of the Counterclaim Complaint and Count Four of the Third-Party Complaint.

[29]

By agreement, White Winston has withdrawn its claims for violation of Mass. Gen. Laws ch. 93A found in Count Four of the Counterclaim Complaint and Count Five of the Third-Party Complaint.

The rulings of the court in the Summary Judgment Decision are incorporated herein by reference.

Judgment shall enter accordingly.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[30]